# EXHIBIT B

STATE OF NORTH CAROLINA

COUNTY OF UNION

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV000445-890

|  |  |
|---|---|
| CHRIS COMISKEY and VICTORIA COMISKEY,<br><br>*Plaintiffs,*<br><br>v.<br><br>VILLAGE OF MARVIN, KIM VANDENBERG, and MARVIN CREEK COMMUNITY ASSOCIATION, INC.,<br><br>*Defendants.* | **AMENDED COMPLAINT, MOTION FOR DECLARATORY JUDGMENT, AND MOTION FOR PRELIMINARY INJUNCTION**<br><br>**(Jury Trial Demanded)** |

**PLAINTIFFS** Chris Comiskey ("Mr. Comiskey") and Victoria Comiskey ("Ms. Comiskey") (collectively, "Plaintiffs"), by and through undersigned counsel, hereby amend their Complaint against Defendants Village of Marvin ("VOM"), Kim Vandenberg ("Ms. Vandenberg"), and Marvin Creek Community Association, Inc. (the "HOA") (collectively, "Defendants"), and allege as follows:

1.      Mr. Comiskey is a resident and citizen of Union County, North Carolina.

2.      Ms. Comiskey is a resident and citizen of Union County, North Carolina.

3.      VOM is an incorporated municipality located within Union County, North Carolina.

4.      Upon information and belief, Ms. Vandenberg is a resident and citizen of Union County, North Carolina.

5.      Upon information and belief, Ms. Vandenberg was serving as mayor pro tempore for VOM at all times relative to the matter set forth in this Complaint.

6.      Upon information and belief, the HOA is a non-profit organization incorporated in North Carolina, and which is headquartered in Mecklenburg County, North Carolina.

7.      On February 5, 2025, Ms. Vandenberg and VOM removed this action to the federal district court of the Western District of North Carolina (the "Federal Court").

8.      On February 6, 2025, the Federal Court bifurcated this action and remanded only Plaintiffs' claims for declaratory and injunctive relief.

1

9.      As such, this Amended Complaint only revises Plaintiffs' claims for declaratory and injunctive relief for purposes of litigation in this Court, and seeks to add the HOA as a named defendant.

10.     Upon information and belief, VOM has purchased liability insurance and/or participates in a local government risk pool, and as such VOM has waived any claim as to governmental or sovereign immunity pursuant to N.C. Gen. Stat. § 160A-485(a).

**Plaintiffs' Property Rights**

11.     Plaintiffs, husband and wife, are the joint owners of the real property and home located at 312 Painted Turtle Court, Marvin, North Carolina 28173 (the "Home").

12.     The Home is located within VOM and is part of a subdivision known as Marvin Creek.

13.     The properties within Marvin Creek are subject to certain covenants, conditions, and restrictions (the "CCRs") which are recorded in book 3664 at page 68.

14.     A true and accurate copy of the CCRs is attached hereto as **Exhibit A** and is hereby incorporated by reference.

15.     Under Article III, § 1 of the CCRs, the HOA-owned common land, including the land at issue abutting Plaintiffs' property (the "HOA Private Property") is strictly limited to private community use and cannot be converted for public use.

16.     The CCRs are on file at the Union County Deeds Office, and as such are sealed to Plaintiffs' deed, securing their private property right that no public use can be made on the HOA Private Property.

17.     Plaintiffs' private property right to restrict attempts to make public use take the form of a negative easement ("Plaintiffs' Negative Easement").

18.     Plaintiffs' Negative Easement restricts the development of any part of the HOA Private Property for public access in any manner.

19.     Upon information and belief, the restrictions in the CCRs and Plaintiffs' Negative Easement were known to Defendants at all relevant times.

20.     In or around November 2023, the HOA purported to grant an easement (the "Easement") to VOM which would allow for the public use of HOA Private Property that is subject to Plaintiffs' Negative Easement.

21.     The Easement is for the purpose of constructing a public trail (the "Public Trail Project") through the woods to another pre-existing trail, for the purpose of directly connecting Plaintiffs' Marvin Creek neighborhood to a newly zoned tavern with at least 120 parking spaces.

2

22.    It has never been the nature or character of Marvin Creek to be directly connected to a bar.

23.    In February 2024, Plaintiffs notified Defendants that the CCRs prohibited the HOA from granting the Easement to VOM for public use.

24.    In the months following January 2024, Plaintiffs repeatedly provided Defendants with evidence, including independent legal opinions, that the Easement was illegal and invalid.

**Plaintiffs' Objections and Defendants' Retaliatory Actions**

25.    Subsequent to the notification by Plaintiffs, Ms. Vandenberg publicly represented that no legal challenges to the validity of the Easement were raised in an effort to garner support for the Public Trail Project.

26.    In the months following January 2024, Ms. Vandenberg initiated and continued a pattern of behavior and actions calculated to retaliate against and suppress Plaintiffs' objection to the Easement.

27.    Ms. Vandenberg escalated her efforts to silence Plaintiffs by misusing the Union County Sheriff's Office ("UCSO") to intimidate and discredit Ms. Comiskey for sharing factual crime data.

28.    Upon information and belief, in February 2024, and again in March 2024, Ms. Vandenberg requested that UCSO officers attend public VOM Council meetings in response to Ms. Comiskey's social-media posts highlighting crime patterns near trails.

29.    Ms. Comiskey had, in the weeks prior, accurately presented crime data obtained from Detective Brandon Trull ("Detective Trull"), a UCSO representative, detailing regional break-ins and property crimes tied to wooded trail access.

30.    In her social media posts, Ms. Comiskey included specific details of her conversation with Detective Trull and provided information for neighbors to contact Detective Trull directly.

31.    Ms. Vandenberg and her associates responded by calling upon UCSO officers to appear at public meetings and to rebut and discredit Ms. Comiskey and her factual reporting.

32.    At both meetings, UCSO's statements failed to substantively refute Ms. Comiskey's data but were nonetheless leveraged by Ms. Vandenberg to publicly portray Ms. Comiskey's concerns as alarmist and unfounded.

33. Namely, Defendants successfully cajoled UCSO to falsely state that there is "no evidence" that the criminals who committed break-ins used the wooded trail that Defendants intend to connect to Plaintiffs' property.[1]

34. UCSO Detective Brandon Trull's theory that the wooded trails were most likely used by the perpetrators of the nearby break-ins was supported by substantial evidence.

35. Ms. Vandenberg's misuse of UCSO created a chilling effect upon Plaintiffs' exercise of their free speech rights and was a calculated effort to intimidate Plaintiffs into silence.

36. Plaintiffs, as a result of these actions, endured and continue to endure public ridicule, isolation, and hostility from members of the community who had been misled into believing that Plaintiffs' concerns were unfounded.

37. Ms. Vandenberg's misuse of law enforcement resources for personal and political gain constitutes an abuse of her official position and is an infringement upon Plaintiffs' constitutionally protected rights.

## Collusion between the HOA and Defendants

38. By February 28, 2024, Plaintiffs had mobilized efforts to stop the Public Trail Project and sought the removal of HOA board members who continued to support the Public Trail Project.

39. In support of her mobilization efforts, Ms. Comiskey emailed to Ms. Vandenberg a private list of names (the "Opposition List") of homeowners in Marvin Creek (the "Owners") who also opposed the Public Trail Project.

40. Ms. Comiskey's purpose in providing Ms. Vandenberg with the Opposition List was to rebut VOM's position that there was no community opposition to the Public Trail Project.

41. Ms. Comiskey assumed that Ms. Vandenberg would not use the Opposition List for political gain.

42. On March 1, 2024, Ms. Vandenberg forwarded the Opposition List from her VOM account to her personal email, and then thirty-five seconds later to an HOA board member (the "Board Member") (the "Political Adversary Email").

43. The Political Adversary Email was reasonably calculated to assist the Board Member in thwarting Plaintiffs' attempts to stop the Public Trail Project and to further Ms. Vandenberg's political agenda.

---

[1] 1st instance of UCSO used as a tool for VOM political intimidation - from about 35:50 to 38:00
- https://www.youtube.com/live/w-QTOCn2OaE?si=ogiONz-xUldsWE63&t=2149
2nd instance of UCSO as tool of VOM political intimidation - from about 1:12:48 to 1:19:00
- https://youtu.be/M1KH9pyi9ls?si=kqlrBkj9hBSaY4An&t=4369

4

## Noncompliance with Public Records Law

44.     Throughout the year of 2024, Plaintiffs submitted multiple requests for public records which relate to the Easement and the Public Trail Project from VOM.

45.     VOM still has not provided many of the requested records which they are legally obligated to provide to Plaintiffs pursuant to Plaintiffs' lawful requests.

46.     Upon information and belief, VOM, pursuant to Ms. Vandenberg's influence and guidance, has intentionally prevented Plaintiffs from obtaining public records pertaining to the Easement and the Public Trail Project.

47.     For example, upon information and belief, documents exist within the custody and control of VOM that pertain to the legal opinion (the "Legal Opinion") upon which VOM relies to justify the approval of the Public Trail Project. However, no such documents have ever been produced by VOM.

48.     Defendants have asserted a claim of attorney-client privilege to justify withholding documents related to the Legal Opinion.

49.     Despite VOM's assertion of attorney-client privilege, Ms. Vandenberg publicly cited the Legal Opinion in response to direct questions about the Public Trail Project's legality and the basis upon which the VOM Council should vote to approve the Public Trail Project.

50.     Upon information and belief, Ms. Vandenberg cited the Legal Opinion to persuade the VOM Council to vote to approve the Public Trail Project.

51.     Upon information and belief, the VOM Council unanimously voted to approve the Public Trail Project in reliance upon the Legal Opinion and Ms. Vandenberg's statements.

52.     Ms. Vandenberg's public citation and use of the Legal Opinion to successfully persuade the VOM Council constitute a waiver of the attorney-client privilege under North Carolina law.

## The Facebook Post

53.     In the fall of 2024, Mr. Comiskey engaged in settlement negotiations with VOM's attorney in an effort to avoid litigation over VOM's violation of Plaintiffs' Negative Easement.

54.     These negotiations culminated in Mr. Comiskey emailing a settlement offer (the "Settlement Offer") to VOM's attorney and to the VOM Council on October 29, 2024.

55.     Upon information and belief, as of November 1, 2024, no other parties had knowledge of nor access to the Settlement Offer.

56. On November 1, 2024, the Board Member submitted a public information request to VOM seeking all emails sent by Mr. Comiskey to VOM between October 28, 2024, and November 1, 2024.

57. Upon information and belief, the Board Member's submission of the public information request was done at the behest of Ms. Vandenberg.

58. Upon information and belief, VOM, under Ms. Vandenberg's influence, fulfilled this public information request the same day, an unusually expedited response time which suggests Ms. Vandenberg's coordination with the Board Member.

59. The emails disclosed pursuant to this public information request included the Settlement Offer.

60. In addition, on November 2, 2024, Ms. Vandenberg also forwarded the Settlement Offer to her husband, Mike Vandenberg ("Mr. Vandenberg"), who had been publicly criticizing Plaintiffs' efforts to stop the Public Trail Project.

61. Later that same day, the Marvin Messenger, a Facebook page, published a portion of the Settlement Offer and publicly accused Plaintiffs of extortion, and misrepresented the contents of the Settlement Offer (the "Facebook Post").

62. Upon information and belief, Mr. Vandenberg had provided the Settlement Offer to the author of the Facebook Post.

63. Upon information and belief, Ms. Vandenberg knew or should have known that forwarding the Settlement Offer to her husband would result in the publication of the Facebook Post.

64. Upon information and belief, Ms. Vandenberg's forwarding of the Settlement Offer to her husband was for the purpose of retaliating against Plaintiffs for their lawful opposition to the Easement and the Public Trail Project.

65. Upon information and belief, in addition to retaliation, Ms. Vandenberg intended to improperly influence the outcome of the HOA special meeting that was to take place the following week.

66. Upon information and belief, Ms. Vandenberg has orchestrated a sustained campaign to target, harass, and silence homeowners who oppose her vision of commercial development and interconnected public trails that intrude directly into private residential areas.

67. Defendant Vandenberg has enacted and has been enforcing an unwritten policy that "'No' is not an option," and resistance to her plan is met with intimidation, coercion, and public smearing, along with her allies within both the VOM and the HOA.

6

68.     Their collective entrenchment in this scheme has driven them to abuse government power, weaponize misinformation, and disregard legal constraints to force compliance at any cost.

69.     Despite Defendant Vandenberg's misdeeds being outside of the scope of her authority, she has continued to pursue her intent to connect homes within VOM to commercial properties and areas, with assistance from the VOM Council.

70.     Further evidencing retaliatory intent, VOM explicitly threatened retaliation against homeowners in the neighboring Amber Meadows community for objecting to a proposed public trail, by stating that VOM would install neon signs, a bench, and bright lights directly adjacent to their property, deliberately impairing their peaceful enjoyment and punishing their lawful opposition.

71.     At a public VOM Council meeting in December 2024, Council Member Lein explicitly threatened the use of eminent domain if the easement route continues to be troublesome for VOM, referencing the ongoing Comiskey family property rights dispute, thereby publicly invoking governmental power to unlawfully pressure Plaintiffs and the HOA.

72.     HOA Attorney Karb explicitly passed along VOM threats of eminent domain to the Marvin Creek HOA, relaying that resistance to granting additional public-use easements was futile due to VOM's power to forcibly obtain those easements, despite overwhelming homeowner opposition previously expressed in October 2024.

73.     The HOA Board Member has explicitly acknowledged that the HOA Board has repeatedly acted in this dispute out of fear of retaliation from VOM, directly demonstrating coercion and improper influence from VOM officials.

## FIRST CAUSE OF ACTION
### Declaratory Relief
*(Plaintiffs v. All Defendants)*

74.     The preceding allegations are incorporated as if fully set forth herein.

75.     Plaintiffs own a home within Marvin Creek, a planned community governed by the CCRs, which explicitly prohibit any action that would make public use of HOA Private Property.

76.     Plaintiffs' Negative Easement guarantees that the HOA Private Property must remain free from public use.

77.     The Public Trail Project violates the CCRs and Plaintiffs' Negative Easement.

78.     Plaintiffs maintain that the "Notwithstanding" clause in Article 3, § 1 of the CCRs expressly supersedes any conflicting language elsewhere in the CCRs upon which Defendants may rely in asserting that the Easement was validly granted.

7

79. Plaintiffs maintain that the phrase "dedicated for the use and enjoyment of the public," as a matter of basic property law, includes the grant of an easement to a public entity for use by the public, thereby rendering such an easement expressly impermissible under the CCRs.

80. Plaintiffs maintain that the granting of an easement for public use constitutes a "dedication" under the definition of that term as has been recognized universally in property law jurisprudence.

81. A nearby planned community (the "Preserve") has similar covenants, conditions, and restrictions (the "Preserve CCRs") which were created by the same drafter as the Marvin Creek CCRs, and on behalf of the same developer.

82. The Preserve CCRs are attached hereto as **Exhibit B** and are hereby incorporated by reference.

83. The Preserve CCRs have a nearly identical provision as the Marvin Creek CCRs, also at Article 3, § 1, except that such provision in the Preserve CCRs explicitly carves out an exception to the "No public use" limitation for a particular "Greenway Trail" which is to be "open to the use of the public."

84. Plaintiffs maintain that the explicit carve-out for the "Greenway Trail" in the Preserve CCRs proves that it was the intention of the drafter of the CCRs, who was the same drafter of both documents, that the dedication of an easement for public use, unless explicitly excepted from the prohibition on such dedication, would violate Article 3, § 1 of both the Marvin Creek CCRs and the Preserve CCRs.

85. Pursuant to N.C. Gen. Stat. § 1-253, Plaintiffs are entitled to declaratory judgment that as a matter of law:

    a. The Public Trail Project violates the CCRs and Plaintiffs' Negative Easement;

    b. The "Notwithstanding" clause in Article 3, § 1 of the CCRs expressly supersedes any conflicting language elsewhere in the CCRs;

    c. The term "dedicated for the use and enjoyment of the public" includes the grant of an easement to a public entity for use by the public;

    d. The granting of an easement for public use constitutes a "dedication for public use";

    e. The purported Easement granted by the HOA to VOM was void from its inception and remains void; and

    f. Ms. Vandenberg and VOM are estopped by their MDO from threatening eminent domain to coerce the HOA, Plaintiffs, or other homeowners into granting easements, rendering such threats improper and unlawful.

8

## SECOND CAUSE OF ACTION
### Defamation
*(Plaintiffs v. Ms. Vandenberg and VOM)*

86.  The preceding allegations are incorporated as if fully set forth herein.

87.  Mr. Comiskey is a reputable and accomplished attorney who holds licenses to practice in several states.

88.  Ms. Comiskey is a stay-at-home mother.

89.  Upon information and belief, Ms. Vandenberg provided the Settlement Offer to Mr. Vandenberg with the intent that he would provide it to the author of the Facebook Post.

90.  Upon information and belief, Ms. Vandenberg knew or should have known that the author of the Facebook Post would use the Settlement Offer as the basis of the Facebook Post.

91.  The Facebook Post explicitly identifies Plaintiffs.

92.  The Facebook Post was published online and made accessible to the public on November 2, 2024.

93.  A true copy of the Facebook Post is attached hereto as **Exhibit C**.

94.  The Facebook Post is defamatory per se.

95.  The Facebook Post has subjected Plaintiffs to public ridicule, contempt, and disgrace.

96.  The accusations asserted in the Facebook Post were and remain demonstrably false.

97.  Plaintiffs' reputations have been unjustly tarnished due to the Facebook Post.

98.  Upon information and belief, Mr. Vandenberg and the author of the Facebook Post were acting as Ms. Vandenberg's agents.

99.  Upon information and belief, Mr. Vandenberg, the author of the Facebook Post, and Ms. Vandenberg entered into civil conspiracy to defame Plaintiffs.

100. As a direct and foreseeable result of Ms. Vandenberg's and VOM's actions in intentionally causing the Facebook Post to be published, Plaintiffs have been damaged in pan amount exceeding $25,000.

101. The actions of Defendants were willful, wanton, and reckless, entitling Plaintiffs to an award of punitive damages pursuant to Chapter 1D of the North Carolina Rules of Civil Procedure, in a sum to be proven at trial.

## THIRD CAUSE OF ACTION
## Intentional Infliction of Emotional Distress
### (*Plaintiffs v. Ms. Vandenberg*)

102.    The preceding allegations are incorporated as if fully set forth herein.

103.    Plaintiffs have suffered significant emotional distress as a result of Ms. Vandenberg's actions, which have created a hostile and adversarial environment in both their neighborhood and community.

104.    Plaintiffs have been subjected to public ridicule, hostility, and isolation within their community, all of which were foreseeable consequences of Ms. Vandenberg's actions.

105.    Upon information and belief, Ms. Vandenberg utilized her position as mayor pro tempore to intentionally engage in a coordinated campaign of harassment, intimidation, and defamation aimed at Plaintiffs.

106.    Upon information and belief, Ms. Vandenberg utilized her position as mayor pro tempore to intentionally influence VOM to prevent Plaintiffs from obtaining public records to which Plaintiffs were legally entitled.

107.    Upon information and belief, Ms. Vandenberg utilized her position as mayor pro tempore to intentionally influence VOM to expedite production of records which were adverse to Plaintiffs' position to the Board Member.

108.    Upon information and belief, Ms. Vandenberg utilized her position as mayor pro tempore to intentionally cause Plaintiffs to be publicly and falsely accused of extortion.

109.    Upon information and belief, Ms. Vandenberg utilized her position as mayor pro tempore to attempt to discredit and intimidate Plaintiffs via the improper use of the UCSO.

110.    Ms. Vandenberg has repeatedly engaged in actions which were intentionally and reasonably calculated to thwart Plaintiffs' exercise of their First Amendment rights.

111.    Ms. Vandenberg, utilizing her position as mayor pro tempore, has repeatedly engaged in actions which were likely to cause Plaintiffs severe emotional distress.

112.    Upon information and belief, Ms. Vandenberg's actions were intentional.

113.    Ms. Vandenberg's actions, particularly in light of her position as mayor pro tempore, have been extreme and outrageous.

114.    Plaintiffs did in fact, and continue to, suffer severe emotional distress as a direct and foreseeable result of Ms. Vandenberg's actions.

115.    As a direct and foreseeable result of Ms. Vandenberg's intentional and extreme and outrageous conduct, Plaintiffs have been damaged in an amount exceeding $25,000.

10

116.  Ms. Vandenberg's actions were willful, wanton, and reckless, entitling Plaintiffs to an award of punitive damages pursuant to Chapter 1D of the North Carolina Rules of Civil Procedure, in a sum to be proven at trial.

## FOURTH CAUSE OF ACTION
### Violation Of Open Governance Laws
*(Plaintiffs v. Ms. Vandenberg and VOM)*

117.  The preceding allegations are incorporated as if fully set forth herein.

118.  Ms. Vandenberg and VOM violated North Carolina's Open Meetings Law (N.C. Gen. Stat. §§ 143-318.9 et seq.) and Public Records Law (N.C. Gen. Stat. §§ 132-1 et seq.) through a series of secretive and improper actions to promote the Public Trail Project.

119.  On March 1, 2024, Ms. Vandenberg forwarded the Political Adversary Email to the Board Member.

120.  Plaintiffs submitted lawful public records requests on multiple occasions to obtain information about the Public Trail Project and related communications.

121.  VOM delayed any response to Plaintiffs' lawful requests, imposed unreasonable review timelines, and improperly invoked attorney-client privilege to shield critical information.

122.  In contrast, VOM expedited public records requests from political allies, including a November 1, 2024 request by the Board Member seeking emails from Mr. Comiskey. This request was fulfilled the same day and included sensitive communications, such as the Settlement Offer.

123.  During public meetings, Defendants relied upon the Legal Opinion to justify the Easement's legality, while simultaneously invoking attorney-client privilege to withhold the Legal Opinion from public scrutiny.

124.  Ms. Vandenberg's and VOM's refusal to disclose the legal authority upon which they relied constitutes secret lawmaking and undermines public accountability.

125.  As a matter of law, Defendants have implicitly waived attorney-client privilege over the legal reasoning underlying the legal conclusion publicly cited and relied upon to justify voting for the unlawful trail through their 'secret lawmaking' on July 25, 2024.

126.  VOM cannot now shield the underlying legal analysis from disclosure, as doing so constitutes secret lawmaking in violation of open government principles.

127.  Ms. Vandenberg's and VOM's actions deprived Plaintiffs of their right to participate in transparent governance and obstructed their ability to protect their property rights.

128.  Plaintiffs are entitled to an order requiring Ms. Vandenberg and VOM to disclose all communications and records related to the Easement and Public Trail Project.

11

## FIFTH CAUSE OF ACTION
### Violation of the First Amendment (42 U.S.C. § 1983)
### (*Plaintiffs v. Ms. Vandenberg and VOM*)

129.  The preceding allegations are incorporated as if fully set forth herein.

130.  Ms. Vandenberg's improper use of the UCSO to discredit Ms. Comiskey's factual crime-reporting further contributed to the chilling effect on Plaintiffs' exercise of their free speech rights.

131.  Plaintiffs' rights to voice their opinions regarding the Easement and the Public Trail Project are protected by the First Amendment of the United Stated Constitution.

132.  At no time did Plaintiffs threaten violence or otherwise engage in speech or protest regarding the Easement and the Public Trail Project which was not protected by the First Amendment.

133.  Upon information and belief, Ms. Vandenberg and VOM purposefully engaged in a number of actions reasonably calculated to chill Plaintiffs' First Amendment rights, including but not limited to:

   a. Responding in an unusually expeditious manner to a planted and targeted request for records made by the Board Member which was reasonably calculated to assist the Board Member in thwarting Plaintiffs' attempts to stop the Public Trail Project and further Ms. Vandenberg's political agenda;

   b. Intentionally postponing or outright refusing to respond to Plaintiffs' lawful requests for records;

   c. As to Ms. Vandenberg, publishing the Settlement Offer with the knowledge and intent that the information would be used to defame Plaintiffs and thus harm their standing within the community and ultimately keep Plaintiffs from protecting their property rights; and

   d. As to Ms. Vandenberg, calling upon law enforcement officers to be present at the February 22, 2024 and March 28, 2024 meetings solely for the purpose of discrediting and intimidating Plaintiffs from engaging in further political speech that Defendants oppose.

134.  Ms. Vandenberg's and VOM's actions constituted state action.

135.  Upon information and belief, Ms. Vandenberg's and VOM's actions were motivated entirely or almost entirely by Plaintiffs' lawful opposition to the Easement and to the Public Trail Project.

136.   Ms. Vandenberg's and VOM's actions caused Plaintiffs to suffer injuries which are likely to chill a person of ordinary firmness from continuing to engage in their First Amendment rights.

137.   Ms. Vandenberg's and VOM's actions did in fact cause Plaintiffs to suffer injuries that have chilled Plaintiffs from continuing to engage in their First Amendment rights.

138.   Ms. Vandenberg's and VOM's actions were undertaken under color of state law.

139.   As a result of Ms. Vandenberg's and VOM's continued violation of Plaintiffs' First Amendment rights, Plaintiffs have been damaged in an amount exceeding $25,000.

## SIXTH CAUSE OF ACTION
### Civil Conspiracy to Violate Plaintiffs' First Amendment Rights
### (42 U.S.C. 1983)
### (*Plaintiffs v. Ms. Vandenberg and VOM*)

140.   The preceding allegations are incorporated as if fully set forth herein.

141.   Upon information and belief, Defendants have regularly communicated with one another since January 2024 regarding the Easement and the Public Trail Project.

142.   Upon information and belief, Ms. Vandenberg and VOM are both motivated by the political consequences of successfully completing the Public Trail Project.

143.   Upon information and belief, Ms. Vandenberg was motivated to ensure that the HOA retains certain HOA board members whom she knew would support the Easement and the Public Trail Project despite the community's general opposition.

144.   Upon information and belief, Ms. Vandenberg, using her influence as mayor pro tempore, engaged and continues to engage with VOM and others to stifle lawful opposition to the Easement and the Public Trail Project.

145.   Upon information and belief, VOM has intentionally worked together with Ms. Vandenberg to stifle lawful opposition to the Easement and the Public Trail Project.

146.   Defendants were at all relevant times aware of Plaintiffs' efforts to exercise their First Amendment rights to question the legality of the Easement and of the Public Trail Project.

147.   Upon information and belief, Ms. Vandenberg and VOM conspired and/or entered into an agreement with one another, and with HOA board members, to take certain overt actions in furtherance of their intentions to chill Plaintiffs' First Amendment rights, including:

   a.   Responding in an unusually expeditious manner to a planted and targeted request for records made by the Board Member which was reasonably calculated to assist the

13

Board Member in thwarting Plaintiffs' attempts to stop the Public Trail Project and further Ms. Vandenberg's political agenda;

b. Intentionally postponing or outright refusing to respond to Plaintiffs' lawful requests for records;

c. As to Ms. Vandenberg, publishing the Settlement Offer with the knowledge and intent that the information would be used to defame Plaintiffs and thus harm their standing within the community and ultimately keep Plaintiffs from protecting their property rights; and

d. As to Ms. Vandenberg, calling upon law enforcement officers to be present at the February 22, 2024 and March 28, 2024 meetings solely for the purpose of discrediting and intimidating Plaintiffs from engaging in further political speech that Defendants oppose.

148. As a result of Defendants' conspiracy to violate Plaintiffs' First Amendment rights, Plaintiffs have been damaged in an amount exceeding $25,000.

## MOTION FOR PRELIMINARY INJUNCTION

149. The preceding allegations are incorporated as if fully set forth herein.

150. Pursuant to Rule 65 of the North Carolina Rules of Civil Procedure, Plaintiffs seek both a temporary restraining order and preliminary injunction to maintain the status quo between the parties.

151. Defendants' actions have already caused irreparable harm to Plaintiffs, including unauthorized public access, diminished privacy, and reports of vagrancy and trespass on HOA Private Property.

152. The CCRs prohibit public use of the HOA Private Property.

153. Additionally, § 1.8-3 of the Marvin Development Ordinances ("MDO") provides, with regard to decisions by VOM concerning land use, that "[t]his Ordinance is not intended to abrogate any easement, covenant, or other private agreement."

154. Similarly, § 1.8-4 of the MDO provides that "[t]his Ordinance is not intended to repeal, abrogate, annul, impair or interfere with any existing easements, covenants, deed restrictions, agreements, vested rights, or permits previously adopted or issued pursuant to law."

155. VOM's own ordinances prohibit it from making land use decisions which would repeal, abrogate, impair, or interfere with real property covenants.

156. VOM's own ordinances prohibit it from accepting an easement which would violate existing covenants, including those covenants which restrict land use in a planned community such as Marvin Creek.

157. As such, the HOA was prohibited pursuant to the CCRs from granting the Easement, and VOM was prohibited by its own laws from accepting the Easement.

158. Since January 2024, Defendants have not presented a colorable justification for circumventing the clear language of the CCRs and of the MDO.

159. The Easement is void.

160. Plaintiffs are thus substantially likely to succeed on the merits.

161. The portion of the HOA Private Property identified in the Easement directly abuts Plaintiffs' property.

162. The Easement and the trail which Ms. Vandenberg and VOM intend to build upon it would decrease Plaintiffs' privacy and relative security within their own property.

163. The Easement and the Public Trail Project have had and would continue to have a severe negative effect upon Plaintiffs' quiet enjoyment of their property.

164. Plaintiffs' Negative Easement prohibits public use of the HOA Private Property.

165. Despite demands that they do so, Ms. Vandenberg and VOM have refused to discontinue the Public Trail Project.

166. Upon information and belief, Ms. Vandenberg and VOM are in the process of receiving bids from contractors in order to develop the Public Trail Project.

167. Plaintiffs will be irreparably harmed by the continued development of the Public Trail Project.

168. The harm inflicted by Defendants' unlawful actions is irreparable, depriving Plaintiffs of peace, security, and their ability to enjoy their home without fear of retaliation. The ongoing campaign of coercion—including threats of eminent domain, public targeting, and interference with HOA governance—has caused severe emotional distress, disrupted Plaintiffs' family life, and forced them into an exhausting legal battle simply to protect their fundamental property rights.

169. Each day that Defendants continue their unlawful conduct, the harm compounds, further diminishing Plaintiffs' quiet enjoyment of their home and creating an intolerable situation that requires immediate and extended injunctive relief.

170. Plaintiffs thus move this Court for an order enjoining any development of the Public Trail Project during the pendency of this action.

15

WHEREFORE, Plaintiffs pray unto this Court for the following relief:

1. For a temporary restraining order enjoining all activities conducted in furtherance of the Public Trail Project;

2. For a preliminary injunction enjoining all activities conducted in furtherance of the Public Trail Project;

3. For a declaration that the Easement granted by the HOA to VOM was void from its inception and remains void;

4. For a declaration that Plaintiffs' Negative Easement prohibits the use of the HOA Private Property for the Public Trail Project;

5. For an order requiring Ms. Vandenberg and VOM to disclose all communications and records related to the Easement and Public Trail Project;

6. That Plaintiffs have and recover compensatory damages from Ms. Vandenberg and VOM in an amount to be determined at trial, but which in any event exceed $25,000;

7. For an award of punitive damages in a sum to be proven at trial;

8. For an award of attorneys' fees, as allowed by law;

9. That the costs be taxed to Ms. Vandenberg and VOM;

10. For a jury trial on all issues so triable; and

11. For such other and further relief as the Court deems just and proper.

This the 19th day of March, 2025.

TLG LAW

Benjamin J. Axelman
David G. Redding
TLG Law
2907 Providence Road, Suite 303
Charlotte, NC 28211
T:704-612-2128
F: 704-626-6552
baxelman@tlg-law.com
dredding@tlg-law.com

16

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing AMENDED COMPLAINT, MOTION FOR DECLARATORY JUDGMENT, AND MOTION FOR PRELIMINARY INJUNCTION was served upon all parties of record by via electronic mail to the attorneys addressed as follows:

**CRANFILL SUMNER LLP**
Jake Stewart
2907 Providence Rd. # 200
Charlotte, NC 28211
jstewart@cshlaw.com
(704) 940-3441
*Attorney for Defendants*

THIS the 19th day of March, 2025.

**TLG Law**

_____
Benjamin J. Axelman

18

# EXHIBIT A

BK 3664 PG 68
Filed for record
Date 1-11 , 200 5
Time 2:30 o'clock P m
Crystal D. Crump, Register of Deeds
Union County, Monroe, North Carolina

DECLARATION

OF

COVENANTS, CONDITIONS AND RESTRICTIONS

MARVIN CREEK

Drawn by and after recording return to:
Brian P. Evans, Esquire
Kennedy, Covington, Lobdell & Hickman
214 N. Tryon Street, Suite 4700
Charlotte, NC 28202

STATE OF NORTH CAROLINA

COUNTY OF UNION

DECLARATION OF COVENANTS,
CONDITIONS AND
RESTRICTIONS FOR

MARVIN CREEK

THIS DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS (this "Declaration") is made this 22 day of December, 2004, by NC COUNTRY CLUB ESTATES LIMITED PARTNERSHIP, a North Carolina limited partnership (the "Declarant"). All capitalized terms used herein shall have the meanings set forth in Article I or elsewhere in this Declaration.

## WITNESSETH:

Declarant is the owner of that certain real property located in Union County, North Carolina, and more particularly described on Exhibit "A" attached hereto and incorporated hereby by reference (the "Property"), which Property is being developed by Declarant as a residential community and amenity facility as a portion of the development known as Marvin Creek .

Declarant desires to provide for the preservation of the property values, amenities and opportunities in the Project and for the maintenance of the Property and improvements thereon, and to this end desires to subject the Property to the easements, covenants, conditions, restrictions, charges and liens hereinafter set forth and/or described.

Although Declarant contemplates that separate easements, covenants, conditions and restrictions (which may include easements, covenants, conditions and restrictions similar to those herein contained) may be imposed with regard to the various phases or sections of the Project, Declarant desires to impose pursuant hereto easements, covenants, conditions and restrictions upon all of the Property, with the understanding that, at the option of Declarant, additional restrictions may be imposed with regard to the various phases or sections of the Project.

NOW, THEREFORE, Declarant hereby subjects the Property to the easements, covenants, conditions, restrictions, charges and liens hereinafter set forth and hereby declares that (subject to certain rights of amendment, as hereinafter described) all of the Property shall be held, sold and conveyed subject to such easements, covenants, conditions, restrictions, charges and liens, all of which are for the purpose of protecting the value, desirability and attractiveness of the Project. Subject to the above-described rights of Declarant, such easements, covenants, conditions, restrictions, charges and liens shall run with the Property and be binding on all parties having or acquiring any right, title or interest in the Property, or any part thereof and shall inure to the benefit of each owner of the Property or any part thereof.

## ARTICLE I

## DEFINITIONS

Section 1.    "Additional Declaration" shall mean and refer to any Declaration of Covenants, Conditions and Restrictions filed in the Office of the Register of Deeds of Union County, North Carolina, with regard to a certain Phase, section or portion of the Property, as more particularly described in Article II, Section 2 hereof.

2210055.07
UB: Charlotte

Section 2.    "Additional Property" shall mean and refer to additional real estate near or contiguous to the Property, all or a portion of which may be made subject to the terms of this Declaration in accordance with the provisions of Article II of this Declaration, including without limitation all of that certain property conveyed to Declarant by Deed recorded in Book 3396 at Page 226 of the Union County Registry, and further including, without limitation, that parcel of real estate identified in the current Union County Tax Records as GIS Parcel 06222005.

Section 3.    "Amenity Area" or "Amenity Areas" shall mean and refer to the parcel or parcels of land labeled "Amenity Area" (or a similar term) on a Plat, together with any parking area, clubhouse, pool, or other recreational amenity or facility constructed or placed thereon for the common use and enjoyment of all Owners, including without limitation that certain parcel shown as "C.O.S. #4/Future Amenity Center 12.665 acres" on the Plat recorded in Plat Cabinet I, Page 163, of the Union County Registry.

Section 4.    "Architectural Changes Committee" shall have the meaning set forth in Article VIII hereof.

Section 5.    "Architectural Control Committee" shall mean and refer to the committee appointed by the Board to oversee the development and enforcement of architectural control standards and restrictions with respect to the Project and to perform certain other functions described in the Declaration.

Section 6.    "Architectural, Design and Landscape Guidelines" shall have the meaning as set forth in Article VIII hereof.

Section 7.    "Articles of Incorporation" shall mean and refer to the Articles of Incorporation for the Association.

Section 8.    "Association" shall mean and refer to MARVIN CREEK COMMUNITY ASSOCIATION, INC., a North Carolina non-profit corporation, its successors and assigns.

Section 9.    "Board" or "Board of Directors" shall mean and refer to the Board of Directors of the Association, which shall be elected and shall serve pursuant to the Bylaws.

Section 10.    "Bylaws" shall mean and refer to the Bylaws for the Association.

Section 11.    "Certificate of Occupancy" shall mean and refer to any required certification issued by the appropriate governmental authorities as a prerequisite to occupancy of any structure on the Property.

Section 12.    "Common Area" or "Common Areas" shall mean and refer to the Amenity Area, Parking Area(s), Street Lights and the Roadways, including sidewalks, drainage facilities and other improvements located therein (prior to their acceptance for maintenance by the North Carolina Department of Transportation or other governmental entity), collectively, and any other property specifically shown and designated on any Plat as "Common Area," "Common Open Area," "Common Open Space," "Open Space," or "COS." The Common Areas shall be initially owned by the Declarant, and ultimately owned by the Association, except as otherwise provided herein, for the common use, benefit and enjoyment of the Owners. The Declarant reserves the right, but not the obligation, to provide additional Common Areas within the Project.

Section 13.    "CPI" shall have the meaning set forth in Article V hereof.

2210055.07
LIB: Charlotte

Section 14.     "Declarant" shall mean and refer to NC Country Club Estates Limited Partnership, a North Carolina Limited Partnership, its successors in title and assigns, provided that any such successor-in-title or assign shall acquire for the purpose of development and/or sale all or substantially all of the remaining undeveloped or unsold portions of the Property and, provided further, that in the instrument of conveyance to any such successor-in-title or assign, such successor-in-title or assign is designated as the "Declarant" hereunder by the grantor of such conveyance, which grantor shall be the "Declarant" hereunder at the time of such conveyance. Provided further, that upon such designation of such successor Declarant, all rights, duties and obligations of the former Declarant in and to such status as "Declarant" hereunder shall cease, it being understood that as to all of the Property, there shall be only one person or legal entity entitled to exercise the rights and powers of the "Declarant" hereunder at any time.

Section 15.     "Declaration" shall mean and refer to this Declaration of Covenants, Conditions and Restrictions as same may be amended and/or supplemented from time to time as herein provided.

Section 16.     "Dwelling Unit" shall mean and refer to a residential dwelling located upon a Lot.

Section 17.     "Entrance Monument Easements" shall mean and refer to the easements reserved by Declarant and granted to the Association in Article X hereof over, across and under certain areas of the Property, for the installation and maintenance of entrance monuments, landscaping and related improvements for the Project, all as more particularly described in Article X.

Section 18.     "Featured Builder" shall have the same meaning as set forth in Article VIII hereof.

Section 19.     "Guidelines" shall mean and refer to the Architectural, Design and Landscape Guidelines.

Section 20.     "Improvement" shall have the same meaning as set forth in Article VIII hereof.

Section 21.     "Lot" shall mean and refer to any numbered or lettered tract of land (excluding any Common Area) shown on any Plat which is a part of the Property and which shall be restricted for such uses as are consistent with this Declaration and any other restrictions covering the area wherein the tract of land is located. No tract of land shall become a "Lot" as that word is used herein until a Plat of the area in which the same is located is recorded in the Office of the Register of Deeds of Union County, North Carolina.

Section 22.     "Maintenance Areas" shall have the meaning as set forth in Article X hereof.

Section 23.     "Member" shall mean and refer to every person or entity who holds membership in the Association.

Section 24.     "Mortgage" shall mean any mortgage or deed of trust constituting a first lien on a Lot.

Section 25.     "Mortgagee" shall mean the owner and holder of a Mortgage at the time such term is being applied. Upon request, each Owner shall be obligated to furnish to the Association the name and address of the holder of any Mortgage encumbering such Owner's Lot.

2210055.07
LIB: Charlotte

Section 26.    "Occupant" shall mean and refer to any person occupying all or any portion of a Lot or the Property for any period of time, regardless of whether such person is a tenant of the Owner of such Lot or portion of the Property.

Section 27.    "Owner" shall mean and refer to the record owner, whether one or more persons or entities, of fee simple title to any Lot or other portion of the Property, but excluding those having such interest merely as security for the performance of an obligation.

Section 28.    "Parking Area" shall mean and refer to the parking lot or lots which may be constructed over certain portions of the Common Area(s), including, without limitation, the Amenity Area, for the common use, benefit and enjoyment of the Owners, their families, guests and invitees.

Section 29.    "Person" shall mean and refer to any natural person, corporation, joint venture, partnership (general or limited), corporation, association, trust or other legal entity.

Section 30.    "Phase" shall mean and refer to any phase, section or portion of the Property for which a separate Plat or Plats are recorded in the Office of the Register of Deeds of Union County, North Carolina.

Section 31.    "Plat" shall mean and refer to any plat of the Property or any part of it which is recorded from time to time in the Office of the Register of Deeds of Union County, North Carolina.

Section 32.    "Project" shall mean and refer to the residential development and amenity facility being developed by Declarant on the Property and commonly known as Marvin Creek.

Section 33.    "Property" shall mean and refer to that certain real property located in Union County, North Carolina, and more particularly described on Exhibit "A" attached hereto and incorporated herein by reference, as well as such additional property as may be made subject to the provisions of this Declaration pursuant to the provisions of Article II hereof.

Section 34.    "Roadways" shall mean and refer to the roads, streets, entranceways and cul-de-sacs in the Project, as shown on the Plats, and any other roads, streets, entranceways and cul-de-sacs on the Property, all to be privately maintained by the Association until accepted for maintenance by the North Carolina Department of Transportation or other governmental entity, as set forth herein.

Section 35.    "Street Lights" shall mean and refer to those certain street lights leased by Declarant and installed upon, along and/or over the rights-of-way of the Roadways, Parking Area(s) (if any), Maintenance Areas and Common Areas.

Section 36.    "Supplemental Declaration" shall mean and refer to any Supplemental Declaration of Covenants, Conditions and Restrictions filed in the office of the Register of Deeds of Union County, North Carolina, to bring additional property within the coverage of this Declaration and the jurisdiction of the Association, as more particularly described in Article II hereof.

Section 37.    "Transfer Fee" shall have the meaning set forth in Article V below.

Section 38.    "Turnover Date" shall have the meaning set forth in Article IV hereof.

2210035.07
LIB: Charlotte

## ARTICLE II

## PROPERTY SUBJECT TO THIS DECLARATION
## AND WITHIN THE JURISDICTION OF
## THE ASSOCIATION

Section 1. Property Made Subject to this Declaration. The Property is hereby made subject to this Declaration and the Property shall be owned, held, leased, transferred, sold, mortgaged and/or conveyed by Declarant, the Association, each Owner and each party owning record title to any of the Property subject to this Declaration and the controls, covenants, conditions, restrictions, easements, development guidelines, charges and liens set forth in this Declaration.

Section 2. Additions to the Property.

(a) Declarant may cause Additional Property (including Common Areas) to be made subject to the terms and scheme of this Declaration by filing one or more Supplemental Declarations in the Office of the Union County Register of Deeds, containing a description of the Additional Property and a statement by the Declarant of its intent to extend the operation and effect of this Declaration to the Additional Property. Notwithstanding the foregoing, the covenants and restrictions established herein as applied to, or imposed upon, the Additional Property may be altered or modified by the filing of one or more Supplemental Declarations as provided in Subparagraph (b) below.

(b) Any Supplemental Declaration may contain complementary additions to the covenants and restrictions contained herein as may be necessary in the judgment of the Declarant to reflect the different character of the Additional Property. In no event, however, shall any Supplemental Declaration revoke, modify or add to the covenants and restrictions contained herein with respect to the Property, nor revoke, modify, change or add to the covenants and restrictions established by previously filed Supplemental Declarations, without meeting the requirements for amendment set forth in this Declaration.

(c) In addition to the controls, covenants, conditions, restrictions, easements, development guidelines, charges and liens set forth in this Declaration, Declarant shall have the right, at its election without the consent of any Owner or Owners, to subject any Phase, section or portion of the Property owned by Declarant to additional controls, covenants, conditions, restrictions, easements, development guidelines, charges and liens, by filing an Additional Declaration in the Office of the Register of Deeds of Union County covering only such Phase, section or portion of the Property. Such an Additional Declaration may or may not provide for the establishment of a property owners' association to govern the ownership and/or maintenance of the Property affected by and the enforcement of the provisions of such Additional Declaration. Whether or not a property owners' association is formed pursuant to such Additional Declaration, the Association shall have the right and authority to enforce all controls, covenants, conditions, restrictions, easements, development guidelines, charges and liens imposed by such Additional Declaration and any amendments thereto, whether or not such right and authority is expressly provided for in such Additional Declaration.

(d) Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that, so long as Declarant owns any part of the Property, the prior written consent of Declarant shall be required for any parties to modify, change and/or amend, in whole or in part, the terms and provisions of this Declaration, any Supplemental Declaration and/or any Additional Declaration or to impose new or additional covenants, conditions, restrictions or easements on any part of the Property.

2210055.07
LIB: Charlotte

## ARTICLE III

## PROPERTY RIGHTS

Section 1.    Ownership of Common Areas.  Except as otherwise provided herein, Declarant shall convey to the Association the Common Areas to be owned and maintained by the Association; provided, with respect to any part of the Common Areas leased by Declarant (e.g., Street Lights), Declarant shall assign its rights under such lease to the Association.  The Declarant reserves the right (but shall not be obligated) to construct within the Common Areas, among other things, (i) the Street Lights (which will be leased from a third party) and other lighting, signage and irrigation facilities, (ii) the Roadways (including sidewalks, drainage facilities and other improvements), (iii) certain improvements within the Amenity Area, and (iv) certain additional recreational amenities and facilities, for the use and enjoyment of the Owners who are entitled to the use of such Common Areas as provided in this Declaration.  Notwithstanding the recordation of any Plat or any other action by Declarant or the Association, all Common Areas shall remain private property and shall not be considered as dedicated to the use and enjoyment of the public (with the exception of the Roadways, which may eventually be accepted for public dedication and maintenance by the North Carolina Department of Transportation or other governmental entity, and with the exception of the rights of "Licensees," as defined and described in Article III, Section 4, below).

Section 2.    Owners' Rights to Use and Enjoy Common Areas.  Each Owner shall have the non-exclusive easement and right to use and enjoy the Common Areas, and such right shall be appurtenant to and conveyed with title to such Owner's Lot, subject to the following:

(a)    the right of the Association and the Board to promulgate and enforce reasonable regulations governing the use of the Common Areas to insure the availability of the right to use the Common Areas to the Owners;

(b)    the right of the Association to suspend the voting rights of an Owner in the Association and the right of the Association to suspend the right to use certain or all of the Common Areas by an Owner for any period during which any assessment or charge against said Owner's Lot remains unpaid, and for the maximum period allowed by applicable law for any infraction of its published rules and regulations;

(c)    the right of the Declarant or the Association to grant or reserve utility, drainage and other easements across the Common Areas;

(d)    the right and easement, which is hereby reserved by Declarant, to use portions of the amenity center, clubhouse, and any other buildings located on the Amenity Area for sales and marketing purposes; and;

(e)    any and all other applicable provisions of this Declaration, including, without limitation, the provisions of Section 4 below.

Section 3.    Delegation of Use.  Any Owner may delegate, in accordance with the Bylaws, his or her right of enjoyment to the Common Areas and facilities located thereon to the members of his or her family, his or her guests, invitees, or his or her tenants.

Section 4.    Use of Amenity Areas by Licensees.  The Association shall have the right, from time to time, to allow individuals not owning a Lot or any other part of the Property (each, a "Licensee;" collectively, "Licensees") to use all or a certain portion of the Amenity Areas upon terms and conditions

2210035.07
LIB: Charlotte

acceptable to the Association and set forth in a written agreement between the Association and each Licensee (each, a "License Agreement"). Each License Agreement, among other things, may include the following provisions:

(a)     Upon execution of a License Agreement, each Licensee may be required to pay to the Association an amount determined by the Association in its sole discretion ("the License Fee") as consideration (in addition to the "User Fee" defined in Section 4(b) below) for the Association's agreement to enter into the License Agreement;

(b)     In addition to the License Fee, each Licensee shall pay to the Association an amount to be collected no less often than annually (a "User Fee") in such amount as is determined by the Association from time to time as consideration for the ongoing use of the Amenity Areas (or such portion thereof with respect to which license has been granted);

(c)     The License Agreement may provide for termination at will by the Association or the Licensee, and may provide that, upon any such termination, any License Fee paid by such Licensee, as well as a pro-rated portion of the User Fee, if applicable, shall be refunded to the Licensee, less any costs owed by such Licensee to the Association; and

(d)     The License Agreement may provide for termination for cause by the Association, and may provide for forfeiture of the License Fee and any prepaid User Fee in the event of any such termination.

Section 5.     Bodies of Water.
By acceptance of a deed to a Lot, each Owner acknowledges that the water levels of all water bodies within the Property may vary. There is no guarantee by the Declarant or the Association that water levels will be constant or aesthetically pleasing at any particular time. In fact, water levels may be non-existent from time to time.


## ARTICLE IV

## THE ASSOCIATION

Section 1.     Membership.  Every Owner of a Lot shall be a Member of the Association. Membership shall be appurtenant to and may not be separated from ownership of any Lot, and shall be governed by the Bylaws attached as Exhibit "B" hereto.  In addition, as long as Declarant owns any part of the Property, Declarant shall be a Member of the Association.

Section 2.     Classes of Voting Members.  The Association shall have two (2) classes of voting membership:

(a)     Class I.  The Class I Association Members shall be all Association Members with the exception of Declarant.  Class I Association Members shall be entitled to one (1) vote for each Lot owned by such Association Member.  When more than one Person owns an interest (other than a leasehold or security interest) in any Lot, all such Persons shall be Members and the voting rights appurtenant to said Lot shall be exercised as they, among themselves, determine, but in no event shall more than one (1) vote be cast with respect to any Lot.

(b)     Class II.  The Class II Association Member shall be Declarant.  The Class II Association Member shall be entitled to ten (10) votes for each Lot owned by Declarant.

2210055.07
LIB: Charlotte

Section 3. Relinquishment of Control. Notwithstanding anything contained herein to the contrary, the Class II Association Membership shall cease and be converted to the Class I Association Membership upon the earliest to occur of (a) the date on which Declarant no longer owns any part of the Property; (b) the date Declarant shall elect, in its sole discretion, that the Class II membership cease and be converted to the Class I membership (which election may be made, if at all, upon Declarant giving written notice of its election to the Board); or (c) December 31, 2030. The earliest to occur of (a), (b) or (c) above shall herein be referred to as the "Turnover Date." After the Turnover Date and for so long as Declarant owns any part of the Property, Declarant shall be a Class I Association Member.

Section 4. Availability of Documents. The Association shall maintain current copies of the Declaration, the Bylaws and other rules concerning the Project as well as its own books, records, and financial statements available for inspection by all Owners, Mortgagees and insurers and guarantors of Mortgages that are secured by Lots. All such documents shall be available upon reasonable notice and during normal business hours. In addition, any Mortgagee may, at its own expense, have an audited statement prepared with respect to the finances of the Association.

Section 5. Management Contracts. The Association is authorized and empowered to engage the services of any person, firm or corporation to act as managing agent of the Association at a compensation level to be established by the Board and to perform all of the powers and duties of the Association. The managing agent may be an affiliate of Declarant. Any such contract shall be terminable by the Association with or without cause upon sixty (60) days prior written notice to the manager without payment of a termination fee.

Section 6. Maintenance. Prior to their acceptance for public maintenance, the Roadways shall be maintained by the Association, provided that the Declarant, in its sole discretion, has the right to reimburse the Association for maintenance costs until the Roadways are accepted for maintenance by the North Carolina Department of Transportation or other governmental entity. Such maintenance shall include repair and reconstruction, when necessary. Maintenance of the Roadways shall conform to the standard of maintenance (if one is ascertainable) which would be required by the North Carolina Department of Transportation or other governmental entity before it would accept such Roadways for maintenance.

The Common Areas and the Maintenance Areas, together with all utilities, easements and amenities located therein and not otherwise maintained by public entities or utilities or any other party as provided herein, shall be maintained by the Association as more particularly described below:

(a) Maintenance of the entryways to the Project shall include maintenance, repair and reconstruction, when necessary, of the entrance monuments, signage, irrigation, planters and lighting located thereon and providing and paying for landscaping, utility charges for irrigation and lighting of the entrance monuments and signage located thereon.

(b) Maintenance of the Parking Area(s) (if any) shall include repair, maintenance and reconstruction, when necessary, of the pavement and payment of the costs of lighting.

(c) To the extent not maintained by the North Carolina Department of Transportation or other governmental entity, as the case may be, the Association shall maintain or cause to be maintained the swales and medians and associated landscaping and related improvements along and within the Roadways.

2210055.07
LIB: Charlotte

(d)     The Common Areas and Maintenance Areas, including, without limitation, the Amenity Area, and the landscaping thereon (if any), shall be clean and free from debris and maintained in a safe and orderly condition, including any removal and replacement of any landscaping, utilities, or improvements located thereon.

(e)     Maintenance of any improvement within the Amenity Area (including, without limitation, any fencing, parking area, clubhouse, pool or other recreational amenity or facility located therein) shall include, but not be limited to, any and all interior and exterior maintenance (including, where necessary, repair and/or reconstruction), landscaping and payment of all utility charges related to any such improvement.

Section 7.     Reserve Fund.  The Association shall establish and maintain an adequate reserve fund for the periodic maintenance, repair and replacement of all or a portion of the Common Areas or Maintenance Areas and in order to fund unanticipated expenses of the Association or to acquire equipment or services deemed necessary or desirable by the Board of Directors. Such reserve fund shall be collected and maintained out of the Annual Assessments, as hereinafter defined. Assessments collected as reserves shall not be considered to be advance payments of Annual Assessments.

Section 8.     Parking Area.  Declarant may (but is not obligated to) construct, and the Association shall maintain, repair and, if destroyed, replace, as a common expense of the Association, paved Parking Areas located on the Amenity Area and other Common Areas. The Parking Areas shall be constructed and maintained in order to provide parking for the Owners, and may be used by Declarant and its assigns and the Owners, their families, guests and invitees, in connection with their use of the Amenity Area.

Section 9.     Liability Limitations.  Neither Declarant, nor any Association Member, nor the Board, nor any officers, directors, volunteers, agents or employees of any of them shall be personally liable for debts contracted for or otherwise incurred by the Association or for a tort of another Association Member, whether or not such other Association Member was acting on behalf of the Association or otherwise. Neither Declarant, nor the Association, nor their directors, officers, agents or employees shall be liable for any incidental or consequential damages for failure to inspect any premises, improvements or portions thereof or for failure to repair or maintain the same. Declarant, the Association or any other person, firm or association making such repairs or maintenance shall not be liable for any personal injury or other incidental or consequential damages occasioned by any act or omission in the repair or maintenance of any premises, improvements or portions thereof.  The Association shall, to the extent permitted by applicable law, indemnify and defend all members of the Board from and against any and all loss, cost, expense, damage, liability, claim, action or cause of action arising from or relating to the performance by the Board of its duties and obligations, except for any such loss, cost, expense, damage, liability, claim, action or cause of action resulting from the gross negligence or willful misconduct of the person(s) to be indemnified.

## ARTICLE V

## COVENANT FOR ANNUAL AND SPECIAL ASSESSMENTS

Section 1.     Creation of the Lien and Personal Obligation for Annual, Supplemental Annual, Special and Special Individual Assessments, and for Transfer Fees.  Each Owner of any Lot other than Declarant, by acceptance of a deed therefor, whether or not it shall be so expressed in any such deed or other conveyance document, is deemed to covenant and agrees to pay to the Association Annual Assessments, Supplemental Annual Assessments, Special Assessments and Special Individual

2210055.07
LJB: Charlotte

Assessments (collectively, the "Assessments"), and to pay any Transfer Fee established by the Board, as hereinafter defined, established and collected as hereinafter provided. Any such assessment or charge, together with interest, costs, and reasonable attorneys' fees, shall be a charge and a continuing lien upon the Lot, as the case may be, against which each such assessment or charge is made. Each such assessment or charge, together with interest, costs and reasonable attorneys' fees, shall also be the personal obligation of the Owner, at the time when the assessment fell due, of the Lot, as the case may be, against which such assessment or charge is made. The personal obligation for delinquent assessments or charges shall not pass to an Owner's successors in title unless expressly assumed by them, provided such assessments or charges, together with interest, costs, and reasonable attorneys' fees, shall, as set forth above, be a continuing lien upon the Lot, as the case may be, against which such assessments or charges are made.

Section 2.    Purpose of Annual Assessments. The assessments to be levied annually by the Association ("Annual Assessments") shall be used as follows:

(a)    to operate, repair, maintain, reconstruct (when necessary) and keep clean and free from debris the Common Areas (including without limitation the Amenity Area) and (to the extent provided herein) the Maintenance Areas and any improvements (including landscaping) located thereon, including any necessary removal or replacement of landscaping;

(b)    to maintain and repair the Roadways to the standards of the maintenance (if one is ascertainable) which would be required by the North Carolina Department of Transportation or other governmental entity before it would accept such Roadways for maintenance;

(c)    to maintain, operate, repair and reconstruct, when necessary, the entryways to the Project, including the entrance monuments, signage, irrigation, planters, landscaping and lighting located thereon;

(d)    to maintain and repair the swales and medians and associated Street Lights, landscaping and related improvements along and within the Roadways to the extent not maintained by the North Carolina Department of Transportation or other governmental entity, as the case may;

(e)    to pay all costs associated with the lease and operation of the Street Lights, including, but not limited to, monthly lease payments and utility costs;

(f)    to pay all ad valorem taxes levied against the Common Areas and any other property owned by the Association;

(g)    to pay the premiums on all insurance carried by the Association pursuant hereto or pursuant to the Bylaws;

(h)    to pay all legal, accounting, management, and other professional fees incurred by the Association in carrying out its duties as set forth herein or in the Bylaws;

(i)    to carry out all other purposes and duties of the Association, the Board of Directors and the Architectural Control Committee as stated in the Articles, the Bylaws and in this Declaration; and

(j)    to maintain contingency reserves for the purposes set forth in Article IV hereof in amounts as determined by the Board of Directors.

The expenses of the Association for the foregoing are sometimes referred to herein as "common expenses."

Section 3.    Payment of Annual Assessments; Due Dates.  Each Owner of a Lot, other than Declarant, shall pay to the Association Annual Assessments as hereinafter set forth.

Annual Assessments provided for herein shall commence as to all Lots shown on a Plat of any Phase of the Property, other than Lots owned by Declarant, as of the date of the conveyance of the first Lot in such Phase by Declarant to an Owner (other than Declarant) of such Lot.  The Annual Assessment for the first year in which a Lot is subject thereto shall be prorated based upon the number of days remaining in the applicable billing period from the date of such conveyance.  The Annual Assessment amount for the calendar year beginning January 1, 2005, shall be One Thousand Three Hundred Eighty and No/100ths Dollars ($1,380.00) per Lot.  The Annual Assessment amount for each and every year thereafter shall be in an amount as set by the Board of Directors, in accordance with the terms of this Article V.  Annual Assessments shall be due and payable in advance in equal installments on a monthly basis (or such other basis as is determined by the Board in its discretion) commencing on January 1 of each calendar year.  The Board of Directors shall fix the amount of the Annual Assessment as to each Lot subject to assessment for any calendar year at least thirty (30) days prior to January 1 of such calendar year, and the Association shall send written notice of the amount of the Annual Assessment, as well as the amount of the payment due, to each Owner on or before January 5 of such calendar year.  To the extent required by North Carolina General Statutes 47F-3-103(c) or other applicable law, such notice shall include notice of a meeting of the Members to consider ratification of the budget, including a statement that the budget may be ratified without a quorum.  If such a meeting is required by N.C. General Statutes 47F-3-103(c), or other applicable law, the Board of Directors shall set a date for a meeting of the Members to consider ratification of the budget to be held not less than ten (10) nor more than sixty (60) days after mailing of the summary and notice.  If such meeting is required as set forth above, there shall be no requirement that a quorum be present at the meeting.  If the proposed budget to be voted on at any such meeting is within the maximum increase limits set forth in Section 4(a) below, the budget is ratified unless at such meeting Members exercising all of the votes in the Association reject the budget.  If the proposed budget to be voted on at any such meeting exceeds the maximum increase limits set forth in Section 4(a), the budget is ratified unless at such meeting Members exercising a majority vote in the Association reject the budget.  The failure of the Association to send, or of a Member to receive, such notice shall not relieve any Member of the obligation to pay Annual Assessments.

Section 4.    Maximum Annual Assessment
(a)    For calendar year 2006 and thereafter, the Board of Directors, by a vote in accordance with the Bylaws, without a vote of the Members (unless required under N.C. General Statute 47F-3-103(c) or other applicable law, in which case the procedures set forth in Section 3 above shall apply), may increase the Annual Assessment applicable to each Lot subject to assessment by a maximum amount equal to the previous year's Annual Assessment times the greater of (i) ten percent (10%) or (ii) the annual percentage increase in the Consumer Price Index, All Urban Consumers, United States, All Items (1982-84 = 100) (hereinafter "CPI") issued by the U.S. Bureau of Labor Statistics for the most recent 12-month period for which the CPI is available.  If the CPI is discontinued, then the index most similar to the CPI (published by the United States Government indicating changes in the cost of living) shall be used.  If the Annual Assessments are not increased by the maximum amount permitted under the terms of this provision, the difference between any actual increase which is made and the maximum increase permitted for that year shall be computed and the Annual Assessments may be increased by that amount in a future year, in addition to the maximum increase permitted under the terms of the preceding sentence for such future year, by a vote of the Board of Directors, without a vote of the Members, unless required under N.C. General Statutes 47F 3-103 (c) or other applicable law, in which case the procedures set forth in Section 3 above shall apply.

(b)    For calendar year 2006 and thereafter, the maximum annual assessment applicable to each Lot may be increased above the maximum amount set forth in subparagraph (a) of this Section 4 by

2210035.07
LIB: Charlotte

a vote of a majority of the votes appurtenant to the Lot which are then subject to this Declaration, plus the written consent of Declarant (so long as Declarant owns any part of the Property), subject to the procedures set forth in Section 3 above if applicable.

(c)     The Board of Directors may fix the Annual Assessment applicable to each Lot subject to assessment at an amount not in excess of the maximum set forth in Subparagraph (a) of this Section 4 (the "Maximum Annual Assessment"). If the Board of Directors shall levy less than the Maximum Annual Assessment for any calendar year and thereafter, during such calendar year, determine that the important and essential functions of the Association cannot be funded by such lesser assessment, the Board may, by vote in accordance with the Bylaws, levy a supplemental Annual Assessment ("Supplemental Annual Assessment"), subject to the procedures set forth in Section 3 above, if applicable. In no event shall the sum of the Annual and Supplemental Annual Assessments for any year exceed the applicable Maximum Annual Assessment for such year other than as set forth herein.

(d)     With respect to any Lot conveyed by Declarant, the purchaser of such Lot shall pay to the Association at closing the amount of the Annual Assessment for the installment period in which the closing occurs on such Lot prorated based upon the number of days remaining in such installment period. With respect to any Lot conveyed by any Owner other than Declarant, the amount of the Annual Assessment applicable to such Lot for the installment period in which such closing occurs shall be prorated between the buyer and seller thereof as of the date of closing of such conveyance.

(e)     Declarant shall have the authority to reduce the Annual Assessment (i) on any Lot on which no structure has been completed (i.e., no Certificate of Occupancy has been issued), or (ii) on any Lot owned by a Featured Builder (as defined below) until such time as the Featured Builder sells or otherwise transfers ownership of its Lot.

Section 5.     Special Assessments. In addition to the Annual Assessment authorized above, the Association may levy, in any assessment year, a special assessment ("Special Assessment") applicable to that year for one or more of the following purposes: (i) paying the cost of the construction of any Common Area and/or Maintenance Area improvements which are not originally constructed by Declarant; or (ii) paying the cost of the reconstruction, repair or replacement of the Common Areas and/or Maintenance Areas, including any improvements located thereon, and including, without limitation, the Amenity Area; or (iii) paying the cost of preventative actions to protect the Property or any improvements located thereon, and to further reconstruct, repair or replace any portion of the Property or such improvements following an emergency, including but not limited to, floods, hurricanes, tornadoes, fires, acts of God or other naturally occurring phenomena; or (iv) any other similar purpose. Provided, however, (a) Declarant shall not be obligated to pay any Special Assessments on Lots owned by Declarant except with Declarant's prior written approval, and (b) any Special Assessment must be approved by Declarant (so long as Declarant owns any part of the Property) and by a vote of a majority of the votes appurtenant to the Lots which are then subject to this Declaration.

Section 6.     Special Individual Assessments. In addition to the Annual Assessments and Special Assessments authorized above, the Board of Directors shall have the power to levy a special assessment applicable to any particular Owner ("Special Individual Assessment") (i) for the purpose of paying for the cost of any construction, reconstruction, repair or replacement of any damaged component of the Common Areas and/or Maintenance Areas, including, without limitation, the Amenity Area and any improvements located thereon, whether occasioned by any act or omission of such Owner(s), members of such Owner's family or such Owner's agents, guests, employees, tenants or invitees and not the result of ordinary wear and tear; or (ii) for payment of fines, penalties or other charges imposed against any particular Owner relative to such Owner's failure to comply with the terms and provisions of this Declaration, the Bylaws or any rules or regulations promulgated by the Association or the Declarant

2210035.07
LIB: Charlotte

pursuant to this Declaration or the Bylaws. Provided, however, Declarant shall not be obligated to pay any Special Individual Assessment except with Declarant's prior written approval. The due date of any Special Individual Assessment levied pursuant to this Section 6 shall be fixed in the Board of Directors resolution authorizing such Special Individual Assessment. Upon the establishment of a Special Individual Assessment, the Board shall send written notice of the amount and due date of such Special Individual Assessment to the affected Owner(s) at least thirty (30) days prior to the date such Special Individual Assessment is due.

Section 7.    Collection Agent. At the option of the Board of Directors, any person or entity designated by the Board of Directors may act as collection agent for any and all assessments imposed by the Association and/or the Board against the Owners.

Section 8.    Assessment Loan or contributed to the Association for the Association's payment of common expenses.

It is anticipated that until Declarant has sold a certain number of Lots (which number has not yet been determined, and which number is referred to herein as the "Break-even Number"), the Annual Assessments collected by the Association will not be sufficient to pay all common expenses on a current basis, but that the anticipated Annual Assessments collected after the Break-even Number of Lots has been sold will exceed common expenses. To fund this shortfall, Declarant reserves the right, but is not obligated, to make loan (the "Assessment Loan") to the Association, as provided below, until cash flow from the Annual Assessments is sufficient to pay common expenses. If Declarant elects to make the Assessment Loan, then Declarant shall advance to the Association annually the amount by which the common expenses exceed the Annual Assessments collected for such year. The Association shall have the affirmative obligation to repay the Assessment Loan to the Declarant in accordance with the terms hereof, together with interest thereon at the short term Applicable Federal Rate ("AFR"), as published by the Internal Revenue Service, and adjusted each month to reflect the AFR for such month. The Association shall use proceeds advanced to the Association only to pay the above described shortfall in common expenses. The Association shall repay the Assessment Loan to Declarant in monthly installments beginning on the first day of the first month following the month in which sales of Lots reach the Break-even Number, until the balance of the Assessment Loan has been repaid to Declarant in accordance with its terms; provided, however, an Assessment Loan shall in no event be repaid to Declarant later than December 31, 2010. Each Owner of a Lot, by acceptance of a deed or other conveyance therefor, whether or not it shall be so expressed in any such deed or other conveyance, is hereby deemed to covenant and agree (and such covenant further shall be deemed to constitute a portion of the purchase money and consideration for acquisition of the Lot), that such an Assessment Loan is reasonable and was made by Declarant and accepted by the Association in good faith and at arm's length.

Section 9.    Working Capital Fund. At the time of closing of the initial sale of each Lot by Declarant to a third party purchaser, a sum equal to Seven Hundred Fifty and No/100 Dollars ($750.00), or any other sum as Declarant, while a Class II Membership exists, or the Board, following the termination of the Class II Membership, shall determine, shall be collected from the purchaser of such Lot (or, if Declarant so elects, from Declarant) and transferred to the Association to be held as a working capital fund. The purpose of said fund is to insure that the Association will have adequate cash available to meet unforeseen expenses, and to acquire additional equipment or services deemed necessary or desirable. Amounts paid into the fund shall not be considered advance payment of regular assessments.

Section 10.    Transfer Fee.
The Board shall have the authority, on behalf of the Association, to establish and collect a transfer fee (the "Transfer Fee") from the transferring Owner upon each transfer of title to a Lot in the Property, which fee

shall be payable at the closing of the transfer and shall be secured by the Association's lien for assessments under Article V, Section 1. The Board shall have the sole discretion to determine the amount and method of determining any such Transfer Fee, which may, but is not required to, be determined based upon a sliding scale which varies in accordance with the "Gross Selling Price" of the Unit or another factor as determined by the Board; provided, however, any such fee shall not exceed seventy-five hundredths of a percent (0.75%) of the Gross Selling Price of the Lot (including the Dwelling Unit and all other Improvements thereon). For the purpose of determining the amount of the Transfer Fee, the Gross Selling Price shall be the total cost to the purchaser of the Lot (including the Dwelling Unit and all other Improvements thereon). All Transfer Fees which the Association collects may be deposited with and used for any one or more of the same purposes for which assessments are used, as the Board deems beneficial to the general good and welfare of the Project.

Notwithstanding the above, no Transfer Fee shall be levied upon transfer of title to a Lot or Dwelling Unit:

      (a)     by or to Declarant;

      (b)     to a Featured Builder who is holding title solely for purposes of development and resale;

      (c)     by a Featured Builder to the first Owner to occupy a Dwelling Unit upon or within a Lot;

      (d)     by a co-owner of a Lot or Dwelling Unit to any Person who was also a co-owner of such Lot or Dwelling Unit immediately prior to such transfer;

      (e)     to the Owner's estate, surviving spouse or child upon the death of the Owner;

      (f)     to an entity wholly owned by the grantor; provided, however, upon any subsequent transfer of an ownership interest in such entity, the transfer fee shall become due; or

      (g)     to an institutional lender pursuant to a Mortgage or upon foreclosure of a Mortgage.

## ARTICLE VI

### GENERAL ASSESSMENT PROVISIONS

Section 1.    Certificate Regarding Assessments. The Association shall, upon demand, and for a reasonable charge, furnish a certificate signed by an officer of the Association setting forth whether the assessments on a specified Lot have been paid. A properly executed certificate of the Association as to the status of assessments on a Lot is binding upon the Association as of the date of its issuance.

Section 2.    Effect of Nonpayment of Assessments; Remedies of the Association. Any assessment (or installment thereof) not paid by its due date as set forth herein shall bear interest from such due date at the rate of eighteen percent (18%) per annum or the highest rate then permitted by law, whichever is less. In addition to such interest charge, the delinquent Owner shall also pay such late charge as may have been theretofore established by the Board of Directors to defray the costs arising because of late payment. The Association may bring an action at law against the delinquent Owner (or foreclose the lien against the applicable portion of the Property), and interest, late payment charges, costs

and reasonable attorney's fees related to such action or foreclosure shall be added to the amount of such assessment and assessment lien. No Owner may waive or otherwise escape liability for the assessments provided for herein by non-use of his or her property or the Common Areas or otherwise.

Section 3. Subordination of the Lien to Mortgages. The lien of the assessments provided for in this Declaration shall be subordinate to the lien of any first Mortgage on a Lot. Sale or transfer of any Lot shall not affect the assessment lien. The sale or transfer of any Lot pursuant to a mortgage foreclosure under any first Mortgage on a Lot, or any proceeding in lieu thereof, however, shall extinguish the lien (but not the personal obligation of the mortgagor or any prior Owner) of such assessments as to payments which became due prior to such sale or transfer; provided, however, that the Board of Directors may in its sole discretion determine such unpaid assessments to be an Annual, Special or Special Individual Assessment (as the case may be), as applicable, collectable pro rata from all Owners, including the foreclosure sale purchaser. Such pro rata portions are payable by all Owners notwithstanding the fact that such pro rata portions may cause the Annual Assessment to be in excess of the Maximum Annual Assessment permitted hereunder. No sale or transfer shall relieve the purchaser of such Lot from liability for any assessments thereafter becoming due or from the lien thereof, but the lien provided for herein shall continue to be subordinate to the lien of any first Mortgage on a Lot.

# ARTICLE VII

# RESTRICTIONS

Section 1. Residential Restrictions Each Lot shall be used exclusively for single-family, non-transient residential purposes; provided, however, Declarant shall have the right to use the Lots designated from time to time by Declarant for the purpose of construction and operation of construction offices and sales/marketing offices (and for related uses) for the Project. No trade, business or business activity of any kind shall be conducted upon a Lot or any part thereof except by Declarant as described hereinabove or except with the written approval of the Board. Provided, however, the Board may permit a business or business activity to be conducted on a Lot so long as such business, in the sole discretion of the Board, does not otherwise violate the provisions of this Declaration; does not create a disturbance; does not unduly increase traffic flow or parking congestion on the Property or in the Project; is not a mail order business; is incidental to the Lot's primary residential use; and is in compliance with all applicable laws. Furthermore, Owners who pursue such incidental occupational use of their Lots shall have no employees, customers or clients at the Lot and shall obtain prior approval from all authorities having jurisdiction over the use of the Lot and the Dwelling Unit located thereon. The Board may issue rules regarding permitted business activities. Leasing of a residence on a Lot shall not be considered a business or business activity.

a. Except those to be utilized by Declarant as described hereinabove, no structure shall be erected, placed, altered, used or permitted to remain on any Lot other than one attached or detached single-family private Dwelling Unit and one private garage for not less than two (2) vehicles and only such other accessory structures as are approved in advance in writing by the Architectural Control Committee pursuant to the Guidelines. Only Dwelling Units on the Lots may be occupied for use as a residence. Dwelling Units shall be occupied by no more persons than the maximum permitted by law, and by no more than one household or housekeeping unit. No Lot and no Improvements may be used for hotel or other transient residential purposes. Each lease relating to any Lot or any Improvements thereon (or any part of either thereof) must be for a term of at least six (6) months, must be in writing, and must provide that the tenant is obligated to observe and perform all of the terms and provisions hereof applicable to such Lot and/or Improvements.

15

2210055.07
Charlotte

Section 2.    Dwelling Unit Size.  The square footage requirements set forth below are for enclosed heated floor area, are measured from the ground level up (said ground level being the first level of any Dwelling Unit as viewed from the Roadway fronting same) and are exclusive of the areas in heated or unheated basements, vaulted ceiling areas and attics, unheated porches of any type, attached or detached garages, porte-cocheres and unheated storage areas, decks and patios.

Any Dwelling Unit erected upon any Lot shall contain not less than the following heated floor areas:

| | Minimum Total Heated Area | Minimum Ground Floor Heated Area |
|---|---|---|
| 1 Story | 2,200 | 2,000 |
| 1½ story, split level, tri-level and others | 2,500 | 1,800 |
| 2 story, 2½ story, and 3 story | 2,400 | 1,400 |

Notwithstanding the foregoing requirements, the Architectural Control Committee shall have the right (but not the obligation), because of restrictive topography, lot shape, dimensions or unusual site related conditions or other reasons, to allow variances from such minimum square footage requirements of up to ten percent (10%) of such minimum square footage requirements by granting a specific written variance.

No Dwelling Unit erected upon a Lot shall contain more than three (3) stories above ground level (said ground level being the first level of any Dwelling Unit as viewed from the Roadway fronting same). Nothing herein shall be construed to prohibit the finishing of any walkup third floor in a Dwelling Unit. Notwithstanding the foregoing, the Architectural Control Committee shall have the right (but not the obligation), because of steep topography, unique Lot configuration or dimensions, unusual site related conditions or other similar reasons, to allow Dwelling Unit heights greater than three (3) stories as viewed from rear and side elevations.

Section 3.    HVAC Equipment.  No air conditioning or heating equipment or apparatus shall be installed on the ground in front of, or attached to any front wall of, any Dwelling Unit on a Lot. Additionally, air conditioning and heating equipment and apparatus shall be screened from view from Roadways by landscape improvements, as more particularly provided in the Guidelines.

Section 4.    Exterior Lighting; Tennis and Other Sport Courts.  Exterior lighting on Lots shall be subject to the applicable requirements and limitations in the Guidelines. Tennis courts and sport courts may not be constructed on any Lot without the approval of the Architectural Control Committee. Night lighting of tennis courts and other recreational facilities on Lots is not permitted.

Section 5.    Fences and Walls.  In addition to the restrictions contained elsewhere in this Declaration and except as expressly provided below, no fence or wall (including densely planted hedges, rows or similar landscape barriers) (i) shall be erected, placed, maintained or altered on any Lot nearer to any Roadway fronting such Lot than the front building corner of the main Dwelling Unit constructed on such Lot (unless otherwise approved by the Architectural Control Committee) and (ii) shall not exceed six (6) feet in height, except fences enclosing approved tennis courts may be up to ten (10) feet in height if located at least twenty-five (25) feet from all Lot boundary lines.  Provided, however, and notwithstanding the foregoing, in order to accentuate certain architectural styles within the Project, Declarant and/or the Architectural Control Committee, in their sole and absolute discretion, may allow the

construction and use of fencing along or near the front, side and/or rear boundary lines of certain designated Lots within the Project. All fences and walls shall be maintained in a structurally sound and attractive manner. No fence or wall shall be erected on any Lot until the Architectural Control Committee has given its prior written approval of the color, size, design, materials and location for such fence or wall.

Section 6. Mail and Newspaper Boxes: House Numbers. Declarant shall provide to each Lot Owner, at Lot Owner's expense, and each Lot Owner shall install and maintain, at Lot Owner's expense, a standard mailbox/newspaper box for such Owner's use on such Owner's Lot. No other mailbox or newspaper box shall be erected or maintained on any Lot. The location of the mailbox/newspaper box on a Lot must be approved in writing by the Architectural Control Committee. House numbers may be displayed on the Dwelling Unit and/or mailbox only as approved by the Architectural Control Committee. Declarant shall not be responsible for the installation or maintenance of any mailbox or newspaper box

Section 7. Animals. No animals, wildlife, livestock, reptiles or poultry shall be raised, bred or kept on any portion of the Property except that domesticated dogs, domesticated house cats, domesticated household birds, and fish may be kept as household pets, but not for any commercial purposes, provided that they do not create a nuisance (in the judgment of the Board) such as, but without limitation, by noise, odor, damage or destruction of property or refuse. Under no circumstances shall any animals which raise the insurance premium or are deemed to be "dangerous animal" pursuant to the Association's policy of liability insurance be allowed to be raised, bred, or kept on any portion of the Property. Any excrement deposited by an animal on any portion of the Property shall be promptly removed and appropriately disposed of by the owner of such animal. All animals shall at all times whenever they are outside of a Dwelling Unit be on a leash or otherwise confined in a manner acceptable to the Board. The Association may restrict the walking of pets to certain areas. Commercial activity involving pets, including, without limitation, boarding, breeding, grooming or training is not allowed. The ability to keep a pet is a privilege, not a right. If, in the opinion of the Board, any pet becomes a source of unreasonable annoyance to others, or the owner of the pet fails or refuses to comply with these restrictions, the owner, upon written notice, may be required to remove the pet from the Project. Pets may not be left unattended or leashed in yards or garages or on porches or lanais. Pursuant to rules and regulations, the Board may further regulate pets, including but not limited to number and type of pets. Animal control authorities shall be permitted to enter the Project and the Property to patrol and remove pets and wild animals. All pets shall be registered, licensed and inoculated as required by law. No fenced dog enclosure or other structure for pets may be constructed or maintained on any Lot unless the same has been approved in writing by the Architectural Control Committee.

Section 8. Signs No sign, banner, flag, billboard or advertisement of any kind, including without limitation, informational signs, "for sale" or "for rent" signs and those of contractors and subcontractors, shall be displayed on any Lot except for sign(s), banners(s), flags(s), and billboard(s) approved in advance by the Board of Directors, and by Declarant as long as Declarant owns any Lot or any portion of the Property. Declarant shall be entitled to erect and maintain signs and billboards advertising the Property, the Project or portions of either, or for any other purpose, on any portion of the Property owned by Declarant or in the Common Areas or Maintenance Areas. If permission is granted to any Owner to erect a sign within on a Lot, the Board of Directors (and Declarant, as long as Declarant owns any Lot or any portion of the Property) reserve the right to restrict the size, shape, color, lettering, height, material and location of the sign, or in the alternative, provide the Owner with a sign to be used for such purposes. No sign shall be nailed or otherwise attached to trees.

Section 9. Temporary Structures: Structure Materials. No residence or building of a temporary nature, including a construction trailer, shall be erected or allowed to remain on any Lot, and

17

2210055.07
LIB: Charlotte

no metal, fiberglass, plastic or canvas tent, barn, carport, garage, utility building, storage building or other metal, fiberglass, plastic or canvas structure shall be erected on any Lot or attached to any residence. Provided, however, nothing herein shall prohibit Declarant or a Featured Builder (subject to the prior written approval of Declarant) from erecting or moving temporary buildings onto Lots owned by Declarant or such Featured Builder to be used for storage, or for construction or sales offices.

Section 10. Sight Line Limitations. To the extent that governmental requirements shall not impose a stricter standard, no fence, wall, hedge or shrub planting which obstructs sight lines at elevations between two (2) and six (6) feet above Roadways shall be placed or permitted to remain on any corner Lot within the triangular areas shown on the Plat as "Sight Triangles." The same sight line limitations shall apply on any Lot within the triangular area formed by (i) the line that runs from the point of intersection of (a) the edge of a Roadway's pavement and (b) the edge of the pavement of the driveway on such Lot for a distance of ten (10) feet along such Roadway pavement away from such driveway pavement, (ii) the line that runs from said point of intersection for a distance of ten (10) feet along such driveway pavement away from such Roadway pavement, and (iii) the straight line that connects the ending points of the lines described in the foregoing clauses (i) and (ii). No tree shall be permitted to remain within such triangular areas unless the foliage line is maintained at an appropriate height to prevent obstruction of sight lines.

Section 11. Utilities. All utilities and utility connections shall be located underground, including electrical, telephone and cable television lines. Transformers, electric, gas or other meters of any type, or other apparatus shall be located at the rear of the buildings constructed on Lots or, if approved by the Architectural Control Committee in writing, located elsewhere on the Lot provided they are adequately screened as required by the Architectural Control Committee in accordance with the provisions of this Declaration.

Section 12. Sediment Control. Sufficient sediment control measures, including, but not limited to, installation and maintenance of silt fences, straw bale fences, storm water inlet protection and temporary seeding, to the extent deemed reasonably necessary by Declarant or the Architectural Control Committee, shall be taken by the Owner or Owner's builder to ensure that all sediment resulting from any land disturbance or construction operation is retained on the Lot in question. All sediment control measures must be maintained until such Lot has been permanently stabilized with respect to soil erosion.

Section 13. Building Envelope. No building or other Improvement on any Lot (including any stoops or porches, patios, decks, terraces, etc.) shall be erected or permitted to remain outside of the "Building Envelope" for that particular Lot as established by the Architectural Control Committee (as to each Lot, the "Building Envelope"). The Building Envelope approved for any Lot will be available from the Architectural Control Committee on an unrecorded map. Provided, however, and notwithstanding the foregoing to the contrary, (i) exterior steps at the front and rear of a Dwelling Unit may project into the setback area established by the Building Envelope up to a distance of five (5) feet, and (ii) fireplace chimney structures projecting from the side of a Dwelling Unit may encroach no more than eighteen (18) inches into the side yard setback established by the Building Envelope. The Architectural Control Committee shall have the right in its sole discretion to make exceptions to any Building Envelope to recognize any special topography, vegetation, Lot shape or dimension, or other site-related conditions. In the event any zoning or subdivision ordinance, floodway regulation or other ordinance, law or regulation applicable to a Lot shall prescribe greater setbacks, then all buildings erected during the pendency of such requirements shall conform thereto.

Section 14. Waste. No Lot shall be used or maintained as a dumping ground for rubbish, trash, new or used lumber or weed, metal scrap, or garbage, except that such material may be kept on the Lot or in areas of the Property designated for this purpose by the Declarant (in connection with its

18

construction) or by the Board of Directors, provided that these materials are kept in sanitary containers in a clean and sanitary condition. Owners shall place these containers for collection only in the designated areas and only on the day these refuse materials are to be collected. Empty containers shall be removed promptly after collection. During construction of Improvements on a Lot, all rubbish and debris shall be stored and disposed of in accordance with the rules and established by the Architectural Control Committee.

Section 15. Combination or Subdivision of Lots. Should the Owner of a Lot own an adjacent Lot(s) and desire that two (2) or more such Lots be considered as one Lot, then such Lots shall (except as provided herein) be considered as one Lot for the purposes of this Article VII upon the recordation in the Office of the Register of Deeds of Union County, North Carolina, of an instrument by such Owner expressing such intent (such instrument to refer specifically to this section in this Declaration and to identify the Lots to be considered as one Lot for purposes of this Article VII, and a copy of such recorded instrument shall be promptly delivered by such Owner to the Architectural Control Committee); and in each such case, Building Envelopes, setback lines, and easements reserved in this Declaration shall be adjusted accordingly by the Architectural Control Committee. The Owner of any Lot which combines with all or a portion of a contiguous Lot shall be solely responsible for any costs which may result from such combination, including the costs of relocating any existing easements. With respect to combined Lots, Declarant reserves the right to designate said combined Lots as one (1) Lot or multiple Lots, in Declarant's sole and absolute discretion, for purposes of payment of assessments. No Lot shall be subdivided by sale, lease or otherwise without the prior written consent of Declarant. Provided, however, Declarant reserves the right to change the size, boundaries or dimensions of any Lot owned by Declarant for any reason.

Section 16. Restricted Activities in Common Areas and Maintenance Areas. No cutting of vegetation, dumping, digging, filling, destruction or other waste shall be committed on the Common Areas or the Landscape Easements or other Maintenance Areas. There shall be no obstruction of the Common Areas or the Maintenance Areas, or of any drainage channels or facilities thereon, nor shall anything be kept or stored in the Common Areas or the Maintenance Areas, nor shall anything be altered, or constructed or planted in, or stored upon, or removed from, the Common Areas or the Maintenance Areas, without the prior written consent of the Declarant and the Association. Motor vehicles including, but not limited to, mini-bikes, snowmobiles, and motorcycles, may not be driven on the Common Area by any Owner, or any occupant or guest of an Owner, except on paved driveways and parking areas designated by the Board of Directors. Each Owner shall be liable to the Association and/or Declarant for any damage to any Common Area and/or the Maintenance Area caused by the negligence or willful misconduct of the Owner or his family, tenants, guests, agents, employees, or invitees. Provided, however, the provisions in this paragraph shall not apply to Declarant in connection with Declarant's construction activities on the Property. Except for work done by the Declarant in connection with the construction and marketing of the Lots and the Property, nothing shall be built, caused to be built or done in or to any part of the Property which will alter or cause any alteration to the Common Areas or any Improvements located thereon without the prior written approval of the Association and the Declarant. The Declarant's approval shall be required until Declarant no longer owns any portion of the Property.

Section 17. Unsightly or Unkempt Conditions. The pursuit of hobbies or other activities, including specifically, without limiting the generality of the foregoing, the assembly and disassembly of motor vehicles and other mechanical devices, which might tend to cause disorderly, unsightly, or unkempt conditions, shall not be pursued or undertaken on any Lot, other than in enclosed garages. All garage doors in the Project shall be kept closed except when in use.

Section 18. Rules of the Board. All Owners of any Lot shall abide by all rules and regulations adopted by the Board from time to time. The Board shall have the power to enforce

compliance with said rules and regulations by all appropriate legal and equitable remedies, and an Owner determined by judicial action to have violated said rules and regulations shall be liable to the Association and/or Declarant for all damages and costs, including attorneys' fees.

Section 19.    Recreational and Other Equipment    (a)    No recreational equipment (including, but not limited to, basketball backboards and hoops, trampolines, swing sets, tree houses, children's climbing or play apparatus and other equipment associated with either adult or juvenile leisure or recreation) shall be attached to the exterior of any Dwelling Unit or otherwise placed or kept on any Lot, except in accordance with the requirements as set forth in the Guidelines.

(b)    No such recreational equipment shall be located in such a manner as to constitute a nuisance or unsightly condition to adjoining Owners.

(c)    Children's play toys and other moveable equipment of any type (such as lawn mowers, garden tools, etc.) shall not remain repeatedly overnight within any front yard of any Lot, or within the side yards of any Lot located on a Roadway corner, in such number or for such a long period of time as to create a continuing, unsightly condition.

Section 20.    Parking; Storage

(a)    Roadways, driveways, streets and other exterior parking areas on the Property shall be used by Owners, occupants and guests for fully operable, inspected and registered four wheel passenger vehicles, two wheel motorized bicycles and standard bicycles only. No recreational vehicles, vans (other than non-commercial passenger vans), mobile homes, trailers, boats, trucks (unless licensed as a passenger vehicle and less than three-quarter ton capacity) or commercial vehicles (whether or not registered as a commercial vehicle with the State Department of Transportation) shall be permitted to be parked on the Property, except on a day-to-day temporary basis in connection with repairs, maintenance or construction work on the Lot or if entirely enclosed in a Lot Owner's garage. No vehicles, trucks, vans, cars, trailers, construction equipment, etc. may be parked overnight on any Roadway within the Property.

(b)    Commercial-use vehicles or trucks not involved with construction activity on the Property and having a carrying capacity and/or size designation greater than or equal to three-fourths (3/4th) ton shall not be permitted to park overnight on the Roadways, driveways or otherwise within the Property, unless stored in an enclosed garage. No vehicle of any size which transports inflammatory or explosive cargo may be kept within the Property at any time. No vehicles that are not in a condition to be normally operated or that do not have a current registration tag may be stored or situated on any Lot for more than thirty (30) days unless stored in an enclosed garage.

(c)    The Owner of each Lot will be responsible for providing on such Owner's Lot a sufficient paved parking area for all vehicles normally parked and/or situated on or in regard to such Lot.

(d)    No recreational vehicles or related equipment, including any boat, houseboat, trailer, all terrain vehicle, motor home or "camper" vehicle may be maintained, stored or kept on any portion of the Property, unless stored in an enclosed garage or in an enclosure specifically approved for such maintenance or storage by the Architectural Control Committee.

(e)    No construction office trailers may be placed, erected or allowed to remain on any Lots during construction, except as approved in writing by the Architectural Control Committee. Provided, however, nothing herein shall prohibit Declarant from erecting or moving temporary buildings or trailers onto Lots owned by Declarant to be used as construction or sales offices. Other construction vehicles

2210055.07
LIB: Charlotte

(trucks, vans, cars, construction equipment, equipment trailers, etc.) may be left overnight on the Property (including any Lot or Roadway) only in accordance with such rules as may be established by the Architectural Control Committee.

Section 21. Nuisances. It shall be the responsibility of each Owner to prevent the development of any unclean, unhealthy, unsightly, or unkempt condition on such Owner's property. No Lot shall be used, in whole or in part, for the deposit, storage or burial of any property or thing that will cause such property to appear to be in an unclean or untidy condition or that will be obnoxious to the eye; nor shall any substance, thing, or material be kept that will emit foul or obnoxious odors or that will cause any noise or other condition that will or might disturb the peace, quiet, safety, comfort, or serenity of the occupants of surrounding property. No noxious or offensive activity shall be carried on within any Lot, nor shall anything be done tending to cause embarrassment, discomfort, annoyance, or nuisance to any Person using any property within the Project. There shall not be maintained on any Lot any plants or animals or device or thing of any sort whose activity or existence in any way is noxious, dangerous, unsightly, unpleasant, or of a nature as may diminish or destroy the enjoyment of the Project. Without limiting the generality of the foregoing, no speaker, horn, whistle, siren, bell, amplifier or other sound device, except such devices as may be used exclusively for security purposes, shall be located, installed or maintained upon the exterior of any Dwelling Unit or any unimproved Lot unless required by law.

Section 22. Clotheslines and Other Exterior Facilities.
No clotheslines and no outdoor clothes drying or hanging shall be permitted in the Project, nor shall anything be hung, painted or displayed on the outside of the windows (or inside, if visible from the outside) or placed on the outside walls or outside surfaces of doors of any of the Dwelling Units or any other Improvements, and no awnings, canopies or shutters (except for those heretofore or hereinafter installed by Declarant) shall be affixed or placed upon the exterior walls or roofs of any Dwelling Units or any other Improvements, or any part thereof, nor relocated or extended, without the prior written consent of the Board of Directors. Window air conditioners are prohibited.

Section 23. Antennas.
To the extent permitted by law, a DBS antenna, MDS antenna or transmission-only antenna may be erected on a Lot provided it is not greater than one (1) meter in diameter and prior approval of the Architectural Control Committee is obtained. No television broadcast antenna of any size or masts of any size attached to any of the above-listed antennas may be erected. Qualified antennas must be erected on the rear of the Lot or affixed to the rear of the Dwelling Unit, unless such placement impedes reception in which event such antenna may be erected in another location on the Lot provided that it is screened by landscaping or other material where reasonable.

2210055.07
LIB: Charlotte

Section 24.    Diligent Construction.    All construction, landscaping or other work which has been commenced on any Lot must be continued with reasonable diligence to completion and no partially completed Dwelling Units or other Improvements shall be permitted to exist on any Lot, except during such reasonable time period as is necessary for completion.    All construction must be completed within one (1) year after the date upon which it commenced, unless a longer time is approved by the Architectural Control Committee.    Any damage to the Roadways, curbs or sidewalks or any part of any Common Area, Maintenance Area or any utility system caused by an Owner or Owner's builder or such builder's subcontractors shall be repaired by such responsible Owner.    Any builder of Improvements and such builder's subcontractors on any portion of the Property shall keep such portion of the Property free of unsightly construction debris, in accordance with the construction rules established by the Architectural Control Committee (or, in the absence of such rules, in accordance with standard construction practices), and shall similarly keep contiguous public and private areas free from any dirt, mud, garbage, trash, or other debris which is occasioned by construction of Improvements.    The Board may levy a Special Individual Assessment against an Owner's property in the Project to pay for the cost of repairing any damage to Roadways, curbs or sidewalks or any part of any Roadway, Common Area, Maintenance Area or utility system, to pay for the cost of cleaning public and private areas, including the Roadways in the Project, and to pay for the cost of the removal of garbage, trash or other debris, which are occasioned by the activities of an Owner or Owner's builder or such builder's subcontractors during the construction of Improvements.

Section 25.    Governmental Requirements.    Nothing herein contained shall be deemed to constitute a waiver of any governmental requirements applicable to any Lot and all applicable governmental requirements or restrictions relative to the construction of Improvements on and/or use and utilization of any Lot shall continue to be applicable and shall be complied with in regard to the Lots. Each Owner shall comply with all laws, regulations, ordinances and other governmental rules and restrictions in regard to the Lot(s) or other portion of the Property owned by such Owner (including, without limitation, applicable zoning and watershed laws, rules, regulations and ordinances).

Section 26.    Occupants Bound.    All provisions of this Declaration, any Additional or Supplemental Declaration and the Bylaws and any and all rules and regulations, use restrictions or Guidelines promulgated pursuant hereto or thereto which govern the conduct of Owners and which provide for sanctions against Owners shall also apply to all Occupants even though Occupants are not specifically mentioned.

Section 27.    Applicability to Declarant and Builders.
The provisions of this Article are intended to restrict certain uses that may be harmful or affect the ambience or aesthetic appeal of the Property. The restrictions are not intended to prohibit Declarant from performing such work as may be necessary in the completion of the work in the Property.    The restrictions of this Article shall therefore not be binding upon Declarant in the performance of any of the work required in order to complete the development and construction of and within the Property. Furthermore, Declarant shall have the right, in its sole and absolute discretion, to exempt any Person purchasing a Lot from Declarant for the purpose of constructing a residence thereon for resale to a third party (such Person being hereinafter referred to as a "Builder") from any one or more of the provisions hereof during the period during which such Builder is constructing a residence thereon until such residence is sold by such Builder to a third party; and may furthermore grant to any such Builder, in Declarant's sole discretion, the right to exercise any one or more of the rights, easements and privileges reserved to Declarant under the terms hereof.

2210035.07
LIB: Charlotte

## ARTICLE VIII

## ARCHITECTURAL AND LANDSCAPING CONTROL

Section 1.    General. Notwithstanding anything contained in this Declaration to the contrary, no Improvements, including, without limitation, site preparation on any Lot, change in grade or slope of any Lot, or erection of buildings or exterior additions or alterations to any building situated upon the Property, erection of or changes or additions in fences, hedges, walls and other structures, any landscaping, or any cutting of trees on any Lot, shall be commenced, erected or maintained on any portion of the Property, subject to the provisions of Article VIII, Section 7 hereof, until: (a) the Architectural Control Committee, appointed as hereinafter provided, has approved the plans and specifications therefor and the location of such Improvements and has given its written approval for commencement of construction, all in accordance with the terms and requirements in the Architectural, Design and Landscape Guidelines; (b) the fees set forth in or contemplated in this Article VIII have been paid; and (c) the contracts identified in this Article VIII have been executed. In addition to any standards established pursuant to this Declaration, Declarant may establish, by Additional Declarations, architectural and landscaping control standards, guidelines and restrictions in regard to various Phases or sections of the Property. The provisions of this Article VIII shall not apply to the construction of any Improvements commenced, erected or maintained by Declarant on any Lot or upon any of the Common Areas or Maintenance Areas.

The Board may delegate to the Architectural Control Committee any powers or authority reserved or granted to the Board under this Article VIII.

Section 2.    Composition of Architectural Control Committee. So long as Declarant owns any Lot or other portion of the Property, the members of the Architectural Control Committee shall be appointed by Declarant. At such time as Declarant no longer owns any Lot or other portion of the Property or at such earlier date as Declarant releases its right to appoint the members of the Architectural Control Committee, the members of the Architectural Control Committee shall thereafter be appointed by the Board. The members of the Architectural Control Committee shall be appointed annually and will be composed of at least three (3) and not more than seven (7) individuals, the exact number of members of the Architectural Control Committee to be designated from time to time by the body then having the authority to appoint such members (Declarant or the Board, as the case may be). The members of the Architectural Control Committee need not be Owners of property in the Project. In the event of the death or resignation of any member of the Architectural Control Committee, the party or body then having the authority to appoint members to the Architectural Control Committee shall have full authority to designate and appoint a successor. Members of the Architectural Control Committee may be removed and replaced at any time, with or without cause, and without prior notice, by the party or body then having the authority to appoint such members. Notwithstanding anything contained herein to the contrary, the Architectural Control Committee shall have the right, power and authority to employ and/or use the services of any architects, engineers, attorneys or other professionals as it deems necessary or advisable, in its sole discretion, to carry out the duties and obligations of the Architectural Control Committee as described in this Article VIII.

Section 3.    Architectural and, Design and Landscape Guidelines.
(a)    The Architectural Control Committee shall, from time to time, publish and promulgate architectural, design, and landscape guidelines (the "Guidelines"). The Guidelines shall be explanatory and illustrative of the general intent of the development of the Property and are intended as a guide to assist the Architectural Control Committee in reviewing plans and specifications for Improvements (including landscaping). The Guidelines shall also set out, among other things, the procedures for submission, review and approval of plans and specifications to the Architectural Control Committee and

2210055.07
LIB: Charlotte

the fees to be imposed by the Architectural Control Committee, as more specifically described in Article VIII, Section 8 hereof; and the Guidelines may address the Featured Builders, as more specifically described in Article VIII, Section 9 hereof. In any event, the Guidelines shall not be binding upon the Architectural Control Committee, may be revised and amended at any time by the Architectural Control Committee, in its sole discretion, and shall not constitute, in any event, the basis for approval or disapproval of plans, specifications and other materials (for the construction of non-landscape Improvements) submitted to the Architectural Control Committee for approval.

        (b)      The portions of the Guidelines addressing landscaping Improvements may establish approved standards, methods and procedures for landscaping, landscape management and landscape maintenance in the Property, including the removal of trees. Such authorized standards, methods and procedures shall be utilized by Owners and their contractors and subcontractors, and the approval by the Architectural Control Committee of any landscaping plan or other landscaping improvement in connection with landscaping on a Lot or other portion of the Property shall be based upon the conformity of such plan or improvement with the Guidelines.

        (c)      The Architectural Control Committee is also hereby authorized to publish and promulgate from time to time, and revise and amend at any time in its sole discretion, construction rules to be followed by all Owners and builders performing work or constructing or installing Improvements (including landscape Improvements) on the Property.

        (d)      The Architectural Control Committee may issue and amend the Guidelines from time to time and may publish and promulgate different Guidelines for different Phases, sections or portions of the Property.

Section 4.      Definition of "Improvements". The term "Improvement" or "Improvements" shall mean and include any and all man-made changes or additions to a Lot, including, but not limited to, the location, materials, size and design of all buildings (including any exterior devices attached to or separate from buildings, such as heating and air conditioning equipment, solar heating devices, antennae, satellite dishes, etc.); storage sheds or areas; roofed structures; parking areas; fences; "invisible" pet fencing; pet "runs," lines and similar tethers or enclosures; walls; irrigation equipment, apparatus and systems; landscaping (including cutting of trees); hedges; mass plantings; poles; driveways; ponds; lakes; changes in grade or slope; site preparation; swimming pools; hot tubs; jacuzzis; tennis courts; tree houses; basketball goals; skateboard ramps; and other sports or play apparatus; signs; exterior illumination; and changes in any exterior color or shape. The definition of Improvements includes both original Improvements and all later changes to Improvements. The definition of Improvements, however, does not include the replacement or repair of Improvements previously approved by the Architectural Control Committee, provided such replacement or repair does not change exterior colors, materials, designs or appearances from that which were previously approved by the Architectural Control Committee.

Section 5.      Enforcement.

        (a)      It is Declarant's intent that the architectural control provisions of this Declaration and any Additional Declarations are to permit control of the architectural design and landscaping and to establish quality standards for construction and construction activity in the Project and to help preserve values of properties in the Project. All Owners, by purchasing property subject to this Declaration, acknowledge that a violation of any such provisions could result in irreparable harm and damage to other Owners of property in the Project and to Declarant, and to the values of their respective properties in the Project, a monetary measure of which harm and damage would be difficult to establish. Accordingly, the Association shall have the specific right (but not the obligation) to enforce and/or to prevent any violation of the provisions contained in this Article VIII by a proceeding at law or in equity against the person or

2210055.07
LIB: Charlotte

persons violating or attempting to violate any such provisions. Declarant hereby specifically reserves and grants unto the Architectural Control Committee, the Board and any agent or member thereof, the right of entry and inspection upon any portion of the Property for the purpose of determination by the Architectural Control Committee or the Board whether there exists any construction of any Improvement which violates the terms of any approval by the Architectural Control Committee, the terms of the Guidelines, the terms of this Declaration or any Additional Declaration, or the terms of any amendments hereto or thereto.

(b)     As to nonconforming or unapproved Improvements, the Association may require any Owner to restore such Owner's Improvements to the condition existing prior to the construction thereof (including, without limitation, the demolition and removal of any unapproved Improvements) if such Improvements were commenced or constructed in violation of this Article. In addition, the Association may, but has no obligation to, cause such restoration, demolition and removal to be performed and to levy the amount of the cost thereof as a Special Individual Assessment against the Lot or portion of the Property upon which such Improvements were commenced or constructed. In the event that it becomes necessary to resort to litigation to determine the propriety of any constructed Improvement, to remove any unapproved Improvement or otherwise to remedy a violation of the Guidelines, the Association shall be entitled to recover court costs, attorneys' fees and expenses incurred by the Association and/or the Architectural Control Committee in connection therewith, which costs, fees and expenses may be levied as a Special Individual Assessment against the Lot or other portion of the Property upon which such Improvement was commenced or constructed.

Section 6.     Failure of the Architectural Control Committee to Act.  If the Architectural Control Committee fails to approve or disapprove any plans and specifications and other submittals which conform (and which relate to Improvements which will conform) with the requirements hereof and of the Guidelines or to reject them as being inadequate or unacceptable within forty-five (45) business days after receipt thereof, and provided such submittal was a full and complete submittal, in accordance with the Guidelines, of all items that were to have been submitted to the Architectural Control Committee, and provided the Architectural Control Committee shall again fail to approve or disapprove of such plans, specifications and other submittals within ten (10) business days after additional written request to act on such items is delivered to the Architectural Control Committee following the passage of such first above-described forty-five (45) business day period, it shall be conclusively presumed that the Architectural Control Committee has approved such conforming plans and specifications and other submittals, EXCEPT that the Architectural Control Committee has no right or power, either by action or failure to act, to waive or grant any variances relating to any mandatory requirements specified in this Declaration or any Additional Declaration, and EXCEPT FURTHER, that the Architectural Control Committee shall not be deemed to have waived any of the requirements set forth in Article VIII, Section 8, Section 9 or Section 10 hereof. If plans and specifications or other submittals are not sufficiently complete or are otherwise inadequate, the Architectural Control Committee may reject them as being inadequate or may approve or disapprove part, conditionally or unconditionally, and reject or approve the balance. The Architectural Control Committee is authorized to request the submission of samples of proposed construction materials.

Section 7.     Variances.  Upon submission of a written request for a variance, which request shall set forth, among other things, the extraordinary circumstances applicable to a Lot giving rise to the need for a variance, the Architectural Control Committee may, from time to time, in its sole discretion, permit Owners to construct, erect or install Improvements which are at variance with restrictions, requirements or provisions of this Declaration or any Additional Declaration from which a variance is permitted, pursuant to the terms hereof or thereof. In any case, however, the Architectural Control Committee may grant a variance only due to the existence of extraordinary circumstances applicable to a Lot, which extraordinary circumstance (i) has not been caused by the Owner of such Lot and (ii)

25

materially impairs the ability of an Owner to construct a Dwelling Unit on such Owner's Lot. Any variance granted shall be in basic conformity with and shall blend effectively with the general architectural style and design of the community and shall not materially change the scheme of restrictions herein set forth. Written requests for variances shall be deemed to be disapproved in the event the Architectural Control Committee has not expressly and in writing approved such request within thirty (30) business days of the submission of such request. No member of the Architectural Control Committee shall be liable to any Owner for any claims, causes of action, or damages arising out of the grant or denial of any variance to any Owner. Each request for a variance submitted hereunder shall be reviewed separately and apart from other such requests and the grant of a variance to any Owner shall not constitute a waiver of the Architectural Control Committee's right to strictly enforce the covenants, restrictions and architectural standards provided hereunder or under any Additional Declaration against any other Owner. If a variance is granted, the Owner receiving such variance shall comply with the more restrictive of the terms of the variance or applicable local, state or federal laws (including, without limitation, local zoning and development laws), and the granting of a variance shall not relieve any Owner from the obligation of complying with such laws.

      **Section 8.**    **Fees Required by the Architectural Control Committee.** The Architectural Control Committee, in its sole discretion, may require that each Person submitting plans and specifications for Improvements to the Architectural Control Committee pay one or more fees to the Architectural Control Committee or to Declarant as a condition to commencement of construction of such Improvements. Such fee(s), including the amount(s), payee and purpose(s) thereof, shall be established by, and may be increased from time to time by, the Architectural Control Committee and shall be set forth in the Guidelines.

      **Section 9.**    **Featured Builders.**
      (a)    The Architectural Control Committee may require, in its sole discretion, that each Person submitting plans and specifications to the Architectural Control Committee for the construction of Improvements also submit to the Architectural Control Committee a copy of a fully signed contract (for the construction of such Improvements) between the Owner of the relevant Lot and a builder who is featured by the Board or the Architectural Control Committee, in their sole discretion (herein, a "Featured Builder"; collectively, the "Featured Builders"), as a condition to the commencement of construction of any such Improvements.

      (b)    The Architectural Control Committee may provide a list of Featured Builders in accordance with the provisions of the Guidelines. To qualify as a Featured Builder, a builder must satisfy certain criteria and requirements established by the Architectural Control Committee and Declarant. However, the criteria and requirements established by the Architectural Control Committee and Declarant for a builder to qualify as a Featured Builder are solely for the Architectural Control Committee's and Declarant's protection and benefit and are not intended to, and shall not be construed to, benefit any Owner or any other party whatsoever. The Architectural Control Committee and Declarant make no representation, express or implied, to any Owner or any other party whatsoever with regard to the Featured Builders, including, without limitation, the existence, nature and extent (including coverage amounts and deductibles) of insurance policies that may be maintained by the Featured Builders from time to time, the solvency or financial status of the Featured Builders from time to time, the nature and amount of any bonds that may be maintained by the Featured Builders from time to time, the performance (or the ability to perform) by the Featured Builders of their contractual obligations (including any contractual obligations of any of the Featured Builders in favor of any Owner or any other party whatsoever), the compliance by the Featured Builders with building codes and other requirements, rules, laws and ordinances of federal, state and local governmental and quasi-governmental bodies and agencies relating to the construction of homes and other activities engaged in by the Featured Builders from time to time, the use of any substance or material, including, without limitation, any stucco or synthetic material

2210055.07
LIB: Charlotte

by the Featured Builders in connection with the construction of homes, the compliance by any Featured Builder with any licensing requirements imposed by federal, state and local governmental and quasi-governmental bodies and agencies from time to time, including, without limitation, the maintenance of any required builder's and/or contractor's license, and the failure or alleged failure of any Featured Builder to comply with any industry standard or any other reasonable standard or practice with respect to such builder's work or materials used in the construction of houses and other activities engaged in by such Featured Builder at Marvin Creek . Furthermore, neither the Architectural Control Committee nor Declarant, nor the officers, directors, members, employees, agents or affiliates of either of them, shall have any responsibility whatsoever for any sum that any Owner or any other party may deposit with a Featured Builder, including, without limitation, any earnest money or other deposit that any Owner may deliver to a Featured Builder. The selection of a Featured Builder by an Owner shall be conclusive evidence that such Owner is independently satisfied with regard to any and all concerns such Owner may have about the Featured Builder's work product and/or qualifications. Owners shall not rely on the advice or representations of the Architectural Control Committee, Declarant or the officers, directors, members, employees, agents or affiliates of either of them in that regard.

     Section 10.    No Construction Without Payment of Fees and Use of a Featured Builder. Notwithstanding anything contained in this Article VIII to the contrary, plans and specifications for Improvements to be constructed on a Lot or other portion of the Property shall not be deemed to have been properly submitted unless and until any and all fees required by the Architectural Control Committee to be paid in connection with such Improvements, as provided in Article VIII, Section 8 above, shall have been paid to the Architectural Control Committee or Declarant as required. In addition, such plans and specifications shall not be deemed to have been properly submitted unless a copy of a fully signed contract between the Owner of the relevant Lot and a Featured Builder for construction of such Improvements (if required by the Architectural Control Committee), as provided in Section 9 above, shall have been submitted to the Architectural Control Committee.

     Section 11.    Notices and Submittals. Notices and submittals to the Architectural Control Committee shall be in accordance with the notice provisions set forth from time to time in the Guidelines.

     Section 12.    Separate Committee for Changes to Existing Improvements. The Board shall have the right, power and authority, in its sole discretion, to appoint a committee separate and apart from the Architectural Control Committee to review plans and specifications for any and all renovations, changes and additions to existing Improvements located on a Lot or other portion of the Property (herein, the "Architectural Changes Committee"). Should the Board appoint such an Architectural Changes Committee, then the Architectural Control Committee shall relinquish to the Architectural Changes Committee its authority to review plans and specifications for any such changes to existing Improvements, and the Architectural Changes Committee shall be solely responsible for review and approval of the same. The composition of the Architectural Changes Committee shall be determined by the Board in its sole discretion and the procedure for submission, review and approval of plans and specifications to and by the Architectural Changes Committee shall be set forth in the Guidelines. Notwithstanding the foregoing, nothing herein shall be deemed to obligate the Board to appoint an Architectural Changes Committee, and until an Architectural Changes Committee is appointed, the Architectural Control Committee shall be responsible for reviewing and approving or disapproving all plans and specifications for renovations, changes and additions to existing Improvements in accordance with the provisions of this Article VIII and the Guidelines.

     Section 13.    Limitation of Liability. No member of the Architectural Control Committee or the Architectural Changes Committee shall be liable for claims, causes of action or damages (except where occasioned by willful misconduct of such member) arising out of services performed pursuant to this Article VIII. Neither the Architectural Control Committee, nor the Architectural Changes Committee

2210055.07
LIB: Charlotte

(if applicable), nor the members thereof, nor the Association, nor Declarant, nor any officers, directors, members, employees, agents or affiliates of any of them, shall be liable for damages or otherwise to anyone submitting plans and specifications and other submittals for approval or to any Owner by reason of mistake of judgment, negligence or nonfeasance arising out of or in connection with the approval or disapproval of, or the failure to approve or disapprove of, any plans and specifications. The approval of plans and specifications by the Architectural Control Committee or the Architectural Changes Committee (if applicable) shall not be deemed or construed as a representation or warranty of the Architectural Control Committee or the Architectural Changes Committee (as the case may be), Declarant, or any officer, director, member, employee, agent or affiliate of any of them, (i) that Improvements constructed in accordance with such plans and specifications will comply with applicable zoning ordinances, building codes, or other governmental or quasi-governmental laws, ordinances, rules and regulations or (ii) as to the structural soundness, quality, durability, suitability, fitness or proper functioning of Improvements constructed in accordance with such plans and specifications; and any responsibility or liability therefor is hereby disclaimed. Every person who submits plans and specifications, and every Owner, agrees that he will not bring any action or suit against Declarant, the Association, the Architectural Control Committee, the Architectural Changes Committee (if applicable), the Board, or the officers, directors, members, employees, agents or affiliates of any of them, to recover any such damages and hereby releases, demises, and quitclaims all claims, demands and causes of action arising out of or in connection with any judgment, negligence or nonfeasance and hereby waives the provisions of any law which provides that a general release does not extend to claims, demands and causes of action not known at the time the release is given. Declarant shall be the sole party responsible for the performance of Declarant's obligations under this Declaration, and no other person, firm or entity, including, without limitation, any entity affiliated with Declarant, shall have any obligation or liability for Declarant's obligations under this Declaration.

Section 14. Miscellaneous. Members of the Architectural Control Committee and, if applicable, the Architectural Changes Committee, in the sole discretion of the party or body appointing such members (i.e., either Declarant or the Board, as the case may be) may be compensated for their services. The Association shall reimburse members of the Architectural Control Committee and the Architectural Changes Committee (if applicable) for reasonable out-of-pocket expenses associated with their activities hereunder. All costs, expenses and attorneys' fees of the Architectural Control Committee and the Architectural Changes Committee (if applicable), including those incurred in connection with the exercise of their enforcement or other powers as provided herein, shall be borne by the Association; provided, however, nothing herein shall be deemed to negate the Association's right to an award of court costs, attorneys' fees and expenses in accordance with Article VIII, Section 5 hereof.

# ARTICLE IX

## INSURANCE; REPAIR AND RESTORATION; CONDEMNATION

Section 1. Board of Directors. The Board of Directors shall obtain and maintain at all times insurance of the type and kind and in no less than the amounts set forth below:

(a) Fire. All improvements and all fixtures and personal property included in the Common Areas and Maintenance Areas and all personal property and supplies belonging to the Association shall be insured in an amount equal to the current replacement cost (exclusive of land, foundation, excavation and other normally excluded items) as determined annually by the Board with the assistance of the insurance company providing coverage. The Board shall, at least annually, review the insurance coverage required herein and determine the current replacement cost of such improvements and fixtures and personal property and supplies. Such coverage shall provide protection against loss or damage by fire or other

28

4210055.07
LIB: Charlotte

hazards covered by a standard extended coverage endorsement, windstorm and water damage, vandalism and malicious damage and all perils covered by a standard "all risk" endorsement. In addition to the provisions and endorsements set forth in Article IX, Section 3 and Section 4, the fire and casualty insurance described herein shall contain the following provisions:

(1)     standard "Agreed Amount" and "Inflation Guard" endorsements;

(2)     construction code endorsements if the Common Area becomes subject to a construction code provision which would require changes to undamaged portions of any building thereby imposing significant costs in the event of partial destruction of such building by an insured peril;

(3)     a waiver of subrogation by the insurer as to any claims against the Association, any officer, director, agent or employee of the Association, the Owners and their employees, agents, tenants and invitees; and

(4)     a provision that the coverage will not be prejudiced by act or neglect of one or more Owners when said act or neglect is not within the control of the Association or by any failure of the Association to comply with any warranty or condition regarding any portion of the Property over which the Association has no control.

The fire and casualty insurance policy shall not contain (and the insurance shall not be placed with companies whose charters or bylaws contain) provisions whereby: (1) contributions or assessments may be made against the Association or the Owners; (2) loss payments are contingent upon action by the carrier's directors, policy holders or members; and (3) there are limiting clauses (other than insurance conditions) which could prevent Owners from collecting the proceeds.

(b)     Public Liability.  The Board shall also be required to obtain and maintain, to the extent obtainable, public liability insurance and officer's and director's liability insurance in such limits as the Board may, from time to time, determine to be customary for projects similar in construction, location and use as the Project, covering each member of the Board, the managing agent, if any, and each Owner with respect to his liability arising out of the ownership, maintenance, or repair of the Common Areas and Maintenance Areas, or from service on the Board; provided, however, in no event shall the amounts of such public liability insurance ever be less than $2,000,000 per occurrence against liability for bodily injury, including death resulting therefrom, and damage to property, including loss of use thereof, occurring upon, in or about, or arising from or relating to, the Property or any portion thereof, nor shall the amount of such officer's and director's insurance be less than $2,000,000 unless such coverage is determined by the Board to be unreasonably expensive.  Such insurance shall include endorsements covering cross liability claims of one insured against another, including the liability of the Owners as a group to a single Owner.  The Board shall review such limits annually.  Until the first meeting of the Board following the initial meeting of the Association Members, such public liability insurance shall be in amounts of not less than $2,000,000 per occurrence for claims for bodily injury and property damage and such officer's and director's liability insurance shall be in amounts not less than $2,000,000.

(c)     Fidelity Coverage.  The Board shall also be required to obtain fidelity coverage against dishonest acts on the part of all persons, whether officers, directors, trustees, employees, agents or independent contractors, responsible for handling funds belonging to or administered by the Association. The fidelity insurance policy shall be written in an amount sufficient to provide protection which is in no event less than one and one-half times the Association's estimated annual operating expenses and reserves.  An appropriate endorsement to the policy to cover any persons who serve without compensation shall be added if the policy would not otherwise cover volunteers.

2210055.07
LIB: Charlotte

(d)     Other.   Such other insurance coverages, including flood insurance and worker's compensation, as the Board shall determine from time to time desirable.

Section 2.     Premium Expense. Premiums upon insurance policies purchased by the Board shall be paid by the Board and charged as a common expense to be collected from the Owners pursuant to the terms of this Declaration.

Section 3.     Special Endorsements. The Board shall make diligent efforts to secure insurance policies that will provide for the following:

(a)     recognition of any insurance trust agreement entered into by the Association;

(b)     coverage that may not be cancelled or substantially modified (including cancellation for nonpayment of premium) without at least thirty (30) days' prior written notice to the named insured and any insurance trustee; and

(c)     coverage that cannot be cancelled, invalidated or suspended on account of the conduct of any officer or employee of the Board without prior demand in writing that the Board cure the defect and the allowance of a reasonable time thereafter within which the defect may be cured by the Association or any Owner.

Section 4.     General Guidelines. All insurance policies purchased by the Board shall be with a company or companies licensed to do business in the State of North Carolina and holding a rating of "A VIII" or better by the current issue of Best's Insurance Reports. All insurance policies shall be written for the benefit of the Association and shall be issued in the name of and provide that all proceeds thereof shall be payable to the Association. Notwithstanding any of the foregoing provisions and requirements relating to insurance, there may be named as an insured, on behalf of the Association, the Association's authorized representative, who shall have exclusive authority to negotiate losses under any policy providing such insurance.

Section 5.     Insurance Proceeds. Subject to any limitations imposed by any applicable financing documents, the Association shall use the net proceeds of casualty insurance covered by it to repair and/or replace any damage or destruction of property, real or personal, covered by such insurance. Any balance from the proceeds of casualty insurance paid to the Association remaining after satisfactory completion of repair and replacement shall be retained by the Association as part of the general reserve fund for repair and replacement of the Common Area and/or Maintenance Areas.

Section 6.     Insufficient Proceeds. If the insurance proceeds received by the Association are insufficient to reimburse, to repair and/or replace any damage or destruction to person or property, the Board may levy a Special Assessment against the Owners to cover the deficiency.

Section 7.     Owner's Personal Property. Neither the Association nor Declarant shall be liable in any manner for the safekeeping or condition of any personal property belonging to or used by any Owner or his family, tenants, guests or invitees, located on or used at the Common Areas. Further, neither the Association nor Declarant shall be responsible or liable for any damage or loss to any personal property of any Owner, his family, tenants, guests or invitees located on or used at the Common Areas. Each Owner shall be solely responsible for all personal property and for any damage thereto or loss thereof, and shall be responsible for the purchase of, at such Owner's sole cost and expense, any liability or other insurance for damage to or loss of such property. Neither the Association nor Declarant shall be responsible or liable for any damage or loss to or of any equipment or other personal property of any Owner, his family, tenants, guests or invitees located on or used at the Parking Area or other Common

Areas. Each Owner shall be solely responsible for all personal property and for any damage thereto or loss thereof, and shall be responsible for the purchase, at such Owner's sole cost and expense, of any liability or other insurance for damage to or loss of such property.

Section 8. No Obligation to Insure Owners' Property. By virtue of taking title to a Lot within the Project, each Owner acknowledges that neither the Association nor Declarant has any obligation to provide any insurance for any portion of such Lot or any Dwelling Unit or other property located thereon.

Section 9. Security. The Association may, in its sole discretion, but shall not be obligated to, provide certain security and fire protection measures, and maintain or support certain other activities within the Project designed to make the Project safer than it might otherwise be. Provided, however, should the Association provide, maintain or support any such measures or activities, then neither the Association, Declarant, nor any successor of Declarant shall in any way be considered insurers or guarantors of security or fire protection within the Project, and neither the Association, Declarant nor any successor of Declarant shall be held liable for any loss or damage by reason or failure to provide or take any security or fire protection measures or for the ineffectiveness of any such measures undertaken. Each Owner and Occupant of any Lot or Dwelling Unit and each tenant, guest and invitee thereof acknowledges and understands that neither the Association, Declarant nor any successor of Declarant are insurers, and each such Owner, and Occupant of a Lot or Dwelling Unit and their tenants, guests and invitees hereby assume all risks for loss or damage to persons, property or contents belonging to any such persons.

Section 10. Condemnation. Whenever all or part of the Common Area shall be taken or condemned by any authority having the power of eminent domain, all compensation and damages for and on account of such taking shall be paid to the Association. The Association, acting through the Board, shall have the right to negotiate and litigate the issues with respect to the taking and compensation affecting the Common Area, without limitation on the right of the Owners to represent their own interests. Each Owner, by his acceptance of a deed to a Lot or other portion of the Property, hereby appoints the Association as his attorney-in-fact to negotiate, litigate or settle on his behalf all claims arising from the condemnation of the Common Area. All compensation and damages paid to the Association on account of such a taking shall be used to restore the Common Area, provided such restoration is possible, with the excess, if any, to be retained by the Association and applied to future operating expenses by the Board, in its sole discretion. Nothing herein is to prevent Owners whose Lots or other property are specifically affected by the taking or condemnation from joining in the condemnation proceedings and petitioning on their own behalf for consequential damages relating to loss of value of the affected Lots or other property, or improvements, fixtures or personal property thereon, exclusive of damages relating to the Common Area. In the event that the condemnation award does not allocate consequential damages to specific Owners, but by its terms includes an award for reduction in value of Common Area, Lots or other property without such allocation, the award shall be divided between affected Owners and the Board, as their interests may appear, by the Board in its sole discretion.

31

## ARTICLE X

## EASEMENTS AND OTHER RIGHTS

Declarant, in addition to any other easements granted or reserved herein, hereby reserves unto itself, its successors and assigns, and grants to the Association and any other persons or entities hereinafter set forth, the following non-exclusive easements on, upon, over, across, through and under the Property. In addition, Declarant hereby reserves unto itself, its successors and assigns, the right, on behalf of itself and the Association, to grant additional easements on, upon, over, across, through and under the Common Areas and any portion of the Property owned by Declarant as deemed to be in the best interests of and proper for the Project, including, but not limited to, easements in favor of Declarant, the Association, the Owners, and all their family members, guests, invitees and tenants and to various governmental and quasi-governmental authorities and agencies and private concerns for the purposes and uses hereinafter specified.

Section 1. Easements and Cross-Easements on Common Areas. Declarant, for itself, its designees and the Association, reserves the right to impose upon the Common Areas henceforth and from time to time such easements and cross-easements for ingress and egress, installation, maintenance, construction and repair of utilities and facilities including, but not limited to, electric power, telephone, cable television, master antenna transmission, surveillance services, governmental and quasi-governmental purposes, sewer, water, gas, drainage, irrigation, storm water management, lighting, television transmission, garbage and waste removal, emergency services, and the like as it deems to be in the best interests of, and necessary and proper for, the Project or any portion thereof.

Section 2. Use of Common Areas. Subject to any limitation or restriction set forth in this Declaration, Declarant declares that the Common Areas are subject to a perpetual nonexclusive easement in favor of Declarant, the Association and their designees, the Owners and all their family members, guests, invitees and tenants, and appropriate governmental and quasi-governmental agencies to use the Common Areas for all proper and normal purposes including, but not limited to, ingress, egress and access for the furnishing of services and utilities and for such use of the facilities as the same are reasonably intended in accordance with the terms of this Declaration and any Additional Declaration. If ingress or egress to any Lot or other portion of the Property is through any Common Area, any conveyance or encumbrance of such area is subject to this easement.

Section 3. Right-of-Way Over Roadways. Declarant hereby reserves, for the benefit of itself, its agents, employees, lessees, invitees, designees, successors and assigns, and grants to the Association, its agents, employees, tenants, invitees, designees, successors and assigns; and to each Owner of a Lot, their family members, tenants, guests, invitees, successors and assigns, and to each Occupant of a Lot and to all governmental and quasi-governmental agencies and service entities having jurisdiction over the Property while engaged in their respective functions, a perpetual non-exclusive easement, license, right and privilege of passage and use, both pedestrian and vehicular, over and across the Roadways for the purpose of providing access, ingress and egress to and from, through and between the Property.

Section 4. Right of the Association and Declarant to Enter Upon the Common Areas and Maintenance Areas. Declarant hereby reserves for the benefit of itself, its successors in interest and assigns, and grants to the Association and all agents, employees or other designees of Declarant or the Association an easement for ingress, egress and access to enter upon or over the Common Areas and Maintenance Areas for the purposes of inspecting any construction, proposed construction, or Improvements or fulfilling the rights, duties and responsibilities of ownership, administration, maintenance and repair of Declarant or the Association, as appropriate. Such easement includes an

2210055.07
LIB: Charlotte

easement in favor of the Association and Declarant to enter upon the Common Areas and Maintenance Areas now or hereafter created to use, repair, maintain and replace the same for the purposes for which they are initially designated or for such purposes as they are hereafter redesignated or as Declarant otherwise determines them to be reasonably suited. Notwithstanding the foregoing, nothing contained herein shall be interpreted as imposing any obligation upon the Association or Declarant to maintain, repair, or construct Improvements which an Owner is required to maintain, construct or repair.

Section 5.    Easement for Encroachments. Declarant hereby reserves, for the benefit of itself, its successors in interest and assigns, and grants to the Association, the Owners, their successors and assigns, and to the Occupants of Lots, easements for encroachments, to the extent necessary, in the event any portion of the Improvements located on any portion of the Property now or hereafter encroaches upon any of the remaining portions of the Property as a result of minor inaccuracies in survey, construction or reconstruction, or due to settlement or movement. Any easement(s) for encroachment shall include an easement(s) for the maintenance and use of the encroaching Improvements in favor of Declarant, the Association, the Owners and all their designees.

Section 6.    Maintenance Areas
Declarant hereby reserves, for the benefit of itself, its successors in interest and assigns, and grants to the Association, its successors and assigns, the following nonexclusive perpetual easements over certain areas of the Property as hereinafter described for the purposes hereinafter described:

(i)    Easements for the purposes of landscaping and maintaining entryways and erecting and maintaining entrance monument(s) for the Project, over, across and under those portions of the Property shown and designated as "Monument Easement" on the Plats (herein referred to as the "Entrance Monument Easements"). Declarant and/or the Association shall have the right to landscape and maintain the areas of the Property so designated as entryways to the Project, to erect and maintain entrance monument(s) thereon bearing the name of the Project, and to erect and maintain lighting for such monument(s), plantings, landscaping, irrigation systems and other improvements typically used for entryways.

(ii)    Easements for the installation, maintenance, repair and removal of landscaping and landscaping amenities, including signage, lighting, monuments and irrigation systems, over, across and under those portions of the Property shown and designated as "Landscape Easements" on the Plats (herein referred to as "Landscape Easements").

(iii)    Easements for the installation, maintenance, repair and removal of sidewalks, over, across and under those portions of the Property shown and designated as "Sidewalk Easements" on the Plat (herein referred to as the "Sidewalk Easements").

(iv)    Easements for the installation, maintenance, repair and removal of storm drainage facilities within the areas shown as "S.D.E.," "Storm Drainage Easement," or other similar designation on the Plats.

All of the above-described areas and items shall herein be referred to as the "Maintenance Areas." The Association shall maintain the Maintenance Areas to a consistent standard of maintenance typical of a first-class development. Notwithstanding the foregoing, Association shall not be obligated to maintain the Landscape Easements with the exception of the Landscape Easements along Joe Kerr Road. Association shall have the right, but not the obligation, to enter onto and maintain other Landscape Easements. Additionally, Association may maintain a portion, but not all, of certain Maintenance Areas. Each Owner shall be obligated to maintain all portions of any Maintenance Area located upon his or her Lot to the extent the Association does not maintain it.

33

2210055.07
LIB: Charlotte

Section 7.     Utility and Drainage Easements.  The Property shall be subject to all easements and rights-of-way for utilities and drainage shown on the Plats, including, but not limited to, those certain easements shown and designated on the Plats as:

(a)     "Utility Easement";

(b)     "Public Storm Drainage Easement" or "Drainage Easement" or "S.D.E.";

(c)     "Sanitary Sewer Easement"; and

(d)     "Sanitary Sewer Right-of-Way."

Such easements are hereby reserved for the use of Declarant, its successors and assigns, and are hereby established for the use of the Association, its successors and assigns, and include, without limitation, storm drainage easements of variable width, whether or not depicted on a Plat, over the entire area within all ditches along any Roadway.

Additionally, Declarant hereby reserves, for the benefit of itself, its successors and assigns, and grants to the Association, its successors and assigns, a non-exclusive easement and right-of-way over, under and along (a) a 10-foot strip of land adjacent to the front, side and rear boundary lines of all Lots within the Property and (b) all Landscape Easements, for the installation and maintenance of lines, conduits, pipes and other equipment necessary for furnishing electric power, gas, telephone service, cable service, water, irrigation, septic system, sanitary sewer and drainage facilities, storm drainage and/or other utilities. Within the above-described easements no structure, planting or other material shall be placed or permitted to remain which may damage or interfere with the installation of utilities or which may change the direction or flow of drainage channels in the easements.  This reservation of easements shall not prohibit the construction of driveways, at locations approved by the Architectural Control Committee, over such easements.

Section 8.     Irrigation Easements.  Declarant hereby reserves, for the benefit of itself, its successors and assigns, and grants to the Association, its successors and assigns, non-exclusive perpetual easements over, across and under those portions of the Property shown and designated as "Irrigation Easement" on the Plats for the installation, maintenance, repair and removal of irrigation systems to service the landscaping to be installed and maintained in the Landscape Easement areas (herein referred to as the "Irrigation Easements"). Within the Irrigation Easements no structure, planting or other material shall be placed or permitted to remain which may damage or interfere with the installation, repair and maintenance of irrigation systems.  This reservation of easements shall not prohibit the construction of driveways, at locations approved by the Architectural Control Committee, over such easements.

Section 9.     Declarant's Right to Assign Easements; Maintenance of Easement Areas. Declarant shall have the right to assign and convey, in whole or in part, the easements reserved by it hereunder.  The areas burdened by the easements and rights-of-way reserved by Declarant on each Lot or other portion of the Property pursuant hereto, including any Improvements in such areas, which are not to be maintained by the Association or a public authority or utility, shall be maintained continuously by each Owner of such Lot or other portion of the Property, but no structures, plantings or other material shall be placed or permitted to remain upon such areas or other activities undertaken thereon which may damage or interfere with the installation or maintenance of utilities or other services, or which may retard, obstruct or reverse the flow of water or which may damage or interfere with established slope ratios or create erosion problems.  Notwithstanding the above, the Association and/or Declarant shall have the right, but not the obligation, to maintain the landscaping in the easement areas on any Lot.

2210055.07
LIB: Charlotte

**Section 10.**   Easement Reserved for the Association and Declarant. Full rights of access, ingress and egress are hereby reserved by Declarant for itself and the Association at all times over and upon any Lot or other portion of the Property for the exercise of the easement rights described in this Article X and for the carrying out by Declarant or the Association of the rights, functions, duties and obligations of each hereunder; provided, that any such entry by Declarant or the Association upon any Lot or portion of the Property shall be made with the minimum inconvenience to the Owner of such property as is reasonably practical, and any damage caused as a result of the gross negligence of Declarant, the Association or their employees or agents shall be repaired by Declarant or the Association, as the case may be, at the expense of Declarant or the Association, as the case may be.

**Section 11.**   Additional Easements. Declarant shall have the right to grant over, under, across and upon any portion of the Property owned by Declarant, and the Board shall have the authority, in its sole discretion, to grant over, under, across and upon the Common Areas, such easements, rights-of-way, licenses and other rights in accordance with or to supplement the provisions of this Declaration or as may otherwise be desirable for the development of the Project, by the execution, without further authorization, of such grants of easement or other instruments as may from time to time be necessary or desirable. Such easements may be for the use and benefit of persons who are not Association Members or Owners. After such time as the members of the Board are no longer appointed by Declarant, the Board shall cooperate with Declarant and execute such grants of easements over the Common Areas as may be desirable to Declarant for the development of the Project and the preservation and enhancement of Declarant's interest therein.

**Section 12.**   No Merger of Easements.   The easements hereby established shall not be terminated by merger or otherwise, except upon execution and recordation of an instrument specifically terminating any such easement.

## ARTICLE XI

## RIGHT OF FIRST REFUSAL

**Section 1.**   Applicability. Except for sales and conveyances by Declarant, no unimproved Lot may be sold by any Owner except in compliance with the provisions of this Article XI.

**Section 2.**   Right of First Refusal. Before any unimproved Lot (or any ownership interest therein) may be sold to any Person other than Declarant or its successors, the Owner or Owners of such Lot shall first offer in writing to sell the Lot to Declarant or its successors at a price equal to: (1) the contract purchase price paid by such Owner for such Lot (excluding all finance charges related to the purchase) increased by the percentage increase, from the closing date of such Owner's purchase of such Lot to the date of such written offer to sell the Lot to Declarant or its successors, in the CPI, less (2) the cost of removing all liens and encumbrances on the Lot and customary seller's closing costs (including, without limitation, the cost of preparing the deed and any documentary or transfer tax stamps to be affixed to said deed). For the purposes of this Article, a Lot shall be considered as unimproved unless and until any proposed Improvements to such Lot have been approved by the Architectural Control Committee and the good faith commencement of the construction of such Improvements (i.e., at a minimum, completion of footings and foundation of the approved residence and bona fide evidence of total expenditures for Improvements to the Lot of at least $50,000.00) shall have occurred. Upon receipt by an Owner of a bona fide offer to purchase an unimproved Lot, such Owner shall send to Declarant a copy of such bona fide offer along with written notification that such Owner is offering the Lot for sale to Declarant pursuant to this right of first refusal. If Declarant or its successor does not accept or reject in writing said offer of sale within thirty (30) days from the date of receipt of the same, then the Owner or

Owners of such Lot shall have the right to sell the Lot to the third party making such bona fide offer pursuant to such bona fide offer, without any further additional obligation to offer the Lot to Declarant. Declarant shall have this right of first refusal with regard to each bona fide offer which an Owner receives for the purchase of an unimproved Lot. Any Owner who buys an unimproved Lot from another Owner shall be governed by the provisions of this Article and the waiver of the right of first refusal with respect to any sale shall not limit Declarant's rights of first refusal with respect to any subsequent sale of any unimproved Lot. Provided, however, the right of first refusal reserved by Declarant pursuant to this Section 2 shall be valid and enforceable with respect to any unimproved Lot only for a period of fifteen (15) years from the date of the first conveyance of such Lot from Declarant to an Owner other than Declarant, and upon the expiration of said fifteen (15) year period, the Owner or Owners of such Lot shall have the right to sell the unimproved Lot to any third party without the obligation to offer the Lot to Declarant. Further provided that this Section 2 shall not be applicable with respect to any foreclosure sale of a first lien deed of trust or first lien mortgage on an unimproved Lot or deed in lieu thereof which is made and delivered in good faith. In each instance where an offer to purchase an unimproved Lot is presented to Declarant by an Owner pursuant to the right of first refusal granted herein, Declarant shall determine in its sole discretion and on a case by case basis whether to exercise its right of first refusal, and such determination may be made on such basis and for such reason as Declarant in its sole discretion shall choose. Should an Owner fail to comply with the provisions of this Section 2 and sell an unimproved Lot without first offering said Lot to Declarant in accordance with the terms hereof, then the purchaser of such unimproved Lot shall purchase such Lot subject to the right of first refusal herein granted, and Declarant shall thereafter at any time have the right to purchase such Lot, whether or not it is subsequently improved, from the purchaser thereof at the price as set forth in this Section 2, and shall also be entitled to any other rights and remedies available at law or in equity for the violation of this Section 2.

Section 3. <u>Death of an Owner; Gift</u>. The personal representative, heirs, successors and assigns of any Owner who dies while owning any unimproved Lot, or the donee of a gift of a Lot from an Owner, shall become an Owner subject to the terms and conditions of this Declaration and any subsequent sale, transfer and conveyance of such Lot shall be governed by the provisions of this Article.

Section 4. <u>Transfers to Declarant</u>. In the event that Declarant exercises its right of first refusal pursuant to Section 2 above, the closing of the conveyance of such Lot shall occur within sixty (60) days after receipt by the Owner of written notice from Declarant or its successors that it elects to exercise its right of first refusal with respect to such Lot. At the closing, Declarant shall make payment to such Owner of the purchase price as described in Section 2 above, in cash or cash equivalent. The Owner shall deliver to Declarant a special warranty deed conveying fee simple marketable title to the Lot free and clear of all exceptions except those that existed at the time of the acquisition of the Lot by such Owner, the lien of ad valorem taxes for the current year and any other exceptions which may be approved by Declarant. In the event the closing occurs after the death of an Owner, Declarant may, in its discretion, require the personal representative of the Owner to post such bonds or other assurances as Declarant may deem reasonable in order to protect Declarant from any loss which might be caused by the failure to pay any federal or state inheritance tax or the failure to pay the claims of any creditors who may have a lien on the Lot superior to Declarant's rights as a purchaser of said Lot.

Section 5. <u>No Further Documentation Required</u>. The right of first refusal reserved by Declarant in this Article shall run with the title to each Lot in the Project and be binding upon each purchaser of a Lot from Declarant and upon any subsequent Owner of a Lot, whether such Owner purchased such Lot from Declarant or from a third party. The provisions of this Article shall constitute record notice to all purchasers of Lots in the Project of the right of first refusal herein reserved, and no additional language in any deed of conveyance of a Lot and no recording of any additional instrument shall be required to make all Owners of Lots in the Project subject to the provisions of this Article.

## ARTICLE XII

## GENERAL PROVISIONS

Section 1. Duty of Maintenance. Except for those portions, if any, of a Lot which the Association may elect to maintain or repair hereunder, the Owner of any Lot shall have the duty and responsibility, at such Owner's sole cost and expense, to keep the Lot(s) owned by such Owner, including Improvements thereon and ground and drainage easements or other rights-of-way incident thereto, in compliance with the covenants, conditions, restrictions and development standards contained in this Declaration (to the extent applicable), and in any applicable Additional Declaration, in accordance with the provisions of the Guidelines, and in a well-maintained, safe, clean and attractive condition at all times. Such maintenance, as to unimproved and improved Lots, shall include, but shall not be limited to, the following:

(1) Prompt removal of all litter, trash, refuse and waste;

(2) Keeping land, including any lawns and shrub beds, well maintained and free of trash, uncut grass and weeds;

(3) Keeping all sediment resulting from land disturbance or construction confined to the respective Owner's property; and

(4) Complying with all governmental health and police requirements.

In addition, such maintenance, as to improved Lots, shall include, but shall not be limited to, the following:

(1) Lawn mowing on a regular basis;

(2) Tree and shrub pruning;

(3) Watering by means of a lawn sprinkler system and/or hand watering as needed;

(4) Keeping exterior lighting and mechanical facilities in working order;

(5) Keeping lawn and garden areas alive;

(6) Removing and replacing any dead plant material;

(7) Maintenance of natural areas and landscaping in accordance with the Guidelines;

(8) Keeping parking areas and driveways in good repair;

(9) Repainting of Improvements; and

(10) Repair of damage and deterioration to Improvements, it being understood and agreed that if any Improvements are damaged or destroyed by fire or other casualty, then within six (6) months following the date such damage or destruction occurs, the Owner of the Lot on which such Improvements are situated, must repair and restore such damaged Improvements (in accordance with plans and specifications approved by the Architectural Control Committee and otherwise in accordance with the

2210035.07
LIB: Charlotte

terms and provisions of this Declaration and of each Additional Declaration applicable thereto) or remove such damaged Improvements and restore the Lot to its condition existing prior to the construction of such Improvements.

Notwithstanding anything contained herein to the contrary, the above-described maintenance responsibilities as to any Lot shall commence only upon a Plat showing such Lot being recorded in the Office of the Register of Deeds of Union County and upon the conveyance of such Lot by Declarant. If an Owner of any Lot has failed in any of the duties or responsibilities of such Owner as set forth herein, then the Board and Declarant, either jointly or severally, may give such Owner written notice of such failure and such Owner must within ten (10) days after receiving such notice (which notice shall be deemed to have been received upon deposit in an official depository of the United States mail, addressed to the party to whom it is intended to be delivered, and sent by certified mail, return receipt requested), perform the care and maintenance required or otherwise perform the duties and responsibilities of such Owner as described in herein. Provided, however, this cure period shall be extended for a time not to exceed sixty (60) days so long as Owner shall have commenced to cure such nonconformity and shall diligently prosecute the same. Should any such Owner fail to fulfill this duty and responsibility within such period, then the Association, acting through its authorized agent or agents, or Declarant (so long as it owns any portion of the Property), acting through its authorized agent or agents, either jointly or severally, shall have the right and power to enter onto the premises of such Owner and perform such care and maintenance without any liability for damages for wrongful entry, trespass or otherwise to any Person. The Owner of the Lot on which such work is performed shall be liable for the cost of such work, together with interest on the amounts expended by the Association or Declarant in performing such work computed at the highest lawful rate as shall be permitted by law from the date(s) such amounts are expended until repayment to the Association or Declarant, as the case may be, and for all costs and expenses incurred in seeking the compliance of such Owner with his duties and responsibilities hereunder, and such Owner shall reimburse the Association or Declarant, as the case may be, on demand for such costs and expenses (including interest as above provided). If such Owner shall fail to reimburse the Association or Declarant, as the case may be, within thirty (30) days after the mailing to such Owner of a statement for such costs and expenses, then, without limitation of any other rights of the Association or Declarant, the Association may impose a Special Individual Assessment against such Owner.

Section 2.    Duration.    This Declaration and the controls, covenants, restrictions and standards set forth herein shall run with and bind the Property and any Owner, and shall inure to the benefit of every Owner of a Lot in the Property and every Owner of any other portion of the Property, including Declarant, and their respective heirs, successors, and assigns, for a term of thirty (30) years beginning on the date this Declaration is recorded in the Office of the Register of Deeds of Union County, North Carolina. At the end of such thirty (30) year period, the easements, covenants, conditions and restrictions set forth herein shall automatically be extended for successive period(s) of ten (10) additional years, unless prior to the expiration of a respective period, by two-thirds (2/3) vote of the Association Members, there shall be adopted a resolution to terminate these covenants and restrictions. Owners may vote in person or by proxy at a meeting duly called for such purpose at which a quorum is present, written notice of which shall have been given to all Owners at least thirty (30) days in advance of the date of such meeting, which notice shall set forth the purpose of such meeting. The foregoing shall not limit the right of Declarant to amend and/or supersede, in whole or in part, the terms and provisions hereof, as such right in favor of Declarant is described in Section 3 below.

Section 3.    Amendment.    Except as otherwise expressly provided herein and subject to the limitations hereinafter contained, this Declaration may be amended or modified at any time by a vote of no less than sixty-seven percent (67%) of all votes entitled to be cast by the Association Members, which vote is taken at a duly held meeting of the Association Members at which a quorum is present, all in accordance with the Bylaws. Provided, however, if sixty-seven percent (67%) of all votes entitled to be

2210055.07
LIB: Charlotte

cast by the Association Members cannot be obtained at such a meeting, then this Declaration may be amended by obtaining the vote of sixty-seven percent (67%) of all votes present at a duly held meeting of the Association Members at which a quorum is present and by, within ninety (90) days of such vote, obtaining written consent to such amendment by Association Members holding a sufficient number of votes to comprise, along with such voting Association Members, a total of sixty-seven percent (67%) of all votes entitled to be cast by Association Members. Further provided, that any amendment or modification to this Declaration must be consented to by Declarant so long as Declarant is the Owner of any Lot or other portion of the Property, which consent Declarant may grant or withhold in its sole discretion. Any amendment or modification upon which the vote of Association Members is required pursuant to this Section 3 shall become effective when an instrument executed by the Association Members voting for such amendment or modification is filed of record in the Office of the Register of Deeds of Union County, North Carolina; provided, however, such an amendment or modification, in lieu of being executed by the Association Members voting for such amendment or modification, may contain a certification of the Secretary of the Association stating that the amendment or modification has been voted on and approved by the requisite number of votes of the Association Members, as provided in this Section 3.

Notwithstanding the terms of the immediately preceding paragraph of this Section 3, for a period of ten (10) years after the recordation of this Declaration, Declarant, without obtaining the approval of any Association Member or any Owner or Owners other than Declarant, shall have the unilateral right, in its sole and absolute discretion, to make any amendments or modifications hereto which Declarant deems necessary or desirable, including, without limitation, amendments or modifications to any procedural, administrative or substantive provision of this Declaration. Furthermore, at any time during the term of this Declaration, Declarant, without obtaining the approval of any Association Member or any Owner or Owners other than Declarant, shall have the unilateral right, in its sole and absolute discretion, to make any amendments or modifications hereto which do not involve a change which materially adversely affects the rights, duties or obligations specified herein.

Section 4.    Release of Property.  For a period of ten (10) years after the recordation of this Declaration, Declarant shall have the right, in its sole and absolute discretion, without the consent of the Association, any Association Member or any other Owner, to release any portion of the Property then owned by Declarant from the terms of this Declaration by recording a release in the Office of the Register of Deeds of Union County, North Carolina.  After the recordation of such release, the portion of the Property described therein shall not be subject to the terms of this Declaration.

Section 5.    Enforcement; Litigation.  The Association, Declarant or any Owner shall have the right, but not the obligation, on its own behalf or on behalf of others, to enforce the provisions of this Declaration or any Additional Declaration.  Enforcement of the controls, covenants, conditions, restrictions, easements, development guidelines, charges and liens for which provision is made in this Declaration shall be by a proceeding at law or in equity (or otherwise, as provided in this Declaration) against any person or persons violating or attempting to violate any such control, covenant, condition, restriction, easement, development guideline, charge or lien, either to restrain such violation or to recover damages, and against the land to enforce any lien created by these covenants; and failure by the Association, Declarant or any Owner to enforce any such control, covenant, condition, restriction, easement, development guideline, charge or lien shall in no event be deemed a waiver of the right to do so thereafter or of any other or future violation of any thereof.  Except as otherwise expressly provided in this Declaration, no judicial or administrative proceeding shall be commenced or prosecuted by the Association unless approved by a vote of no less than two-thirds (⅔) of all votes entitled to be cast by the Association Members, which vote is taken at a duly held meeting of the Association Members at which a quorum is present, all in accordance with the Bylaws.  The immediately preceding sentence shall not apply, however, to (a) actions brought by the Association to enforce the provisions of this Declaration, (b)

2210055.07
LIB: Charlotte

the imposition and collection of assessments, charges or other fees hereunder, (c) proceedings involving challenges to ad valorem taxation, (d) counter-claims brought by the Association in proceedings instituted against it or (e) actions brought by the Association against any contractor, vendor, or supplier of goods or services to the Project. This Section shall not be amended unless such amendment is approved by the percentage of votes, and pursuant to the same procedures, necessary to institute proceedings as provided above.

     Section 6.     Severability of Provisions. If any paragraph, section, sentence, clause or phrase of this Declaration shall be or become illegal, null or void for any reason or shall be held by any court of competent jurisdiction to be illegal, null or void, the remaining paragraphs, sections, sentences, clauses or phrases of this Declaration shall continue in full force and effect and shall not be affected thereby. It is hereby declared that the remaining paragraphs, sections, sentences, clauses and phrases would have been and are imposed irrespective of the fact that any one or more other paragraphs, sections, sentences, clauses or phrases shall become or be illegal, null or void.

     Section 7.     Notice. Except as otherwise set forth herein expressly, whenever written notice to an Owner or Association Member (including Declarant) is required hereunder, such notice shall be given by the mailing of same, postage prepaid, to the address of such Owner or Association Member appearing on the records of Declarant or the Association. If notice is given in such manner, such notice shall be conclusively deemed to have been given by placing same in the United States mail properly addressed, with postage prepaid, whether received by the addressee or not. Declarant's address as of the date of recording of this Declaration is 10800 Sikes Place, Suite 100, Charlotte, North Carolina 28277.

     Section 8.     Titles. The titles, headings and captions which have been used throughout this Declaration are for convenience only and are not to be used in construing this Declaration or any part thereof.

     Section 9.     No Exemption. No Owner or other party may exempt himself from the coverage hereof or obligations imposed hereby by non-use of such Owner's Lot(s) or other property located within the Project or the Common Area.

     Section 10.     Changes to Plans for the Project. Nothing contained herein shall be deemed to incorporate, by reference or otherwise, any plans or proposals promulgated by Declarant with respect to the development of the Project, and Declarant, subject to the covenants, conditions and restrictions contained in this Declaration and any Additional Declaration, reserves the right to change any plans for the Project at any time and from time to time as Declarant may determine to be necessary based upon Declarant's continuing research and design program and/or market conditions, and any plans for the Project shall not bind Declarant or its successors and assigns to adhere to such plans in the development of the Property or any part thereof. In addition, Declarant reserves the right to change, from time to time, the uses and densities that exist on any portion(s) of the Property owned by Declarant, subject to the covenants, conditions and restrictions contained in this Declaration and any Additional Declaration.

40

2210055.07
LIB: Charlotte

IN WITNESS WHEREOF, Declarant has caused this Declaration to be executed as of the day and year first above written.

NC COUNTRY CLUB ESTATES LIMITED PARTNERSHIP
By:     Toll NC GP Corp.

By:     _____
Name:   ~~Robert J Kardos~~
Title:  AVP

STATE OF NORTH CAROLINA

COUNTY OF Mecklenburg

I, Melissa M. Sassaman a Notary Public of the County and State aforesaid, certify that Robert J. Kardos personally came before me this day and acknowledged that s/he is Assistant Vice Pres of TOLL NC GP CORP., a North Carolina corporation, General Partner of NC COUNTRY CLUB ESTATES LIMITED PARTNERSHIP, a North Carolina limited partnership, and that he/she, as AVP_____, being authorized to do so, executed the foregoing instrument on behalf of the corporation, as General Partner of said Partnership.

Witness my hand and official stamp or seal this 21 day of December, 2004.

Melissa M. Sassaman
NOTARY PUBLIC

My Commission Expires:_____

[NOTARIAL STAMP OR SEAL]

OFFICIAL SEAL
Notary Public, North Carolina
MECKLENBURG COUNTY
MELISSA M. SASSAMAN
My Commission Expires September 16, 2009

EXHIBIT "A"

The "Property"

All of that property shown on Final Plat – Marvin Creek – Phase 1A, dated May 6, 2004, prepared by Stantec Consulting Services, recorded in Plat Cabinet I, File 161, 162, 163, and 164, in the office of the Register of Deeds of Union County, North Carolina; excluding, however, the parcel shown as "lands to be donated to adjoiner after san. sewer constructed" on the map recorded in Plat Cabinet I, Page 162, adjacent to Lots 24 and 25; and

All of that property shown on Final Plat – Marvin Creek – Phase 1B, dated December 7, 2004, prepared by Stantec Consulting Services, recorded in Plat Cabinet I, File 444 and 445, in the office of the Register of Deeds of Union County, North Carolina; and

All of that property shown on Final Plat – Marvin Creek – Phase 2A, dated December 7, 2004, prepared by Stantec Consulting Services, recorded in Plat Cabinet I, File 446 and 447, in the office of the Register of Deeds of Union County, North Carolina.

42
210055.07
LIB: Charlotte

# EXHIBIT B

FILED
UNION COUNTY, NC
**CRYSTAL CRUMP**
**REGISTER OF DEEDS**

| | |
|---|---|
| FILED AT | May 23, 2014  11:51 am |
| BOOK | 06230 |
| START PAGE | 0260 |
| END PAGE | 0311 |
| INSTRUMENT # | 12568 |
| EXCISE TAX | (None) |

AH

DECLARATION

OF

COVENANTS, CONDITIONS AND RESTRICTIONS

THE PRESERVE AT MARVIN

EXCEPT AS MAY BE PERMITTED BY THE ARCHITECTURAL CONTROL COMMITTEE, NO OWNER SHALL DISPLAY, INSTALL, ERECT OR MAINTAIN UPON ANY LOT ANY FLAG, AS MORE PARTICULARLY SET FORTH IN ARTICLE VII, SECTION 8, OF THIS DECLARATION. THIS DOCUMENT REGULATES OR PROHIBITS THE DISPLAY OF THE FLAG OF THE UNITED STATES OF AMERICA OR STATE OF NORTH CAROLINA.

NO OWNER SHALL DISPLAY, HANG, STORE OR EXHIBIT ANY SIGNS (INCLUDING WITHOUT LIMITATION POLITICAL SIGNS) OUTSIDE OF THE DWELLING ON ANY LOT OR IN ANY DWELLING SO AS TO BE VISIBLE FROM OUTSIDE THE LOT, OTHER THAN AS MAY BE PERMITTED BY THE RULES AND REGULATIONS, AS MORE PARTICULARLY SET FORTH IN ARTICLE VII, SECTION 8 OF THIS DECLARATION. THIS DOCUMENT REGULATES OR PROHIBITS THE DISPLAY OF POLITICAL SIGNS.

Drawn by and after recording return to:
Brian P. Evans, Esq.
K & L Gates LLP
214 N. Tryon Street, Suite 4700
Charlotte, NC 28202

CH-3170451 v7

STATE OF NORTH CAROLINA

COUNTY OF UNION

**DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR THE PRESERVE AT MARVIN**

     **THIS DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS** (this "Declaration") is made this 11th day of April_____, 2014, by **TOLL NC I LLC**, a North Carolina limited liability company (the "Declarant"). All capitalized terms used herein shall have the meanings set forth in Article I or elsewhere in this Declaration.

W I T N E S S E T H:

     Declarant is the owner of that certain real property located in Union County, North Carolina, and more particularly described on Exhibit "A" attached hereto and incorporated hereby by reference (the "Property"), which Property is being developed by Declarant as a residential community and amenity facility as a portion of the development known as The Preserve at Marvin .

     Declarant desires to provide for the preservation of the property values, amenities and opportunities in the Project and for the maintenance of the Property and improvements thereon, and to this end desires to subject the Property to the easements, covenants, conditions, restrictions, charges and liens hereinafter set forth and/or described.

     Although Declarant contemplates that separate easements, covenants, conditions and restrictions (which may include easements, covenants, conditions and restrictions similar to those herein contained) may be imposed with regard to the various phases or sections of the Project, Declarant desires to impose pursuant hereto easements, covenants, conditions and restrictions upon all of the Property.

     NOW, THEREFORE, Declarant hereby subjects the Property to the easements, covenants, conditions, restrictions, charges and liens hereinafter set forth and hereby declares that (subject to certain rights of amendment, as hereinafter described) all of the Property shall be held, sold and conveyed subject to such easements, covenants, conditions, restrictions, charges and liens, all of which are for the purpose of protecting the value, desirability and attractiveness of the Project. Subject to the above-described rights of Declarant, such easements, covenants, conditions, restrictions, charges and liens shall run with the Property and be binding on all parties having or acquiring any right, title or interest in the Property, or any part thereof and shall inure to the benefit of each owner of the Property or any part thereof.

# ARTICLE I

## DEFINITIONS

**Section 1.** "Act" shall mean and refer to Chapter 47F of the North Carolina General Statutes, the Planned Community Act.

**Section 2.** "Additional Property" shall mean and refer to additional real estate near or contiguous to the Property, all or a portion of which may be made subject to the terms of this Declaration in accordance with the provisions of Article II of this Declaration, including without limitation all of that certain property conveyed to Declarant by Deeds recorded in Book 5942 at Pages 761, 765, 769, and 772 of the Union County Registry, and any property located within one mile of any boundary of the property conveyed to Declarant by the aforesaid deeds.

**Section 3.** "Architectural Control Committee" shall mean and refer to the committee appointed by the Board to oversee the development and enforcement of architectural control standards and restrictions with respect to the Project and to perform certain other functions described in the Declaration.

**Section 4.** "Architectural, Design and Landscape Guidelines" shall have the meaning as set forth in Article VIII hereof.

**Section 5.** "Articles of Incorporation" shall mean and refer to the Articles of Incorporation for the Association.

**Section 6.** "Association" shall mean and refer to THE PRESERVE AT MARVIN COMMUNITY ASSOCIATION, INC., a North Carolina non-profit corporation, its successors and assigns.

**Section 7.** "Board" or "Board of Directors" shall mean and refer to the Board of Directors of the Association, which shall be elected and shall serve pursuant to the Bylaws.

**Section 8.** "Bridges" shall mean and refer to the bridges located on Lots 3, 70, 71, 80, 81, and 82, initially installed by Declarant, to be maintained, repaired, and replaced by the Association as a Common Expense from the Assessments, and any other bridges designated as Bridges in any amendment or supplement to this Declaration.

**Section 9.** "Bylaws" shall mean and refer to the Bylaws for the Association, a copy of which is attached hereto as Exhibit "B".

**Section 10.** "Certificate of Occupancy" shall mean and refer to any required certification issued by the appropriate governmental authorities as a prerequisite to occupancy of any structure on the Property.

**Section 11.** "Common Area" or "Common Areas" shall mean and refer to collectively all property specifically shown and designated on any Plat as "Common Area," "Common Open Area," "Common Open Space," "Open Space," or "COS," including without limitation the parcels designated as "COS - 1.402 ac" and "COS - 4.641 ac" on the plats recorded in Plat Cabinet M, pages 48 through 50, of

2

The Preserve at Marvin Map 1, and the parcel designated as "COS - 15.923 acres" on the plats recorded in Plat Cabinet ___ at pages ___ through ___, of The Preserve at Marvin Map 2, in the Office of the Register of Deeds for Union County, North Carolina, and any and all Improvements located thereon; and the Street Lights and the Roadways, including sidewalks, drainage facilities and other improvements located therein. The Common Areas shall be initially owned by the Declarant, and ultimately owned by the Association, except as otherwise provided herein, for the common use, benefit and enjoyment of the Owners. The Declarant reserves the right, but not the obligation, to provide additional Common Areas within the Project.

Section 12. "Common Expenses" shall have the meaning set forth in Section 1-103 (5) of the Act, and in Article V, Section 2, of this Declaration.

Section 13. "CPI" shall have the meaning set forth in Article V hereof.

Section 14. "Declarant" shall mean and refer to Toll NC I LLC, a North Carolina limited liability company, its successors in title and assigns, provided that any such successor-in-title or assign shall acquire for the purpose of development and/or sale all or substantially all of the remaining undeveloped or unsold portions of the Property and, provided further, that in the instrument of conveyance to any such successor-in-title or assign, such successor-in-title or assign is designated as the "Declarant" hereunder by the grantor of such conveyance, which grantor shall be the "Declarant" hereunder at the time of such conveyance. Provided further, that upon such designation of such successor Declarant, all rights, duties and obligations of the former Declarant in and to such status as "Declarant" hereunder shall cease, it being understood that as to all of the Property, there shall be only one person or legal entity entitled to exercise the rights and powers of the "Declarant" hereunder at any time.

Section 15. "Declaration" shall mean and refer to this Declaration of Covenants, Conditions and Restrictions as same may be amended and/or supplemented from time to time as herein provided.

Section 16. "Dwelling Unit" shall mean and refer to a residential dwelling (whether attached or detached) located upon a Lot.

Section 17. "Government Required Improvements" shall mean and refer to all berms, swales, rain gardens, trees, vegetated buffers, tree save areas, and other similar improvements or landscaping originally installed upon, or left in place upon, the Property by Declarant, and required by the Village of Marvin, the North Carolina Department of the Environment and Natural Resources, or any other governmental authority having jurisdiction over the Property, to be maintained on the Property, other than the Bridges.

Section 18. "Guidelines" shall mean and refer to the Architectural, Design and Landscape Guidelines.

Section 19. "Improvement" shall have the same meaning as set forth in Article VIII hereof.

Section 20. "Lot" shall mean and refer to any numbered or lettered tract of land (excluding any Common Area) shown on any Plat which is a part of the Property, including Lots 1 and 67 through 92, as shown on the plats recorded in Plat Cabinet M, pages 48 through 50, of The Preserve at Marvin Map 1, Lots 17-39, inclusive, and 53-59, inclusive, as shown on the plats recorded in Plat Cabinet M at pages 48 through 50, of The Preserve at Marvin Map 2, in the Office of the Register of Deeds for Union County, North Carolina, which Lots shall be restricted for such uses as are consistent with this

3

Declaration and any other restrictions covering the area wherein the tract of land is located. No tract of land shall become a "Lot" as that word is used herein until a Plat of the area in which the same is located is recorded in the Office of the Register of Deeds of Union County, North Carolina.

Section 21.     "Maintenance Areas" shall have the meaning as set forth in Article X hereof.

Section 22.     "Member" shall mean and refer to every person or entity who holds membership in the Association.

Section 23.     "Mortgage" shall mean any mortgage or deed of trust constituting a first lien on a Lot.

Section 24.     "Mortgagee" shall mean the owner and holder of a Mortgage at the time such term is being applied. Upon request, each Owner shall be obligated to furnish to the Association the name and address of the holder of any Mortgage encumbering such Owner's Lot.

Section 25.     "Occupant" shall mean and refer to any person occupying all or any portion of a Lot or the Property for any period of time, regardless of whether such person is a tenant of the Owner of such Lot or portion of the Property.

Section 26.     "Owner" shall mean and refer to the record owner, whether one or more persons or entities, of fee simple title to any Lot or other portion of the Property, but excluding those having such interest merely as security for the performance of an obligation.

Section 27.     "Period of Declarant Control" shall have the meaning set forth in Article IV hereof.

Section 28.     "Person" shall mean and refer to any natural person, corporation, joint venture, partnership (general or limited), corporation, association, trust or other legal entity.

Section 29.     "Phase" shall mean and refer to any phase, section or portion of the Property for which a separate Plat or Plats are recorded in the Office of the Register of Deeds of Union County, North Carolina.

Section 30.     "Plat" shall mean and refer to the plats recorded in Plat Cabinet M, pages 48 through 50, of The Preserve at Marvin Map 1, and the plats recorded in Plat Cabinet ___, pages ___ through ___, of The Preserve at Marvin Map 2, in the Office of the Register of Deeds for Union County, North Carolina, as the same may be revised from time to time, and any other plat of the Property or any part of it which is recorded from time to time in the Office of the Register of Deeds of Union County, North Carolina.

Section 31.     "Project" shall mean and refer to the residential development and amenity facility being developed by Declarant on the Property and commonly known as The Preserve at Marvin.

Section 32.     "Property" shall mean and refer to that certain real property located in Union County, North Carolina, and more particularly described on Exhibit "A" attached hereto and incorporated herein by reference, as well as such additional property as may be made subject to the provisions of this Declaration pursuant to the provisions of Article II hereof.

4

Section 33.    "Roadways" shall mean and refer to those roads, streets, entranceways and cul-de-sacs in the Project shown as "Public R/W" or by similar designation on the Plats, including without limitation Yellow Jasmine Lane, Flowering Peach Road, Carolina Cherry Lane, White Dogwood Lane, Tea Olive Road, and Pampas Lane.  The Roadways are dedicated as public right-of-ways, as indicated on the Plats, and are open to public use, but are all to be privately maintained by the Association, unless and until accepted by North Carolina Department of Transportation or the Village of Marvin.

Section 34.    "Street Lights" shall mean and refer to any street lights now or hereafter leased by Declarant and installed upon, along and/or over the rights-of-way of the Roadways, Maintenance Areas and Common Areas.

Section 35.    "Supplemental Declaration" shall mean and refer to any Supplemental Declaration of Covenants, Conditions and Restrictions filed in the office of the Register of Deeds of Union County, North Carolina, to bring additional property within the coverage of this Declaration and the jurisdiction of the Association, as more particularly described in Article II hereof.

## ARTICLE II

## PROPERTY SUBJECT TO THIS DECLARATION
## AND WITHIN THE JURISDICTION OF
## THE ASSOCIATION

Section 1.    <u>Property Made Subject to this Declaration</u>.  The Property is hereby made subject to this Declaration and the Property shall be owned, held, leased, transferred, sold, mortgaged and/or conveyed by Declarant, the Association, each Owner and each party owning record title to any of the Property subject to this Declaration and the controls, covenants, conditions, restrictions, easements, development guidelines, charges and liens set forth in this Declaration.

Section 2.    <u>Additions to the Property</u>.

(a)    Declarant may cause Additional Property (including Common Areas) to be made subject to the terms and scheme of this Declaration by filing one or more Supplemental Declarations in the Office of the Union County Register of Deeds, containing a description of the Additional Property and a statement by the Declarant of its intent to extend the operation and effect of this Declaration to the Additional Property.  Notwithstanding the foregoing, the covenants and restrictions established herein as applied to, or imposed upon, the Additional Property may be altered or modified by the filing of one or more Supplemental Declarations as provided in Subparagraph (b) below.

(b)    Any Supplemental Declaration may contain complementary additions to the covenants and restrictions contained herein as may be necessary in the judgment of the Declarant to reflect the different character of the Additional Property.  In no event, however, shall any Supplemental Declaration revoke, modify or add to the covenants and restrictions contained herein with respect to the Property, nor revoke, modify, change or add to the covenants and restrictions established by previously filed Supplemental Declarations, without meeting the requirements for amendment set forth in this Declaration.

(c)    Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that, so long as Declarant owns any part of the Property, the prior written

5

consent of Declarant shall be required for any parties to modify, change and/or amend, in whole or in part, the terms and provisions of this Declaration, and/or any Supplemental Declaration or to impose new or additional covenants, conditions, restrictions or easements on any part of the Property.

## ARTICLE III

## PROPERTY RIGHTS

Section 1. <u>Ownership of Common Areas</u>. Except as otherwise provided herein, Declarant shall convey to the Association the Common Areas to be owned and maintained by the Association; provided, with respect to any part of the Common Areas leased by Declarant (*e.g.*, Street Lights), Declarant shall assign its rights under such lease to the Association. The Declarant reserves the right (but shall not be obligated) to construct within the Common Areas, among other things, (i) the Street Lights (which will be leased from a third party) and other lighting, signage and irrigation facilities, and (ii) the Roadways (including sidewalks, drainage facilities and other improvements). Notwithstanding the recordation of any Plat or any other action by Declarant or the Association, all Common Areas shall remain private property and shall not be considered as dedicated to the use and enjoyment of the public, with the exception of the Roadways, are dedicated as public rights-of-way and open to public use, and which may eventually be accepted for public dedication and maintenance by the North Carolina Department of Transportation, the Village of Marvin, or other governmental entity, and with the exception of the areas labeled "Greenway Trail" on the Plats, which are also open to the use of the public.

Section 2. <u>Owners' Rights to Use and Enjoy Common Areas</u>. Each Owner shall have the non-exclusive easement and right to use and enjoy the Common Areas, and such right shall be appurtenant to and conveyed with title to such Owner's Lot, subject to the following:

(a) the right of the Association and the Board to promulgate and enforce reasonable regulations governing the use of the Common Areas to insure the availability of the right to use the Common Areas to the Owners;

(b) the right of the Association to suspend the voting rights of an Owner in the Association and the right of the Association to suspend the right to use certain or all of the Common Areas by an Owner for any period during which any assessment or charge against said Owner's Lot remains unpaid, and for the maximum period allowed by applicable law for any infraction of its published rules and regulations;

(c) the right of the Declarant or the Association to grant or reserve utility, drainage and other easements across the Common Areas;

(d) the rights of the general public to use those portions of the Common Area shown on the Plats as "Greenway Trail" or by similar designation;

(e) the right of the Declarant or the Association to convey or dedicate the Roadways to the Village of Marvin, Union County, the North Carolina Department of Transportation, or other appropriate governmental body or agency;

(f) the rights of the general public to use the Roadways;

6

(g)    the right of the Declarant or the Association to convey or dedicate those portions of the Common Area shown on the Plats as "Greenway" or "Greenway Trail" or by similar designation to the Village of Marvin, Union County, or other appropriate governmental body or agency;

(h)    the right of the Declarant or the Association to convey or dedicate portions of the Common Area to the Village of Marvin, Union County, or other appropriate governmental body or agency for the realignment of Marvin School Road; and

(i)    any and all other applicable provisions of this Declaration.

Section 3.    Delegation of Use.  Any Owner may delegate his or her right of enjoyment to the Common Areas and facilities located thereon to the members of his or her family permanently residing in such Owner's Dwelling Unit, his or her guests, invitees, or his or her tenants, in accordance with such Rules and Regulations regarding same as are established by the Board.

## ARTICLE IV

## THE ASSOCIATION

Section 1.    Membership.  Every Owner of a Lot shall be a Member of the Association. Membership shall be appurtenant to and may not be separated from ownership of any Lot, and shall be governed by the Bylaws attached as Exhibit "B" hereto.  In addition, as long as Declarant owns any part of the Property or the Additional Property, Declarant shall be a Member of the Association.

Section 2.    Classes of Voting Members.  The Association shall have two (2) classes of voting membership:

(a)    Class I.  The Class I Association Members shall be all Association Members with the exception of Declarant.  Class I Association Members shall be entitled to one (1) vote for each Lot owned by such Association Member.  When more than one Person owns an interest (other than a leasehold or security interest) in any Lot, all such Persons shall be Members and the voting rights appurtenant to said Lot shall be exercised as they, among themselves, determine, but in no event shall more than one (1) vote be cast with respect to any Lot.

(b)    Class II.  The Class II Association Member shall be Declarant.  The Class II Association Member shall be entitled to ten (10) votes for each Lot owned by Declarant.

Section 3.    Period of Declarant Control.  "Period of Declarant Control" means the period of time during which the Declarant shall at all times be entitled to appoint and remove the Association's Board of Directors and the officers of the Association, and during which the Class I Association Members shall have no right to nominate, elect, or remove, or exercise any vote to nominate, elect, or remove, the Board of Directors, such period of time beginning on the date that the Association is incorporated and ending at such time as Declarant does not own any portion of the Property or the Additional Property, or at such earlier time as Declarant terminates such right by execution of a written instrument of termination. Anything to the contrary in this Declaration, the Bylaws, the Articles of Incorporation, or the Act notwithstanding, if not sooner ended or terminated, the Period of Declarant Control shall end on December 31, 2040.

7

During the Period of Declarant Control, the Board shall have the sole and exclusive authority to exercise all powers and rights of and to act in all instances on behalf of the Association, and the Members shall have no authority to exercise such powers or rights or to act by exercise of their votes, except as may be determined by the Board in its discretion, and except as provided with respect to the commencement of judicial or administrative proceedings as provided in <u>Article XI, Section 5</u>, of this Declaration, and those acts that the Act or other applicable laws provide may not be undertaken unilaterally by the Board, such as, to the extent required, ratification of the budget as provided in <u>Article V, Section 3</u> of this Declaration, and conveying fee simple title to all or any part of the Common Area as provided in <u>Article VI, Section (t)</u> of the Bylaws.

Section 4.    <u>Availability of Documents</u>. The Association shall maintain current copies of the Declaration, the Bylaws and other rules concerning the Project as well as its own books, records, and financial statements available for inspection by all Owners, Mortgagees and insurers and guarantors of Mortgages that are secured by Lots. All such documents shall be available upon reasonable notice and during normal business hours. In addition, any Mortgagee may, at its own expense, have an audited statement prepared with respect to the finances of the Association.

Section 5.    <u>Management Contracts</u>. The Association is authorized and empowered to engage the services of any person, firm or corporation to act as managing agent of the Association at a compensation level to be established by the Board and to perform all of the powers and duties of the Association. The managing agent may be an affiliate of Declarant. Any such contract shall be terminable by the Association with or without cause upon sixty (60) days prior written notice to the manager without payment of a termination fee.

Section 6.    <u>Maintenance</u>. The Roadways shall be maintained by the Association. Such maintenance shall include repair and reconstruction, when necessary. Maintenance of the Roadways shall conform to the standard of maintenance (if one is ascertainable) which would be required by the North Carolina Department of Transportation or other governmental entity before it would accept such Roadways for maintenance.

The Common Areas and the Maintenance Areas, together with all utilities, easements and amenities located therein and not otherwise maintained by public entities or utilities or any other party as provided herein, shall be maintained by the Association as more particularly described below:

(a)    Maintenance of the entryways to the Project shall include maintenance, repair and reconstruction, when necessary, of the entrance monuments, signage, irrigation, planters and lighting located thereon and providing and paying for landscaping, utility charges for irrigation and lighting of the entrance monuments and signage located thereon.

(b)    The Association shall maintain or cause to be maintained the swales and medians and associated landscaping and related improvements along and within the Roadways.

(c)    The Common Areas and Maintenance Areas, and the landscaping thereon (if any), shall be clean and free from debris and maintained in a safe and orderly condition, including any removal and replacement of any landscaping, utilities, or improvements located thereon. The Association's obligation to maintain the Common Areas shall not require the Association to seed, sod, mow, or otherwise maintain those Common Areas that are open and unimproved, and such open and unimproved Common Areas may be left in their natural state. The Association may, but shall not be obligated to, provide enhanced landscaping and maintenance to those areas and

8

medians located within the rights-of-way for major streets located within the Property. Any maintenance or enhancement called for herein shall be subject to governmental authorities' rules and regulations.

(d)     Maintenance of the detention basins marked as "BMP" on the Plats to the standards required by the North Carolina Department of the Environment and Natural Resources, the Village of Marvin, and any other governmental authority having jurisdiction, and the performance of all monitoring and reporting required by the North Carolina Department of the Environment and Natural Resources, the Village of Marvin, and all other governmental authorities having jurisdiction.

(e)     Maintenance and preservation of trees and other vegetation within those areas located on the Common Areas and marked as "Tree Save," "Tree Preservation," "Viewshed," "Vegetated Buffer," "Preservation Strip," or by similar designation on the Map to the standards required by the Village of Marvin or other governmental authority having jurisdiction.

(f)     Maintenance, repair, and replacement of the Bridges to the standards required by The Village of Marvin or other governmental authority having jurisdiction, and so as to provide vehicular access onto the Lots upon which the Bridges are located. Notwithstanding the foregoing, routine maintenance of each Bridge (for example, removal of snow and debris, and keeping the Bridge free of obstructions) shall be the responsibility of the Owner of the Lot upon which the Bridge is located, at such Owner's sole cost and expense.

(g)     Maintenance, repair, and replacement of any Government Required Improvements to the standards required by The Village of Marvin or other governmental authority having jurisdiction, including maintenance repair, and replacement of Government Required Improvements located on a Lot to the extent that the Owner thereof fails to perform such maintenance, repair, or replacement, and the Association elects to perform same as permitted under the terms of Article X, Section 4, of this Declaration.

Section 7.     Reserve Fund. The Association shall establish and maintain an adequate reserve fund for the periodic maintenance, repair and replacement of the Common Areas and Maintenance Areas, including the Roadways, and in order to fund unanticipated expenses of the Association, and to acquire equipment or services deemed necessary or desirable by the Board of Directors. The reserve for periodic maintenance, repair and replacement of Roadways shall be in such amount as is necessary to fund such maintenance, repair and replacement as would be performed by the North Carolina Department of Transportation for roads that it maintains, repairs, and replaces, at the same intervals as the North Carolina Department of Transportation performs maintenance, repair and replacement on roads maintained, repaired, and replaced by it Such reserve fund shall be collected and maintained out of the Annual Assessments, as hereinafter defined. Assessments collected as reserves shall not be considered to be advance payments of Annual Assessments.

Section 8.     Liability Limitations. Neither Declarant, nor any Association Member, nor the Board, nor any officers, directors, volunteers, agents or employees of any of them shall be personally liable for debts contracted for or otherwise incurred by the Association or for a tort of another Association Member, whether or not such other Association Member was acting on behalf of the Association or otherwise. Neither Declarant, nor the Association, nor their directors, officers, agents or employees shall be liable for any incidental or consequential damages for failure to inspect any premises, improvements or portions thereof or for failure to repair or maintain the same, including without limitation the Bridges.

9

Declarant, the Association or any other person, firm or association making such repairs or maintenance shall not be liable for any personal injury or other incidental or consequential damages occasioned by any act or omission in the repair or maintenance of any premises, improvements or portions thereof, including without limitation the Bridges. The Association shall, to the extent permitted by applicable law, indemnify and defend all members of the Board from and against any and all loss, cost, expense, damage, liability, claim, action or cause of action arising from or relating to the performance by the Board of its duties and obligations, except for any such loss, cost, expense, damage, liability, claim, action or cause of action resulting from the gross negligence or willful misconduct of the person(s) to be indemnified. The Owner of each Lot upon which a Bridge is located shall indemnify and defend the Association from and against any and all loss, cost, expense, damage, liability, claim, action or cause of action arising from or relating to use of the Bridge, including claims for death or bodily injury, and property damage.

## ARTICLE V

## COVENANT FOR ANNUAL AND SPECIAL ASSESSMENTS

Section 1. <u>Creation of the Lien and Personal Obligation for Annual, Supplemental Annual, Special and Special Individual Assessments</u>. Each Owner of any Lot, by acceptance of a deed therefor, whether or not it shall be so expressed in any such deed or other conveyance document, is deemed to covenant and agrees to pay to the Association Annual Assessments, Supplemental Annual Assessments, Special Assessments and Special Individual Assessments (collectively, the "Assessments"), as hereinafter defined, established and collected as hereinafter provided. Any such assessment or charge, together with interest, costs, and reasonable attorneys' fees, shall be a charge and a continuing lien upon the Lot, as the case may be, against which each such assessment or charge is made. Each such assessment or charge, together with interest, costs and reasonable attorneys' fees, shall also be the personal obligation of the Owner, at the time when the assessment fell due, of the Lot, as the case may be, against which such assessment or charge is made. The personal obligation for delinquent assessments or charges shall not pass to an Owner's successors in title unless expressly assumed by them, provided such assessments or charges, together with interest, costs, and reasonable attorneys' fees, shall, as set forth above, be a continuing lien upon the Lot, as the case may be, against which such assessments or charges are made.

Section 2. <u>Purpose of Annual Assessments</u>. The assessments to be levied annually by the Association ("Annual Assessments") shall be used as follows:

(a) to operate, repair, maintain, reconstruct (when necessary) and keep clean and free from debris the Common Areas, the Maintenance Areas and any improvements (including landscaping) located thereon, including any necessary removal or replacement of landscaping, as more particularly provided in <u>Article IV, Section 6</u>, of this Declaration;

(b) to maintain and repair the Roadways to the standards of the maintenance (if one is ascertainable) which would be required by the North Carolina Department of Transportation or other governmental entity before it would accept such Roadways for maintenance;

(c) to maintain, operate, repair and reconstruct, when necessary, the entryways to the Project, including the entrance monuments, signage, irrigation, planters, landscaping and lighting located thereon;

(d) to maintain and repair the swales and medians and associated Street Lights, landscaping and related improvements along and within the Roadways to the extent not

10

maintained by the North Carolina Department of Transportation or other governmental entity, as the case may;

      (e)     to pay all costs associated with the lease and operation of the Street Lights, including, but not limited to, monthly lease payments and utility costs;

      (f)     to pay all ad valorem taxes levied against the Common Areas and any other property owned by the Association;

      (g)     to pay the premiums on all insurance carried by the Association pursuant hereto or pursuant to the Bylaws;

      (h)     to pay all legal, accounting, management, and other professional fees incurred by the Association in carrying out its duties as set forth herein or in the Bylaws;

      (i)     to carry out all other purposes and duties of the Association, the Board of Directors and the Architectural Control Committee as stated in the Articles, the Bylaws and in this Declaration;

      (j)     to maintain contingency reserves for the purposes set forth in Article IV hereof in amounts as determined by the Board of Directors;

      (k)     to maintain in good working order and condition the irrigation systems and sprinkler systems installed in the Common Areas, including without limitation water lines, sprinkler heads, and timing devices; and

      (l)     to maintain the Bridges as provided in Article IV, Section 6(f) of this Declaration.

The expenses of the Association for the foregoing are sometimes referred to herein as "Common Expenses."

      Section 3.     Payment of Annual Assessments; Due Dates.  Each Owner of a Lot shall pay to the Association Annual Assessments as hereinafter set forth.

Annual Assessments provided for herein shall commence as to all Lots shown on a Plat of any Phase of the Property as of the date of the conveyance of the first Lot in such Phase by Declarant to an Owner of such Lot. The Annual Assessment for the first year in which a Lot is subject thereto shall be prorated based upon the number of days remaining in the applicable billing period from the date of such conveyance. The Annual Assessment amount for each and every year shall be in an amount as set by the Board of Directors, in accordance with the terms of this Article V. Annual Assessments shall be due and payable in advance in equal installments on a monthly basis (or such other basis as is determined by the Board in its discretion) commencing on January 1 of each calendar year. The Board of Directors shall fix the amount of the Annual Assessment as to each Lot subject to assessment for any calendar year at least thirty (30) days prior to January 1 of such calendar year, and the Association shall send written notice of the amount of the Annual Assessment, as well as the amount of the payment due, to each Owner on or before January 5 of such calendar year. To the extent required by Section 3-103(c) of the Act or other applicable law, such notice shall include notice of a meeting of the Members to consider ratification of the budget, including a statement that the budget may be ratified without a quorum. If such a meeting is

11

required by Section 3-103(c) of the Act, or other applicable law, the Board of Directors shall set a date for a meeting of the Members to consider ratification of the budget to be held not less than ten (10) nor more than sixty (60) days after mailing of the summary and notice. If such meeting is required as set forth above, there shall be no requirement that a quorum be present at the meeting. If the proposed budget to be voted on at any such meeting is within the maximum increase limits set forth in Section 4(a) below, the budget is ratified unless at such meeting Members exercising all of the votes in the Association reject the budget. If the proposed budget to be voted on at any such meeting exceeds the maximum increase limits set forth in Section 4(a), the budget is ratified unless at such meeting Members exercising a majority vote in the Association reject the budget. The failure of the Association to send, or of a Member to receive, such notice shall not relieve any Member of the obligation to pay Annual Assessments.

Section 4.    Maximum Annual Assessment. Each year, the Board of Directors, by a vote in accordance with the Bylaws, without a vote of the Members (unless required under Section 3-103(c) of the Act or other applicable law, in which case the procedures set forth in Section 3 above shall apply), may increase the Annual Assessment applicable to each Lot subject to assessment by a maximum amount equal to the previous year's Annual Assessment times the greater of (i) ten percent (10%) or (ii) the annual percentage increase in the Consumer Price Index, All Urban Consumers, United States, All Items (1982-84 = 100) (hereinafter "CPI") issued by the U.S. Bureau of Labor Statistics for the most recent 12-month period for which the CPI is available. If the CPI is discontinued, then the index most similar to the CPI (published by the United States Government indicating changes in the cost of living) shall be used. If the Annual Assessments are not increased by the maximum amount permitted under the terms of this provision, the difference between any actual increase which is made and the maximum increase permitted for that year shall be computed and the Annual Assessments may be increased by that amount in a future year, in addition to the maximum increase permitted under the terms of the preceding sentence for such future year, by a vote of the Board of Directors, without a vote of the Members, unless required under Section 3-103 (c) of the Act or other applicable law, in which case the procedures set forth in Section 3 above shall apply.

(b)    The maximum annual assessment applicable to each Lot may be increased above the maximum amount set forth in subparagraph (a) of this Section 4 by a vote of a majority of the votes appurtenant to the Lots which are then subject to this Declaration, plus the written consent of Declarant (so long as Declarant owns any part of the Property), subject to the procedures set forth in Section 3 above if applicable.

(c)    The Board of Directors may fix the Annual Assessment applicable to each Lot subject to assessment at an amount not in excess of the maximum set forth in Subparagraph (a) of this Section 4 (the "Maximum Annual Assessment"). If the Board of Directors shall levy less than the Maximum Annual Assessment for any calendar year and thereafter, during such calendar year, determine that the important and essential functions of the Association cannot be funded by such lesser assessment, the Board may, by vote in accordance with the Bylaws, levy a supplemental Annual Assessment ("Supplemental Annual Assessment"), subject to the procedures set forth in Section 3 above, if applicable. In no event shall the sum of the Annual and Supplemental Annual Assessments for any year exceed the applicable Maximum Annual Assessment for such year other than as set forth herein.

(d)    With respect to any Lot conveyed by Declarant, the purchaser of such Lot shall pay to the Association at closing the amount of the Annual Assessment for the installment period in which the closing occurs on such Lot prorated based upon the number of days remaining in

12

such installment period. With respect to any Lot conveyed by any Owner other than Declarant, the amount of the Annual Assessment applicable to such Lot for the installment period in which such closing occurs shall be prorated between the buyer and seller thereof as of the date of closing of such conveyance.

(e)    Declarant shall have the authority to reduce the Annual Assessment on any Lot on which no structure has been completed (i.e., no Certificate of Occupancy has been issued).

Section 5.    Special Assessments.  In addition to the Annual Assessment authorized above, the Association may levy, in any assessment year, a special assessment ("Special Assessment") applicable to that year for one or more of the following purposes:  (i) paying the cost of the construction of any Common Area and/or Maintenance Area improvements which are not originally constructed by Declarant; or (ii) paying the cost of the reconstruction, repair or replacement of the Common Areas and/or Maintenance Areas, including any improvements located thereon; or (iii) paying the cost of preventative actions to protect the Property or any improvements located thereon, and to further reconstruct, repair or replace any portion of the Property or such improvements following an emergency, including but not limited to, floods, hurricanes, tornadoes, fires, acts of God or other naturally occurring phenomena; or (iv) any other similar purpose.  Provided, however, (a) Declarant shall not be obligated to pay any Special Assessments on Lots owned by Declarant except with Declarant's prior written approval, and (b) any Special Assessment must be approved by Declarant (so long as Declarant owns any part of the Property) and by a vote of a majority of the votes appurtenant to the Lots which are then subject to this Declaration.

Section 6.    Special Individual Assessments.  In addition to the Annual Assessments and Special Assessments authorized above, the Board of Directors shall have the power to levy a special assessment applicable to any particular Owner ("Special Individual Assessment") (i) for the purpose of paying for the cost of any construction, reconstruction, repair or replacement of any damaged component of the Common Areas and/or Maintenance Areas, whether occasioned by any act or omission of such Owner(s), members of such Owner's family or such Owner's agents, guests, employees, tenants or invitees and not the result of ordinary wear and tear; or (ii) for payment of fines, penalties or other charges imposed against any particular Owner relative to such Owner's failure to comply with the terms and provisions of this Declaration, the Bylaws or any rules or regulations promulgated by the Association or the Declarant pursuant to this Declaration or the Bylaws; or (iii) payment for the maintenance, repair, and replacement of Government Required Improvements located on any Lot in the event the Owner of such Lot fails to do so and the Association performs such maintenance, repair, or replacement as provided in Article IV, Section 6(f) of the Declaration.  Provided, however, Declarant shall not be obligated to pay any Special Individual Assessment except with Declarant's prior written approval. The due date of any Special Individual Assessment levied pursuant to this Section 6 shall be fixed in the Board of Directors resolution authorizing such Special Individual Assessment.  Upon the establishment of a Special Individual Assessment, the Board shall send written notice of the amount and due date of such Special Individual Assessment to the affected Owner(s) at least thirty (30) days prior to the date such Special Individual Assessment is due.

Section 7.    Collection Agent.  At the option of the Board of Directors, any person or entity designated by the Board of Directors may act as collection agent for any and all assessments imposed by the Association and/or the Board against the Owners.

Section 8.    Assessments Against Lots Owned by Declarant.  Anything to the contrary set forth in this Declaration notwithstanding, Assessments on each Lot owned by a Class II Association Member shall be in the reduced amount of twenty-five percent (25%) of the per Lot Assessment amount

13

established by the Association for the Lots owned by Class I Association Members. Furthermore, Declarant shall be entitled to credit against any Assessments on Lots owned by Declarant any and all amounts which Declarant has paid directly for Common Expenses, or has paid or contributed to the Association for the Association's payment of Common Expenses.

Section 9. _Assessment Loan_. It is anticipated that until Declarant has sold a certain number of Lots (which number has not yet been determined, and which number is referred to herein as the "Break-even Number"), the Annual Assessments collected by the Association will not be sufficient to pay all Common Expenses on a current basis, but that the anticipated Annual Assessments collected after the Break-even Number of Lots has been sold will exceed Common Expenses. To fund this shortfall, Declarant reserves the right, but is not obligated, to make loan (the "Assessment Loan") to the Association, as provided below, until cash flow from the Annual Assessments is sufficient to pay Common Expenses. If Declarant elects to make the Assessment Loan, then Declarant shall advance to the Association annually the amount by which the Common Expenses exceed the Annual Assessments collected for such year. The Association shall have the affirmative obligation to repay the Assessment Loan to the Declarant in accordance with the terms hereof, together with interest thereon at the short term Applicable Federal Rate ("AFR"), as published by the Internal Revenue Service, and adjusted each month to reflect the AFR for such month. The Association shall use proceeds advanced to the Association only to pay the above described shortfall in Common Expenses. The Association shall repay the Assessment Loan to Declarant in monthly installments beginning on the first day of the first month following the month in which sales of Lots reach the Break-even Number, until the balance of the Assessment Loan has been repaid to Declarant in accordance with its terms; provided, however, an Assessment Loan shall in no event be repaid to Declarant later than December 31, 2020. Each Owner of a Lot, by acceptance of a deed or other conveyance therefor, whether or not it shall be so expressed in any such deed or other conveyance, is hereby deemed to covenant and agree (and such covenant further shall be deemed to constitute a portion of the purchase money and consideration for acquisition of the Lot), that such an Assessment Loan is reasonable and was made by Declarant and accepted by the Association in good faith and at arm's length.

Section 10. _Working Capital Fund_. At the time of closing of the initial sale of each Lot by Declarant to a third party purchaser, a sum equal to One Thousand and No/100 Dollars ($1000.00) shall be collected from the purchaser of such Lot (or, if Declarant so elects, from Declarant) and transferred to the Association to be held as a working capital fund. The purpose of said fund is to insure that the Association will have adequate cash available to meet unforeseen expenses, and to acquire additional equipment or services deemed necessary or desirable. Amounts paid into the fund shall not be considered advance payment of regular assessments.

## ARTICLE VI

## GENERAL ASSESSMENT PROVISIONS

Section 1. _Certificate Regarding Assessments_. The Association shall, upon demand, and for a reasonable charge, furnish a certificate signed by an officer of the Association setting forth whether the assessments on a specified Lot have been paid. A properly executed certificate of the Association as to the status of assessments on a Lot is binding upon the Association as of the date of its issuance.

Section 2. _Effect of Nonpayment of Assessments; Remedies of the Association_. Any assessment (or installment thereof) not paid by its due date as set forth herein shall bear interest from such due date at the rate of eighteen percent (18%) per annum or the highest rate then permitted by law,

14

whichever is less. In addition to such interest charge, the delinquent Owner shall also pay such late charge as may have been theretofore established by the Board of Directors to defray the costs arising because of late payment. The Association may bring an action at law against the delinquent Owner (or foreclose the lien against the applicable portion of the Property), and interest, late payment charges, costs and reasonable attorney's fees related to such action or foreclosure shall be added to the amount of such assessment and assessment lien. No Owner may waive or otherwise escape liability for the assessments provided for herein by non-use of his or her property or the Common Areas or otherwise.

Section 3.     Subordination of the Lien to Mortgages. The lien of the assessments provided for in this Declaration shall be subordinate to the lien of any first Mortgage on a Lot. Sale or transfer of any Lot shall not affect the assessment lien. The sale or transfer of any Lot pursuant to a mortgage foreclosure under any first Mortgage on a Lot, or any proceeding in lieu thereof, however, shall extinguish the lien (but not the personal obligation of the mortgagor or any prior Owner) of such assessments as to payments which became due prior to such sale or transfer; provided, however, that the Board of Directors may in its sole discretion determine such unpaid assessments to be an Annual, Special or Special Individual Assessment (as the case may be), as applicable, collectable pro rata from all Owners, including the foreclosure sale purchaser. Such pro rata portions are payable by all Owners notwithstanding the fact that such pro rata portions may cause the Annual Assessment to be in excess of the Maximum Annual Assessment permitted hereunder. No sale or transfer shall relieve the purchaser of such Lot from liability for any assessments thereafter becoming due or from the lien thereof, but the lien provided for herein shall continue to be subordinate to the lien of any first Mortgage on a Lot.

## ARTICLE VII

## RESTRICTIONS

Section 1.     Residential Restrictions. Each Lot shall be used exclusively for single-family, non-transient residential purposes; provided, however, Declarant shall have the right to use the Lots designated from time to time by Declarant for the purpose of construction and operation of construction offices and sales/marketing offices (and for related uses) for the Project. No trade, business or business activity of any kind shall be conducted upon a Lot or any part thereof except by Declarant as described hereinabove or except with the written approval of the Board. Provided, however, the Board may permit a business or business activity to be conducted on a Lot so long as such business, in the sole discretion of the Board, does not otherwise violate the provisions of this Declaration; does not create a disturbance; does not unduly increase traffic flow or parking congestion on the Property or in the Project; is not a mail order business; is incidental to the Lot's primary residential use; and is in compliance with all applicable laws. Furthermore, Owners who pursue such incidental occupational use of their Lots shall have no employees, customers or clients at the Lot and shall obtain prior approval from all authorities having jurisdiction over the use of the Lot and the Dwelling Unit located thereon. The Board may issue rules regarding permitted business activities. Leasing of a residence on a Lot shall not be considered a business or business activity.

Except those to be utilized by Declarant as described hereinabove, no structure shall be erected, placed, altered, used or permitted to remain on any Lot other than one detached single-family private Dwelling Unit and only such other accessory structures as are approved in advance in writing by the Architectural Control Committee pursuant to the Guidelines. Only Dwelling Units on the Lots may be occupied for use as a residence. Dwelling Units shall be occupied by no more persons than the maximum permitted by law, and by no more than one household or housekeeping unit. No Lot and no Improvements may be used for hotel or other transient residential purposes. Each lease relating to any

15

Lot or any Improvements thereon (or any part of either thereof) must be for a term of at least six (6) months, must be in writing, and must provide that the tenant is obligated to observe and perform all of the terms and provisions hereof applicable to such Lot and/or Improvements.

Section 2.    Dwelling Unit Size.  The square footage requirements set forth below are for enclosed heated floor area, are measured from the ground level up (said ground level being the first level of any Dwelling Unit as viewed from the Roadway fronting same) and are exclusive of the areas in heated or unheated basements, vaulted ceiling areas and attics, unheated porches of any type, attached or detached garages, porte-cocheres and unheated storage areas, decks and patios.

Any Dwelling Unit erected upon any Lot shall contain not less than the following heated floor areas:

|  | Minimum Total Heated Area | Minimum Ground Floor Heated Area |
|---|---|---|
| 1 Story | 2,500 | 2,500 |
| 1½ story, split level, tri-level and others | 2,500 | 1,800 |
| 2 story, 2½ story, and 3 story | 2,500 | 1,400 |

Notwithstanding the foregoing requirements, the Architectural Control Committee shall have the right (but not the obligation), because of restrictive topography, lot shape, dimensions or unusual site related conditions or other reasons, to allow variances from such minimum square footage requirements of up to ten percent (10%) of such minimum square footage requirements by granting a specific written variance.

No Dwelling Unit erected upon a Lot shall contain more than three (3) stories above ground level (said ground level being the first level of any Dwelling Unit as viewed from the Roadway fronting same). Nothing herein shall be construed to prohibit the finishing of any walkup third floor in a Dwelling Unit. Notwithstanding the foregoing, the Architectural Control Committee shall have the right (but not the obligation), because of steep topography, unique Lot configuration or dimensions, unusual site related conditions or other similar reasons, to allow Dwelling Unit heights greater than three (3) stories as viewed from rear and side elevations.

Section 3.    HVAC Equipment.  No air conditioning or heating equipment or apparatus shall be installed on the ground in front of, or attached to any front wall of, any Dwelling Unit on a Lot.

Section 4.    Exterior Lighting.  Exterior lighting on Lots shall be subject to the applicable requirements and limitations in the Guidelines.

Section 5.    Fences and Walls.  In addition to the restrictions contained elsewhere in this Declaration and except as expressly provided below, no fence or wall (including densely planted hedges, rows or similar landscape barriers) (i) shall be erected, placed, maintained or altered on any Lot nearer to any Roadway fronting such Lot than a point on the side of the main Dwelling Unit constructed on such Lot that is no more than twenty (20) feet from the rearmost corner of such Dwelling Unit on that side (unless otherwise approved by the Architectural Control Committee) and (ii) shall not exceed six (6) feet in height, except fences enclosing approved tennis courts may be up to ten (10) feet in height if located at

16

least twenty-five (25) feet from all Lot boundary lines. Provided, however, and notwithstanding the foregoing, in order to accentuate certain architectural styles within the Project, Declarant and/or the Architectural Control Committee, in their sole and absolute discretion, may allow the construction and use of fencing along or near the front, side and/or rear boundary lines of certain designated Lots within the Project. All fences and walls shall be maintained in a structurally sound and attractive manner. No fence or wall shall be erected on any Lot until the Architectural Control Committee has given its prior written approval of the color, size, design, materials and location for such fence or wall.

Section 6.  Mail and Newspaper Boxes; House Numbers.  Individual mailboxes and newspaper boxes may not be used without the approval of the Architectural Control Committee, and are not currently allowed. Mail delivery shall be to mailbox cluster facilities installed by Declarant on the Common Areas. House numbers may be displayed on the Dwelling Unit and/or mailbox only as approved by the Architectural Control Committee.

Section 7.  Animals and Pets.  No animals of any kind, including livestock and poultry, shall be raised, bred, or kept on any portion of the Property, except that for each Dwelling Unit there shall be permitted up to a total of three (3) dogs or three (3) cats or a combination of dogs and cats not to exceed three (3) in total, no more than two (2) birds, and a reasonable number, as determined by the Board, of other usual and common household pets, subject to compliance with applicable local laws, codes and ordinances. In no event, however, shall monkeys, snakes, pigs or ferrets be permitted in any Dwelling Unit. Fecal waste deposited by any pet on portions of the Property other than the Lot of the Owner must be immediately removed and properly disposed of by the Owner. Fecal waste deposited by any pet on or around the Lot of its Owner must be cleaned up and removed at least once every seven (7) days. Pets which are permitted to roam free, or which, in the sole discretion of the Board, make objectionable noise, endanger the health or constitute a nuisance or inconvenience to the Owners of other Dwelling Units or the owner of any portion of the Property shall be removed from the Property upon request of the Board. If the Owner fails to honor such request, the pet may be removed by the Board. The Board may adopt reasonable rules designed to minimize damage and disturbance to other Owners and Occupants, including rules requiring damage deposits, waste removal, leash controls, noise controls, pet occupancy limits based on size and facilities of the Dwelling Unit and fair share use of the Common Area; provided, however, any rule prohibiting the keeping of ordinary household pets shall apply prospectively only and shall not require the removal of any pet which was being kept on the Property in compliance with the rules in effect prior to the adoption of such rule. Nothing in this provision shall prevent the Association from requiring removal of any animal that presents an actual threat to the health or safety of Occupants or from requiring abatement of any nuisance or unreasonable source of annoyance. No pets shall be kept, bred, or maintained by any commercial or business purpose. Under no circumstances shall any animals which raise the insurance premium or are deemed to be "dangerous animal" pursuant to the Association's policy of liability insurance be allowed to be raised, bred, or kept on any portion of the Property. All animals shall at all times whenever they are outside of a Dwelling Unit be on a leash or otherwise confined in a manner acceptable to the Board. The Association may restrict the walking of pets to certain areas. Commercial activity involving pets, including, without limitation, boarding, breeding, grooming or training is not allowed. The ability to keep a pet is a privilege, not a right. Pets may not be left unattended or leashed in yards or garages or on porches or lanais. Animal control authorities shall be permitted to enter the Project and the Property to patrol and remove pets and wild animals. All pets shall be registered, licensed and inoculated as required by law. No fenced dog enclosure or other structure for pets may be constructed or maintained on any Lot unless the same has been approved in writing by the Architectural Control Committee.

17

Section 8.     Signs.  No sign (including political signs), banner, flag (including the flag of the United States and the flag of the State of North Carolina), billboard or advertisement of any kind, including without limitation, informational signs, "for sale" or "for rent" signs and those of contractors and subcontractors, shall be displayed on any Lot except for sign(s), banners(s), flags(s), and billboard(s) approved in advance by the Architectural Control Committee, and by Declarant as long as Declarant owns any Lot or any portion of the Property.  Declarant shall be entitled to erect and maintain signs and billboards advertising the Property, the Project or portions of either, or for any other purpose, on any portion of the Property owned by Declarant or in the Common Areas or Maintenance Areas.  If permission is granted to any Owner to erect a sign within on a Lot, the Board of Directors (and Declarant, as long as Declarant owns any Lot or any portion of the Property) reserve the right to restrict the size, shape, color, lettering, height, material and location of the sign, or in the alternative, provide the Owner with a sign to be used for such purposes. No sign shall be nailed or otherwise attached to trees.  No sign shall be allowed that is prohibited by the Village of Marvin.

Section 9.     Temporary Structures; Structure Materials.  No residence or building of a temporary nature, including a construction trailer, shall be erected or allowed to remain on any Lot, and no metal, fiberglass, plastic or canvas structure shall be erected on any Lot or attached to any residence. Provided, however, nothing herein shall prohibit Declarant from erecting or moving temporary buildings onto Lots owned by Declarant to be used for storage, or for construction or sales offices.

Section 10.     Sight Line Limitations.  To the extent that governmental requirements shall not impose a stricter standard, no hedge or shrub planting or other feature which obstructs sight lines at elevations between two (2) and six (6) feet above Roadways shall be placed or permitted to remain on any corner Lot within the triangular areas shown on the Plat as "Sight Triangles."  The same sight line limitations shall apply on any Lot within the triangular area formed by (i) the line that runs from the point of intersection of (a) the edge of a Roadway's pavement and (b) the edge of the pavement of the driveway on such Lot for a distance of ten (10) feet along such Roadway pavement away from such driveway pavement, (ii) the line that runs from said point of intersection for a distance of ten (10) feet along such driveway pavement away from such Roadway pavement, and (iii) the straight line that connects the ending points of the lines described in the foregoing clauses (i) and (ii).  No tree shall be permitted to remain within such triangular areas unless the foliage line is maintained at an appropriate height to prevent obstruction of sight lines.

Section 11.     Utilities.  All utilities and utility connections shall be located underground, including electrical, telephone and cable television lines, except for utility cabinets and other facilities that are required to be installed above ground by the utility supplier.  Transformers, electric, gas or other meters of any type, or other apparatus shall be located at the rear of the buildings constructed on Lots or, if approved by the Architectural Control Committee in writing, located elsewhere on the Lot provided they are adequately screened as required by the Architectural Control Committee in accordance with the provisions of this Declaration.

Section 12.     Sediment Control.  Sufficient sediment control measures, including, but not limited to, installation and maintenance of silt fences, straw bale fences, storm water inlet protection and temporary seeding, to the extent deemed reasonably necessary by Declarant or the Architectural Control Committee, shall be taken by the Owner or Owner's builder to ensure that all sediment resulting from any land disturbance or construction operation is retained on the Lot in question.  All sediment control measures must be maintained until such Lot has been permanently stabilized with respect to soil erosion.

18

Section 13.   Building Envelope.  No building or other Improvement on any Lot (including any stoops or porches, patios, decks, terraces, etc.) shall be erected or permitted to remain outside of the "Building Envelope" for that particular Lot as established by the Architectural Control Committee (as to each Lot, the "Building Envelope").  The Building Envelope approved for any Lot will be available from the Architectural Control Committee on an unrecorded map.  Provided, however, and notwithstanding the foregoing to the contrary, (i) exterior steps at the front and rear of a Dwelling Unit may project into the setback area established by the Building Envelope up to a distance of five (5) feet, and (ii) fireplace chimney structures projecting from the side of a Dwelling Unit may encroach no more than eighteen (18) inches into the side yard setback established by the Building Envelope.  The Architectural Control Committee shall have the right in its sole discretion to make exceptions to any Building Envelope to recognize any special topography, vegetation, Lot shape or dimension, or other site-related conditions.  In the event any zoning or subdivision ordinance, floodway regulation or other ordinance, law or regulation applicable to a Lot shall prescribe greater setbacks, then all buildings erected during the pendency of such requirements shall conform thereto.

Section 14.   Waste.  No Lot shall be used or maintained as a dumping ground for rubbish, trash, new or used lumber or weed, metal scrap, or garbage, except that such material may be kept on the Lot or in areas of the Property designated for this purpose by the Declarant (in connection with its construction) or by the Board of Directors, provided that these materials are kept in sanitary containers in a clean and sanitary condition. Owners shall place these containers for collection only in the designated areas and only on the day these refuse materials are to be collected. Empty containers shall be removed promptly after collection. During construction of Improvements on a Lot, all rubbish and debris shall be stored and disposed of in accordance with the rules and established by the Architectural Control Committee.

Section 15.   Combination or Subdivision of Lots.  Should the Owner of a Lot own an adjacent Lot(s) and desire that two (2) or more such Lots be considered as one Lot, then such Lots shall (except as provided herein) be considered as one Lot for the purposes of this Article VII upon the recordation in the Office of the Register of Deeds of Union County, North Carolina, of an instrument by such Owner expressing such intent (such instrument to refer specifically to this section in this Declaration and to identify the Lots to be considered as one Lot for purposes of this Article VII, and a copy of such recorded instrument shall be promptly delivered by such Owner to the Architectural Control Committee); and in each such case, Building Envelopes, setback lines, and easements reserved in this Declaration shall be adjusted accordingly by the Architectural Control Committee.  The Owner of any Lot which combines with all or a portion of a contiguous Lot shall be solely responsible for any costs which may result from such combination, including the costs of relocating any existing easements.  With respect to combined Lots, Declarant reserves the right to designate said combined Lots as one (1) Lot or multiple Lots, in Declarant's sole and absolute discretion, for purposes of payment of assessments.  No Lot shall be subdivided by sale, lease or otherwise without the prior written consent of Declarant. Provided, however, Declarant reserves the right to change the size, boundaries or dimensions of any Lot owned by Declarant for any reason.

Section 16.   Restricted Activities in Common Areas and Maintenance Areas.  No cutting of vegetation, dumping, digging, filling, destruction or other waste shall be committed on the Common Areas or other Maintenance Areas.  There shall be no obstruction of the Common Areas or the Maintenance Areas, or of any drainage channels or facilities thereon, nor shall anything be kept or stored in the Common Areas or the Maintenance Areas, nor shall anything be altered, or constructed or planted in, or stored upon, or removed from, the Common Areas or the Maintenance Areas, without the prior written consent of the Declarant and the Association. Motor vehicles including, but not limited to, mini-

19

bikes, snowmobiles, and motorcycles, may not be driven on the Common Area by any Owner, or any occupant or guest of an Owner. Each Owner shall be liable to the Association and/or Declarant for any damage to any Common Area and/or the Maintenance Area caused by the negligence or willful misconduct of the Owner or his family, tenants, guests, agents, employees, or invitees. Provided, however, the provisions in this paragraph shall not apply to Declarant in connection with Declarant's construction activities on the Property. Except for work done by the Declarant in connection with the construction and marketing of the Lots and the Property, nothing shall be built, caused to be built or done in or to any part of the Property which will alter or cause any alteration to the Common Areas or any Improvements located thereon without the prior written approval of the Association and the Declarant. The Declarant's approval shall be required until Declarant no longer owns any portion of the Property.

Section 17.  Unsightly or Unkempt Conditions. The pursuit of hobbies or other activities, including specifically, without limiting the generality of the foregoing, the assembly and disassembly of motor vehicles and other mechanical devices, which might tend to cause disorderly, unsightly, or unkempt conditions, shall not be pursued or undertaken on any Lot, other than in enclosed garages. All garage doors in the Project shall be kept closed except when in use.

Section 18.  Rules of the Board. All Owners of any Lot shall abide by all rules and regulations adopted by the Board from time to time. The Board shall have the power to enforce compliance with said rules and regulations by all appropriate legal and equitable remedies, and an Owner determined by judicial action to have violated said rules and regulations shall be liable to the Association and/or Declarant for all damages and costs, including attorneys' fees.

Section 19.  Recreational and Other Equipment. No recreational equipment (including, but not limited to, basketball backboards and hoops, trampolines, swing sets, tree houses, children's climbing or play apparatus and other equipment associated with either adult or juvenile leisure or recreation) shall be attached to the exterior of any Dwelling Unit or otherwise placed or kept on any Lot, except in accordance with the requirements as set forth in the Guidelines.

(b)  No such recreational equipment shall be located in such a manner as to constitute a nuisance or unsightly condition to adjoining Owners.

(c)  Children's play toys and other moveable equipment of any type (such as lawn mowers, garden tools, etc.) shall not remain repeatedly overnight within any front yard of any Lot, or within the side yards of any Lot located on a Roadway corner, in such number or for such a long period of time as to create a continuing, unsightly condition.

Section 20.  Parking; Storage.

(a)  Roadways, driveways, streets and other exterior parking areas on the Property shall be used by Owners, occupants and guests for fully operable, inspected and registered four wheel passenger vehicles, two wheel motorized bicycles and standard bicycles only. No recreational vehicles, vans (other than non-commercial passenger vans), mobile homes, trailers, boats, trucks (unless licensed as a passenger vehicle and less than three-quarter ton capacity) or commercial vehicles (whether or not registered as a commercial vehicle with the State Department of Transportation) shall be permitted to be parked on the Property, except on a day-to-day temporary basis in connection with repairs, maintenance or construction work on the Lot or if entirely enclosed in a Lot Owner's garage. No vehicles, trucks, vans, cars, trailers, construction equipment, etc. may be parked overnight on any Roadway within the Property.

20

(b)     Commercial-use vehicles or trucks not involved with construction activity on the Property and having a carrying capacity and/or size designation greater than or equal to three-fourths (3/4th) ton shall not be permitted to park overnight on the Roadways, driveways or otherwise within the Property, unless stored in an enclosed garage. No vehicle of any size which transports inflammatory or explosive cargo may be kept within the Property at any time. No vehicles that are not in a condition to be normally operated or that do not have a current registration tag may be stored or situated on any Lot for more than thirty (30) days unless stored in an enclosed garage.

(c)     The Owner of each Lot will be responsible for providing on such Owner's Lot a sufficient paved parking area for all vehicles normally parked and/or situated on or in regard to such Lot.

(d)     No recreational vehicles or related equipment, including any boat, houseboat, trailer, all terrain vehicle, motor home or "camper" vehicle may be maintained, stored or kept on any portion of the Property, unless stored in an enclosed garage or in an enclosure specifically approved for such maintenance or storage by the Architectural Control Committee.

(e)     No construction office trailers may be placed, erected or allowed to remain on any Lots during construction, except as approved in writing by the Architectural Control Committee. Provided, however, nothing herein shall prohibit Declarant from erecting or moving temporary buildings or trailers onto Lots owned by Declarant to be used as construction or sales offices. Other construction vehicles (trucks, vans, cars, construction equipment, equipment trailers, etc.) may be left overnight on the Property (including any Lot or Roadway) only in accordance with such rules as may be established by the Architectural Control Committee.

Section 21.    <u>Nuisances.</u>  It shall be the responsibility of each Owner to prevent the development of any unclean, unhealthy, unsightly, or unkempt condition on such Owner's property. No Lot shall be used, in whole or in part, for the deposit, storage or burial of any property or thing that will cause such property to appear to be in an unclean or untidy condition or that will be obnoxious to the eye; nor shall any substance, thing, or material be kept that will emit foul or obnoxious odors or that will cause any noise or other condition that will or might disturb the peace, quiet, safety, comfort, or serenity of the occupants of surrounding property. No noxious or offensive activity shall be carried on within any Lot, nor shall anything be done tending to cause embarrassment, discomfort, annoyance, or nuisance to any Person using any property within the Project. There shall not be maintained on any Lot any plants or animals or device or thing of any sort whose activity or existence in any way is noxious, dangerous, unsightly, unpleasant, or of a nature as may diminish or destroy the enjoyment of the Project. Without limiting the generality of the foregoing, no speaker, horn, whistle, siren, bell, amplifier or other sound device, except such devices as may be used exclusively for security purposes, shall be located, installed or maintained upon the exterior of any Dwelling Unit or any unimproved Lot unless required by law.

Section 22.    <u>Clotheslines and Other Exterior Facilities.</u>  No clotheslines and no outdoor clothes drying or hanging shall be permitted in the Project, nor shall anything be hung, painted or displayed on the outside of the windows (or inside, if visible from the outside) or placed on the outside walls or outside surfaces of doors of any of the Dwelling Units or any other Improvements, and no awnings, canopies or shutters (except for those heretofore or hereinafter installed by Declarant) shall be affixed or placed upon the exterior walls or roofs of any Dwelling Units or any other Improvements, or any part thereof, nor relocated or extended, without the prior written consent of the Board of Directors. Window air conditioners are prohibited.

21

Section 23.    Antennas and Dishes.  To the extent permitted by law, a DBS dish, MDS dish may be erected on a Lot provided it is not greater than one (1) meter in diameter and prior approval of the Architectural Control Committee is obtained.  No television broadcast antenna of any size or masts of any size may be erected on any Lot.  Qualified dishes must be erected on the rear of the Lot or affixed to the rear of the Dwelling Unit, unless such placement impedes reception in which event such dish may be erected in another location on the Lot provided that it is screened by landscaping or other material where reasonable.

Section 24.    Diligent Construction.  All construction, landscaping or other work which has been commenced on any Lot must be continued with reasonable diligence to completion and no partially completed Dwelling Units or other Improvements shall be permitted to exist on any Lot, except during such reasonable time period as is necessary for completion.  All construction must be completed within one (1) year after the date upon which it commenced, unless a longer time is approved by the Architectural Control Committee.  Any damage to the Roadways, curbs or sidewalks or any part of any Common Area, Maintenance Area or any utility system caused by an Owner or Owner's builder or such builder's subcontractors shall be repaired by such responsible Owner.  Any builder of Improvements and such builder's subcontractors on any portion of the Property shall keep such portion of the Property free of unsightly construction debris, in accordance with the construction rules established by the Architectural Control Committee (or, in the absence of such rules, in accordance with standard construction practices), and shall similarly keep contiguous public and private areas free from any dirt, mud, garbage, trash, or other debris which is occasioned by construction of Improvements.  The Board may levy a Special Individual Assessment against an Owner's property in the Project to pay for the cost of repairing any damage to Roadways, curbs or sidewalks or any part of any Roadway, Common Area, Maintenance Area or utility system, to pay for the cost of cleaning public and private areas, including the Roadways in the Project, and to pay for the cost of the removal of garbage, trash or other debris, which are occasioned by the activities of an Owner or Owner's builder or such builder's subcontractors during the construction of Improvements.

Section 25.    Governmental Requirements.  Nothing herein contained shall be deemed to constitute a waiver of any governmental requirements applicable to any Lot and all applicable governmental requirements or restrictions relative to the construction of Improvements on and/or use and utilization of any Lot shall continue to be applicable and shall be complied with in regard to the Lots.  Each Owner shall comply with all laws, regulations, ordinances and other governmental rules and restrictions in regard to the Lot(s) or other portion of the Property owned by such Owner (including, without limitation, applicable zoning and watershed laws, rules, regulations and ordinances).  In particular, no cutting or removal of trees or other vegetation or installation of fences shall be permitted in those portions of the Property shown as "Tree Save," "Tree Preservation," "Viewshed," "Vegetated Buffer," "Preservation Strip," or by similar designation on the Map except as allowed by applicable governmental requirements and approved by the Board.

Section 26.    Occupants Bound.  All provisions of this Declaration, any Additional or Supplemental Declaration and the Bylaws and any and all rules and regulations, use restrictions or Guidelines promulgated pursuant hereto or thereto which govern the conduct of Owners and which provide for sanctions against Owners shall also apply to all Occupants even though Occupants are not specifically mentioned.

Section 27.    Applicability to Declarant and Builders.  The provisions of this Article are intended to restrict certain uses that may be harmful or affect the ambience or aesthetic appeal of the Property.  The restrictions are not intended to prohibit Declarant from performing such work as may be

22

necessary in the completion of the work in the Property. The restrictions of this Article shall therefore not be binding upon Declarant in the performance of any of the work required in order to complete the development and construction of and within the Property. Furthermore, Declarant shall have the right, in its sole and absolute discretion, to exempt any Person purchasing a Lot from Declarant for the purpose of constructing a residence thereon for resale to a third party (such Person being hereinafter referred to as a "Builder") from any one or more of the provisions hereof during the period during which such Builder is constructing a residence thereon until such residence is sold by such Builder to a third party; and may furthermore grant to any such Builder, in Declarant's sole discretion, the right to exercise any one or more of the rights, easements and privileges reserved to Declarant under the terms hereof.

ARTICLE VIII

ARCHITECTURAL AND LANDSCAPING CONTROL

Section 1.      General. Notwithstanding anything contained in this Declaration to the contrary, no Improvements, including, without limitation, site preparation on any Lot, change in grade or slope of any Lot, or erection of buildings or exterior additions or alterations to any building situated upon the Property, erection of or changes or additions in fences, hedges, walls and other structures, any landscaping, or any cutting of trees on any Lot, shall be commenced, erected or maintained on any portion of the Property, subject to the provisions of Article VIII, Section 7 hereof, until: (a) the Architectural Control Committee, appointed as hereinafter provided, has approved the plans and specifications therefor and the location of such Improvements and has given its written approval for commencement of construction, all in accordance with the terms and requirements in the Architectural, Design and Landscape Guidelines; (b) the fees set forth in or contemplated in this Article VIII have been paid; and (c) the contracts identified in this Article VIII have been executed. The provisions of this Article VIII shall not apply to the construction of any Improvements commenced, erected or maintained by Declarant on any Lot or upon any of the Common Areas or Maintenance Areas.

The Board may delegate to the Architectural Control Committee any powers or authority reserved or granted to the Board under this Article VIII.

Section 2.      Composition of Architectural Control Committee. So long as Declarant owns any Lot or other portion of the Property, the members of the Architectural Control Committee shall be appointed by Declarant. At such time as Declarant no longer owns any Lot or other portion of the Property or at such earlier date as Declarant releases its right to appoint the members of the Architectural Control Committee, the members of the Architectural Control Committee shall thereafter be appointed by the Board. The members of the Architectural Control Committee shall be appointed annually and will be composed of at least three (3) and not more than seven (7) individuals, the exact number of members of the Architectural Control Committee to be designated from time to time by the body then having the authority to appoint such members (Declarant or the Board, as the case may be). The members of the Architectural Control Committee need not be Owners of property in the Project. In the event of the death or resignation of any member of the Architectural Control Committee, the party or body then having the authority to appoint members to the Architectural Control Committee shall have full authority to designate and appoint a successor. Members of the Architectural Control Committee may be removed and replaced at any time, with or without cause, and without prior notice, by the party or body then having the authority to appoint such members. Notwithstanding anything contained herein to the contrary, the Architectural Control Committee shall have the right, power and authority to employ and/or use the services of any architects, engineers, attorneys or other professionals as it deems necessary or

23

advisable, in its sole discretion, to carry out the duties and obligations of the Architectural Control Committee as described in this Article VIII.

Section 3.   Architectural and, Design and Landscape Guidelines.The Architectural Control Committee may, from time to time, publish and promulgate architectural, design, and landscape guidelines (the "Guidelines"). The Guidelines shall be explanatory and illustrative of the general intent of the development of the Property and are intended as a guide to assist the Architectural Control Committee in reviewing plans and specifications for Improvements (including landscaping).   The Guidelines shall also set out, among other things, the procedures for submission, review and approval of plans and specifications to the Architectural Control Committee and the fees to be imposed by the Architectural Control Committee, as more specifically described in Article VIII, Section 8 hereof. In any event, the Guidelines shall not be binding upon the Architectural Control Committee, may be revised and amended at any time by the Architectural Control Committee, in its sole discretion, and shall not constitute, in every event, the basis for approval or disapproval of plans, specifications and other materials (for the construction of non-landscape Improvements) submitted to the Architectural Control Committee for approval.

(b)    The portions of the Guidelines addressing landscaping Improvements may establish approved standards, methods and procedures for landscaping, landscape management and landscape maintenance in the Property, including the removal of trees. Such authorized standards, methods and procedures shall be utilized by Owners and their contractors and subcontractors, and the approval by the Architectural Control Committee of any landscaping plan or other landscaping improvement in connection with landscaping on a Lot or other portion of the Property shall be based upon the conformity of such plan or improvement with the Guidelines. Such authorized standards, methods and procedures may change from time to time based upon the requirements of the Village of Marvin.

(c)    The Architectural Control Committee is also hereby authorized to publish and promulgate from time to time, and revise and amend at any time in its sole discretion, construction rules to be followed by all Owners and builders performing work or constructing or installing Improvements (including landscape Improvements) on the Property.

(d)    The Architectural Control Committee may issue and amend the Guidelines from time to time and may publish and promulgate different Guidelines for different Phases, sections or portions of the Property.

Section 4.   Definition of "Improvements".  The term "Improvement" or "Improvements" shall mean and include any and all man-made changes or additions to a Lot, including, but not limited to, the location, materials, size and design of all buildings (including any exterior devices attached to or separate from buildings, such as heating and air conditioning equipment, solar heating devices, antennae, satellite dishes, etc.); storage sheds or areas; roofed structures; parking areas; fences; "invisible" pet fencing; pet "runs," lines and similar tethers or enclosures; fences; walls; irrigation equipment, apparatus and systems; landscaping (including cutting of trees); hedges; mass plantings; poles; driveways; ponds; lakes; changes in grade or slope; site preparation; swimming pools; hot tubs; jacuzzis; tennis courts; tree houses; basketball goals; skateboard ramps; and other sports or play apparatus; signs; exterior illumination; and changes in any exterior color or shape. The definition of Improvements includes both original Improvements and all later changes to Improvements. The definition of Improvements, however, does not include the replacement or repair of Improvements previously approved by the Architectural

24

Control Committee, provided such replacement or repair does not change exterior colors, materials, designs or appearances from that which were previously approved by the Architectural Control Committee.

        Section 5.      <u>Enforcement</u>.

          (a)     It is Declarant's intent that the architectural control provisions of this Declaration are to permit control of the architectural design and landscaping and to establish quality standards for construction and construction activity in the Project and to help preserve values of properties in the Project. All Owners, by purchasing property subject to this Declaration, acknowledge that a violation of any such provisions could result in irreparable harm and damage to other Owners of property in the Project and to Declarant, and to the values of their respective properties in the Project, a monetary measure of which harm and damage would be difficult to establish. Accordingly, the Association shall have the specific right (but not the obligation) to enforce and/or to prevent any violation of the provisions contained in this <u>Article VIII</u> by a proceeding at law or in equity against the person or persons violating or attempting to violate any such provisions. Declarant hereby specifically reserves and grants unto the Architectural Control Committee, the Board and any agent or member thereof, the right of entry and inspection upon any portion of the Property for the purpose of determination by the Architectural Control Committee or the Board whether there exists any construction of any Improvement which violates the terms of any approval by the Architectural Control Committee, the terms of the Guidelines, the terms of this Declaration, or the terms of any amendments hereto or thereto.

          (b)     As to nonconforming or unapproved Improvements, the Association may require any Owner to restore such Owner's Improvements to the condition existing prior to the construction thereof (including, without limitation, the demolition and removal of any unapproved Improvements) if such Improvements were commenced or constructed in violation of this Article. In addition, the Association may, but has no obligation to, cause such restoration, demolition and removal to be performed and to levy the amount of the cost thereof as a Special Individual Assessment against the Lot or portion of the Property upon which such Improvements were commenced or constructed. In the event that it becomes necessary to resort to litigation to determine the propriety of any constructed Improvement, to remove any unapproved Improvement or otherwise to remedy a violation of the Guidelines, the Association shall be entitled to recover court costs, attorneys' fees and expenses incurred by the Association and/or the Architectural Control Committee in connection therewith, which costs, fees and expenses may be levied as a Special Individual Assessment against the Lot or other portion of the Property upon which such Improvement was commenced or constructed.

        Section 6.      <u>Failure of the Architectural Control Committee to Act</u>. If the Architectural Control Committee fails to approve or disapprove any plans and specifications and other submittals which conform (and which relate to Improvements which will conform) with the requirements hereof and of the Guidelines or to reject them as being inadequate or unacceptable within forty-five (45) business days after receipt thereof, and provided such submittal was a full and complete submittal, in accordance with the Guidelines, of all items that were to have been submitted to the Architectural Control Committee, and provided the Architectural Control Committee shall again fail to approve or disapprove of such plans, specifications and other submittals within ten (10) business days after additional written request to act on such items is delivered to the Architectural Control Committee following the passage of such first above-described forty-five (45) business day period, it shall be conclusively presumed that the Architectural Control Committee has approved such conforming plans and specifications and other submittals,

25

EXCEPT that the Architectural Control Committee has no right or power, either by action or failure to act, to waive or grant any variances relating to any mandatory requirements specified in this Declaration, and EXCEPT FURTHER, that the Architectural Control Committee shall not be deemed to have waived any of the requirements set forth in Article VIII, Section 8, Section 9 or Section 10 hereof. If plans and specifications or other submittals are not sufficiently complete or are otherwise inadequate, the Architectural Control Committee may reject them as being inadequate or may approve or disapprove part, conditionally or unconditionally, and reject or approve the balance. The Architectural Control Committee is authorized to request the submission of samples of proposed construction materials.

Section 7. Variances. Upon submission of a written request for a variance, which request shall set forth, among other things, the extraordinary circumstances applicable to a Lot giving rise to the need for a variance, the Architectural Control Committee may, from time to time, in its sole discretion, permit Owners to construct, erect or install Improvements which are at variance with restrictions, requirements or provisions of this Declaration from which a variance is permitted, pursuant to the terms hereof or thereof. In any case, however, the Architectural Control Committee may grant a variance only due to the existence of extraordinary circumstances applicable to a Lot, which extraordinary circumstance (i) has not been caused by the Owner of such Lot and (ii) materially impairs the ability of an Owner to construct a Dwelling Unit on such Owner's Lot. Any variance granted shall be in basic conformity with and shall blend effectively with the general architectural style and design of the community and shall not materially change the scheme of restrictions herein set forth. Written requests for variances shall be deemed to be disapproved in the event the Architectural Control Committee has not expressly and in writing approved such request within thirty (30) business days of the submission of such request. No member of the Architectural Control Committee shall be liable to any Owner for any claims, causes of action, or damages arising out of the grant or denial of any variance to any Owner. Each request for a variance submitted hereunder shall be reviewed separately and apart from other such requests and the grant of a variance to any Owner shall not constitute a waiver of the Architectural Control Committee's right to strictly enforce the covenants, restrictions and architectural standards provided hereunder against any other Owner. If a variance is granted, the Owner receiving such variance shall comply with the more restrictive of the terms of the variance or applicable local, state or federal laws (including, without limitation, local zoning and development laws), and the granting of a variance shall not relieve any Owner from the obligation of complying with such laws.

Section 8. Fees Required by the Architectural Control Committee. The Architectural Control Committee, in its sole discretion, may require that each Person submitting plans and specifications for Improvements to the Architectural Control Committee pay one or more fees to the Architectural Control Committee or to Declarant as a condition to commencement of construction of such Improvements. Such fee(s), including the amount(s), payee and purpose(s) thereof, shall be established by, and may be increased from time to time by, the Architectural Control Committee and shall be set forth in the Guidelines.

Section 9. No Construction Without Payment of Fees. Notwithstanding anything contained in this Article VIII to the contrary, plans and specifications for Improvements to be constructed on a Lot or other portion of the Property shall not be deemed to have been properly submitted unless and until any and all fees required by the Architectural Control Committee to be paid in connection with such Improvements, as provided in Article VIII, Section 8 above, shall have been paid to the Architectural Control Committee or Declarant as required.

Section 10. Notices and Submittals. Notices and submittals to the Architectural Control Committee shall be in accordance with the notice provisions set forth from time to time in the Guidelines.

Section 11.    Limitation of Liability.  No member of the Architectural Control Committee shall be liable for claims, causes of action or damages (except where occasioned by willful misconduct of such member) arising out of services performed pursuant to this Article VIII.  Neither the Architectural Control Committee, nor the members thereof, nor the Association, nor Declarant, nor any officers, directors, members, employees, agents or affiliates of any of them, shall be liable for damages or otherwise to anyone submitting plans and specifications and other submittals for approval or to any Owner by reason of mistake of judgment, negligence or nonfeasance arising out of or in connection with the approval or disapproval of, or the failure to approve or disapprove of, any plans and specifications.  The approval of plans and specifications by the Architectural Control Committee shall not be deemed or construed as a representation or warranty of the Architectural Control Committee, Declarant, or any officer, director, member, employee, agent or affiliate of any of them, (i) that Improvements constructed in accordance with such plans and specifications will comply with applicable zoning ordinances, building codes, or other governmental or quasi-governmental laws, ordinances, rules and regulations or (ii) as to the structural soundness, quality, durability, suitability, fitness or proper functioning of Improvements constructed in accordance with such plans and specifications; and any responsibility or liability therefor is hereby disclaimed.  Every person who submits plans and specifications, and every Owner, agrees that he will not bring any action or suit against Declarant, the Association, the Architectural Control Committee,, the Board, or the officers, directors, members, employees, agents or affiliates of any of them, to recover any such damages and hereby releases, demises, and quitclaims all claims, demands and causes of action arising out of or in connection with any judgment, negligence or nonfeasance and hereby waives the provisions of any law which provides that a general release does not extend to claims, demands and causes of action not known at the time the release is given.  Declarant shall be the sole party responsible for the performance of Declarant's obligations under this Declaration, and no other person, firm or entity, including, without limitation, any entity affiliated with Declarant, shall have any obligation or liability for Declarant's obligations under this Declaration.

Section 12.    Miscellaneous.  Members of the Architectural Control Committee, in the sole discretion of the party or body appointing such members (i.e., either Declarant or the Board, as the case may be) may be compensated for their services.  The Association shall reimburse members of the Architectural Control Committee for reasonable out-of-pocket expenses associated with their activities hereunder.  All costs, expenses and attorneys' fees of the Architectural Control Committee, including those incurred in connection with the exercise of their enforcement or other powers as provided herein, shall be borne by the Association; provided, however, nothing herein shall be deemed to negate the Association's right to an award of court costs, attorneys' fees and expenses in accordance with Article VIII, Section 5 hereof.

## ARTICLE IX

## INSURANCE; REPAIR AND RESTORATION; CONDEMNATION

Section 1.    Board of Directors.  The Board of Directors shall obtain and maintain at all times insurance of the type and kind and in no less than the amounts set forth below:

(a)    Fire.  All improvements and all fixtures and personal property included in the Common Areas and Maintenance Areas and all personal property and supplies belonging to the Association shall be insured in an amount equal to the current replacement cost (exclusive of land, foundation, excavation and other normally excluded items) as determined annually by the Board with the assistance of the insurance company providing coverage.  The Board shall, at least annually, review the insurance coverage required herein and determine the current replacement

27

cost of such improvements and fixtures and personal property and supplies. Such coverage shall provide protection against loss or damage by fire or other hazards covered by a standard extended coverage endorsement, windstorm and water damage, vandalism and malicious damage and all perils covered by a standard "all risk" endorsement. In addition to the provisions and endorsements set forth in Article IX, Section 3 and Section 4, the fire and casualty insurance described herein shall contain the following provisions:

> (1)    standard "Agreed Amount" and "Inflation Guard" endorsements;

> (2)    construction code endorsements if the Common Area becomes subject to a construction code provision which would require changes to undamaged portions of any building thereby imposing significant costs in the event of partial destruction of such building by an insured peril;

> (3)    a waiver of subrogation by the insurer as to any claims against the Association, any officer, director, agent or employee of the Association, the Owners and their employees, agents, tenants and invitees; and

> (4)    a provision that the coverage will not be prejudiced by act or neglect of one or more Owners when said act or neglect is not within the control of the Association or by any failure of the Association to comply with any warranty or condition regarding any portion of the Property over which the Association has no control.

The fire and casualty insurance policy shall not contain (and the insurance shall not be placed with companies whose charters or bylaws contain) provisions whereby: (1) contributions or assessments may be made against the Association or the Owners; (2) loss payments are contingent upon action by the carrier's directors, policy holders or members; and (3) there are limiting clauses (other than insurance conditions) which could prevent Owners from collecting the proceeds.

> (b)    <u>Public Liability</u>. The Board shall also be required to obtain and maintain, to the extent obtainable, public liability insurance and officer's and director's liability insurance in such limits as the Board may, from time to time, determine to be customary for projects similar in construction, location and use as the Project, covering each member of the Board, the managing agent, if any, and each Owner with respect to his liability arising out of the ownership, maintenance, or repair of the Common Areas and Maintenance Areas, or from service on the Board; provided, however, in no event shall the amounts of such public liability insurance ever be less than $2,000,000 per occurrence against liability for bodily injury, including death resulting therefrom, and damage to property, including loss of use thereof, occurring upon, in or about, or arising from or relating to, the Property or any portion thereof, nor shall the amount of such officer's and director's insurance be less than $2,000,000 unless such coverage is determined by the Board to be unreasonably expensive. Such insurance shall include endorsements covering cross liability claims of one insured against another, including the liability of the Owners as a group to a single Owner. The Board shall review such limits annually. Until the first meeting of the Board following the initial meeting of the Association Members, such public liability insurance shall be in amounts of not less than $2,000,000 per occurrence for claims for bodily injury and property damage and such officer's and director's liability insurance shall be in amounts not less than $2,000,000.

28

(c)  Fidelity Coverage.  The Board shall also be required to obtain fidelity coverage against dishonest acts on the part of all persons, whether officers, directors, trustees, employees, agents or independent contractors, responsible for handling funds belonging to or administered by the Association.  The fidelity insurance policy shall be written in an amount sufficient to provide protection which is in no event less than one and one-half times the Association's estimated annual operating expenses and reserves.  An appropriate endorsement to the policy to cover any persons who serve without compensation shall be added if the policy would not otherwise cover volunteers.

(d)  Other.  Such other insurance coverages, including flood insurance and worker's compensation, as the Board shall determine from time to time desirable.

Section 2.  Premium Expense.  Premiums upon insurance policies purchased by the Board shall be paid by the Board and charged as a Common Expense to be collected from the Owners pursuant to the terms of this Declaration.

Section 3.  Special Endorsements.  The Board shall make diligent efforts to secure insurance policies that will provide for the following:

(a)  recognition of any insurance trust agreement entered into by the Association;

(b)  coverage that may not be cancelled or substantially modified (including cancellation for nonpayment of premium) without at least thirty (30) days' prior written notice to the named insured and any insurance trustee; and

(c)  coverage that cannot be cancelled, invalidated or suspended on account of the conduct of any officer or employee of the Board without prior demand in writing that the Board cure the defect and the allowance of a reasonable time thereafter within which the defect may be cured by the Association or any Owner.

Section 4.  General Guidelines.  All insurance policies purchased by the Board shall be with a company or companies licensed to do business in the State of North Carolina and holding a rating of "A VIII" or better by the current issue of Best's Insurance Reports.  All insurance policies shall be written for the benefit of the Association and shall be issued in the name of and provide that all proceeds thereof shall be payable to the Association.  Notwithstanding any of the foregoing provisions and requirements relating to insurance, there may be named as an insured, on behalf of the Association, the Association's authorized representative, who shall have exclusive authority to negotiate losses under any policy providing such insurance.

Section 5.  Insurance Proceeds.  Subject to any limitations imposed by any applicable financing documents, the Association shall use the net proceeds of casualty insurance covered by it to repair and/or replace any damage or destruction of property, real or personal, covered by such insurance.  Any balance from the proceeds of casualty insurance paid to the Association remaining after satisfactory completion of repair and replacement shall be retained by the Association as part of the general reserve fund for repair and replacement of the Common Area and/or Maintenance Areas.

Section 6.  Insufficient Proceeds.  If the insurance proceeds received by the Association are insufficient to reimburse, to repair and/or replace any damage or destruction to person or property, the Board may levy a Special Assessment against the Owners to cover the deficiency.

29

Section 7.    Owner's Personal Property.  Neither the Association nor Declarant shall be liable in any manner for the safekeeping or condition of any personal property belonging to or used by any Owner or his family, tenants, guests or invitees, located on or used at the Common Areas.  Further, neither the Association nor Declarant shall be responsible or liable for any damage or loss to any personal property of any Owner, his family, tenants, guests or invitees located on or used at the Common Areas. Each Owner shall be solely responsible for all personal property and for any damage thereto or loss thereof, and shall be responsible for the purchase of, at such Owner's sole cost and expense, any liability or other insurance for damage to or loss of such property.  Neither the Association nor Declarant shall be responsible or liable for any damage or loss to or of any equipment or other personal property of any Owner, his family, tenants, guests or invitees located on or used at the Common Areas.  Each Owner shall be solely responsible for all personal property and for any damage thereto or loss thereof, and shall be responsible for the purchase, at such Owner's sole cost and expense, of any liability or other insurance for damage to or loss of such property.

Section 8.    No Obligation to Insure Owners' Property.  By virtue of taking title to a Lot within the Project, each Owner acknowledges that neither the Association nor Declarant has any obligation to provide any insurance for any portion of such Lot or any Dwelling Unit or other property located thereon.

Section 9.    Security.  The Association may, in its sole discretion, but shall not be obligated to, provide certain security and fire protection measures, and maintain or support certain other activities within the Project designed to make the Project safer than it might otherwise be.  Provided, however, should the Association provide, maintain or support any such measures or activities, then neither the Association, Declarant, nor any successor of Declarant shall in any way be considered insurers or guarantors of security or fire protection within the Project, and neither the Association, Declarant nor any successor of Declarant shall be held liable for any loss or damage by reason or failure to provide or take any security or fire protection measures or for the ineffectiveness of any such measures undertaken.  Each Owner and Occupant of any Lot or Dwelling Unit and each tenant, guest and invitee thereof acknowledges and understands that neither the Association, Declarant nor any successor of Declarant are insurers, and each such Owner, and Occupant of a Lot or Dwelling Unit and their tenants, guests and invitees hereby assume all risks for loss or damage to persons, property or contents belonging to any such persons.

Section 10.    Condemnation.  Whenever all or part of the Common Area shall be taken or condemned by any authority having the power of eminent domain, all compensation and damages for and on account of such taking shall be paid to the Association.  The Association, acting through the Board, shall have the right to negotiate and litigate the issues with respect to the taking and compensation affecting the Common Area, without limitation on the right of the Owners to represent their own interests. Each Owner, by his acceptance of a deed to a Lot or other portion of the Property, hereby appoints the Association as his attorney-in-fact to negotiate, litigate or settle on his behalf all claims arising from the condemnation of the Common Area.  All compensation and damages paid to the Association on account of such a taking shall be used to restore the Common Area, provided such restoration is possible, with the excess, if any, to be retained by the Association and applied to future operating expenses by the Board, in its sole discretion.  Nothing herein is to prevent Owners whose Lots or other property are specifically affected by the taking or condemnation from joining in the condemnation proceedings and petitioning on their own behalf for consequential damages relating to loss of value of the affected Lots or other property, or improvements, fixtures or personal property thereon, exclusive of damages relating to the Common Area.  In the event that the condemnation award does not allocate consequential damages to specific Owners, but by its terms includes an award for reduction in value of Common Area, Lots or other

30

property without such allocation, the award shall be divided between affected Owners and the Board, as their interests may appear, by the Board in its sole discretion.

## ARTICLE X

## EASEMENTS AND OTHER RIGHTS

Declarant, in addition to any other easements granted or reserved herein, hereby reserves unto itself, its successors and assigns, and grants to the Association and any other persons or entities hereinafter set forth, the following non-exclusive easements on, upon, over, across, through and under the Property. In addition, Declarant hereby reserves unto itself, its successors and assigns, the right, on behalf of itself and the Association, to grant additional easements on, upon, over, across, through and under the Common Areas and any portion of the Property owned by Declarant as deemed to be in the best interests of and proper for the Project, including, but not limited to, easements in favor of Declarant, the Association, the Owners, and all their family members, guests, invitees and tenants and to various governmental and quasi-governmental authorities and agencies and private concerns for the purposes and uses hereinafter specified.

Section 1. _Easements and Cross-Easements on Common Areas._ Declarant, for itself, its designees and the Association, reserves the right to impose upon the Common Areas henceforth and from time to time such easements and cross-easements for ingress and egress, installation, maintenance, construction and repair of utilities and facilities including, but not limited to, electric power, telephone, cable television, master antenna transmission, surveillance services, governmental and quasi-governmental purposes, sewer, water, gas, drainage, irrigation, storm water management, lighting, television transmission, garbage and waste removal, emergency services, and the like as it deems to be in the best interests of, and necessary and proper for, the Project or any portion thereof.

Section 2. _Use of Common Areas._ Subject to any limitation or restriction set forth in this Declaration, Declarant declares that the Common Areas are subject to a perpetual nonexclusive easement in favor of Declarant, the Association and their designees, the Owners and all their family members, guests, invitees and tenants, and appropriate governmental and quasi-governmental agencies to use the Common Areas for all proper and normal purposes including, but not limited to, ingress, egress and access for the furnishing of services and utilities and for such use of the facilities as the same are reasonably intended in accordance with the terms of this Declaration. If ingress or egress to any Lot or other portion of the Property is through any Common Area, any conveyance or encumbrance of such area is subject to this easement.

Section 3. _Right-of-Way Over Roadways._ Declarant hereby reserves, for the benefit of itself, its agents, employees, lessees, invitees, designees, successors and assigns, and grants to the Association, its agents, employees, tenants, invitees, designees, successors and assigns, and to each Owner of a Lot, their family members, tenants, guests, invitees, successors and assigns, and to each Occupant of a Lot and to all governmental and quasi-governmental agencies and service entities having jurisdiction over the Property while engaged in their respective functions, a perpetual non-exclusive easement, license, right and privilege of passage and use, both pedestrian and vehicular, over and across the Roadways for the purpose of providing access, ingress and egress to and from, through and between the Property.

Section 4. _Right of the Association and Declarant to Enter Upon the Common Areas, Maintenance Areas, and Lots._ Declarant hereby reserves for the benefit of itself, its successors in interest

31

and assigns, and grants to the Association and all agents, employees or other designees of Declarant or the Association an easement for ingress, egress and access to enter upon or over the Common Areas, Maintenance Areas, and Lots for the purposes of inspecting any construction, proposed construction, or Improvements or fulfilling the rights, duties and responsibilities of ownership, administration, maintenance and repair of Declarant or the Association, as appropriate, including without limitation the maintenance, repair, and replacement of irrigation and sprinkler systems, and the maintenance, repair, and replacement of Government Required Improvements, to the extent to Owner of the Lot fails to maintain, repair, or replace same . Such easement includes an easement in favor of the Association and Declarant to enter upon the Common Areas and Maintenance Areas now or hereafter created to use, repair, maintain and replace the same for the purposes for which they are initially designated or for such purposes as they are hereafter redesignated or as Declarant otherwise determines them to be reasonably suited. Notwithstanding the foregoing, nothing contained herein shall be interpreted as imposing any obligation upon the Association or Declarant to maintain, repair, or construct Improvements which an Owner is required to maintain, construct or repair.

Section 5.    Easement for Encroachments.  Declarant hereby reserves, for the benefit of itself, its successors in interest and assigns, and grants to the Association, the Owners, their successors and assigns, and to the Occupants of Lots, easements for encroachments, to the extent necessary, in the event any portion of the Improvements located on any portion of the Property now or hereafter encroaches upon any of the remaining portions of the Property as a result of minor inaccuracies in survey, construction or reconstruction, or due to settlement or movement.  Any easement(s) for encroachment shall include an easement(s) for the maintenance and use of the encroaching Improvements in favor of Declarant, the Association, the Owners and all their designees.

Section 6.    Maintenance Areas.  Declarant hereby reserves, for the benefit of itself, its successors in interest and assigns, and grants to the Association, its successors and assigns, the following nonexclusive perpetual easements over the Property for the purposes hereinafter described:

(a)    Easements for the purposes of landscaping and maintaining entryways and erecting and maintaining entrance monument(s) for the Project.  Declarant and/or the Association shall have the right to landscape and maintain such areas of the Property as entryways to the Project, to erect and maintain entrance monument(s) thereon bearing the name of the Project, and to erect and maintain lighting for such monument(s), plantings, landscaping, irrigation systems and other improvements typically used for entryways.

(b)    Easements for the installation, maintenance, repair and removal of sidewalks.

(c)    Easements for the installation, maintenance, repair and removal of storm drainage facilities.

(d)    Easements for the maintenance, repair, and replacement of the Bridges.

All of the above-described areas and items shall herein be referred to as the "Maintenance Areas."  The Association shall maintain the Maintenance Areas to a consistent standard of maintenance typical of a first-class development.  Additionally, Association may maintain a portion, but not all, of certain Maintenance Areas.  Each Owner shall be obligated to maintain all portions of any Maintenance Area located upon his or her Lot to the extent the Association does not maintain it.

32

Section 7.     Utility and Drainage Easements.  The Property shall be subject to all easements and rights-of-way for utilities and drainage shown on the Plats.  Such easements are hereby reserved for the use of Declarant, its successors and assigns, and are hereby established for the use of the Association, its successors and assigns, and include, without limitation, storm drainage easements of variable width, whether or not depicted on a Plat, over the entire area within all ditches along any Roadway.

Additionally, Declarant hereby reserves, for the benefit of itself, its successors and assigns, and grants to the Association, its successors and assigns, a non-exclusive easement and right-of-way over, under and along a 10-foot strip of land adjacent to the front, side and rear boundary lines of all Lots within the Property for the installation and maintenance of lines, conduits, pipes and other equipment necessary for furnishing electric power, gas, telephone service, cable service, water, irrigation, septic system, sanitary sewer and drainage facilities, storm drainage and/or other utilities.  Within the above-described easements no structure, planting or other material shall be placed or permitted to remain which may damage or interfere with the installation of utilities or which may change the direction or flow of drainage channels in the easements.  This reservation of easements shall not prohibit the construction of driveways, at locations approved by the Architectural Control Committee, over such easements.

Section 8.     Irrigation Easements.  Declarant hereby reserves, for the benefit of itself, its successors and assigns, and grants to the Association, its successors and assigns, non-exclusive perpetual easements over, across and under the Property for the installation, maintenance, repair and removal of irrigation systems.

Section 9.     Declarant's Right to Assign Easements; Maintenance of Easement Areas.  Declarant shall have the right to assign and convey, in whole or in part, the easements reserved by it hereunder.  The areas burdened by the easements and rights-of-way reserved by Declarant on each Lot or other portion of the Property pursuant hereto, including any Improvements in such areas, which are not to be maintained by the Association or a public authority or utility, shall be maintained continuously by each Owner of such Lot or other portion of the Property, but no structures, plantings or other material shall be placed or permitted to remain upon such areas or other activities undertaken thereon which may damage or interfere with the installation or maintenance of utilities or other services, or which may retard, obstruct or reverse the flow of water or which may damage or interfere with established slope ratios or create erosion problems.  Notwithstanding the above, the Association and/or Declarant shall have the right, but not the obligation, to maintain the landscaping in the easement areas on any Lot.

Section 10.     Easement Reserved for the Association and Declarant.  Full rights of access, ingress and egress are hereby reserved by Declarant for itself and the Association at all times over and upon any Lot or other portion of the Property for the exercise of the easement rights described in this Article X and for the carrying out by Declarant or the Association of the rights, functions, duties and obligations of each hereunder; provided, that any such entry by Declarant or the Association upon any Lot or portion of the Property shall be made with the minimum inconvenience to the Owner of such property as is reasonably practical, and any damage caused as a result of the gross negligence of Declarant, the Association or their employees or agents shall be repaired by Declarant or the Association, as the case may be, at the expense of Declarant or the Association, as the case may be.

Section 11.     Additional Easements.  Declarant shall have the right to grant over, under, across and upon any portion of the Property owned by Declarant, and the Board shall have the authority, in its sole discretion, to grant over, under, across and upon the Common Areas, such easements, rights-of-way, licenses and other rights in accordance with or to supplement the provisions of this Declaration or as may otherwise be desirable for the development of the Project, by the execution, without further authorization,

33

of such grants of easement or other instruments as may from time to time be necessary or desirable. Such easements may be for the use and benefit of persons who are not Association Members or Owners. After such time as the members of the Board are no longer appointed by Declarant, the Board shall cooperate with Declarant and execute such grants of easements over the Common Areas as may be desirable to Declarant for the development of the Project and the preservation and enhancement of Declarant's interest therein.

Section 12. <u>No Merger of Easements</u>. The easements hereby established shall not be terminated by merger or otherwise, except upon execution and recordation of an instrument specifically terminating any such easement.

**ARTICLE XI**

**GENERAL PROVISIONS**

Section 1. <u>Owners' Duty of Maintenance</u>. Except for those portions, if any, of a Lot which the Association is obligated to or may elect to maintain or repair hereunder, the Owner of any Lot shall have the duty and responsibility, at such Owner's sole cost and expense, to keep the Lot(s) owned by such Owner, including Improvements thereon and ground and drainage easements or other rights-of-way incident thereto, in compliance with the covenants, conditions, restrictions and development standards contained in this Declaration (to the extent applicable), in accordance with the provisions of the Guidelines, and in a well-maintained, safe, clean and attractive condition at all times. Such maintenance, as to unimproved and improved Lots, shall include, but shall not be limited to, the following:

      (1)     Prompt removal of all litter, trash, refuse and waste;

      (2)     Keeping land, including any lawns and shrub beds, well maintained and free of trash, uncut grass and weeds;

      (3)     Keeping all sediment resulting from land disturbance or construction confined to the respective Owner's property; and

      (4)     Complying with all governmental zoning, environmental, health and police requirements, including maintenance, repair, and replacement of Government Required Improvements located on such Owner's Lot, including maintenance of stream buffers in compliance with Section 151.063 of the Village of Marvin Zoning Ordinance.

In addition, such maintenance, as to improved Lots, shall include, but shall not be limited to, the following:

      (A)     Keeping exterior lighting and mechanical facilities in working order;

      (B)     Keeping parking areas and driveways in good repair;

      (C)     Repainting of Improvements; and

      (D)     Repair of damage and deterioration to Improvements, it being understood and agreed that if any Improvements are damaged or destroyed by fire or other casualty, then within six (6) months following the date such damage or destruction occurs, the Owner of the Lot on which such Improvements

34

are situated, must repair and restore such damaged Improvements (in accordance with plans and specifications approved by the Architectural Control Committee and otherwise in accordance with the terms and provisions of this Declaration or remove such damaged Improvements and restore the Lot to its condition existing prior to the construction of such Improvements.

Notwithstanding anything contained herein to the contrary, the above-described maintenance responsibilities as to any Lot shall commence only upon a Plat showing such Lot being recorded in the Office of the Register of Deeds of Union County and upon the conveyance of such Lot by Declarant. If an Owner of any Lot has failed in any of the duties or responsibilities of such Owner as set forth herein, then the Board and Declarant, either jointly or severally, may give such Owner written notice of such failure and such Owner must within ten (10) days after receiving such notice (which notice shall be deemed to have been received upon deposit in an official depository of the United States mail, addressed to the party to whom it is intended to be delivered, and sent by certified mail, return receipt requested), perform the care and maintenance required or otherwise perform the duties and responsibilities of such Owner as described in herein. Provided, however, this cure period shall be extended for a time not to exceed sixty (60) days so long as Owner shall have commenced to cure such nonconformity and shall diligently prosecute the same. Should any such Owner fail to fulfill this duty and responsibility within such period, then the Association, acting through its authorized agent or agents, or Declarant (so long as it owns any portion of the Property), acting through its authorized agent or agents, either jointly or severally, shall have the right and power to enter onto the premises of such Owner and perform such care and maintenance without any liability for damages for wrongful entry, trespass or otherwise to any Person. The Owner of the Lot on which such work is performed shall be liable for the cost of such work, together with interest on the amounts expended by the Association or Declarant in performing such work computed at the highest lawful rate as shall be permitted by law from the date(s) such amounts are expended until repayment to the Association or Declarant, as the case may be, and for all costs and expenses incurred in seeking the compliance of such Owner with his duties and responsibilities hereunder, and such Owner shall reimburse the Association or Declarant, as the case may be, on demand for such costs and expenses (including interest as above provided). If such Owner shall fail to reimburse the Association or Declarant, as the case may be, within thirty (30) days after the mailing to such Owner of a statement for such costs and expenses, then, without limitation of any other rights of the Association or Declarant, the Association may impose a Special Individual Assessment against such Owner.

Section 2.     Duration.  This Declaration and the controls, covenants, restrictions and standards set forth herein shall run with and bind the Property and any Owner, and shall inure to the benefit of every Owner of a Lot in the Property and every Owner of any other portion of the Property, including Declarant, and their respective heirs, successors, and assigns, for a term of thirty (30) years beginning on the date this Declaration is recorded in the Office of the Register of Deeds of Union County, North Carolina.  At the end of such thirty (30) year period, the easements, covenants, conditions and restrictions set forth herein shall automatically be extended for successive period(s) of ten (10) additional years, unless prior to the expiration of a respective period, by two-thirds (2/3) vote of the Association Members, there shall be adopted a resolution to terminate these covenants and restrictions.  Owners may vote in person or by proxy at a meeting duly called for such purpose at which a quorum is present, written notice of which shall have been given to all Owners at least thirty (30) days in advance of the date of such meeting, which notice shall set forth the purpose of such meeting.  The foregoing shall not limit the right of Declarant to amend and/or supersede, in whole or in part, the terms and provisions hereof, as such right in favor of Declarant is described in Section 3 below.

Section 3.     Amendment.  Except as otherwise expressly provided herein and subject to the limitations hereinafter contained, this Declaration may be amended or modified at any time by a vote of

35

no less than sixty-seven percent (67%) of all votes entitled to be cast by the Association Members, which vote is taken at a duly held meeting of the Association Members at which a quorum is present, all in accordance with the Bylaws. Provided, however, if sixty-seven percent (67%) of all votes entitled to be cast by the Association Members cannot be obtained at such a meeting, then this Declaration may be amended by obtaining the vote of sixty-seven percent (67%) of all votes present at a duly held meeting of the Association Members at which a quorum is present and by, within ninety (90) days of such vote, obtaining written consent to such amendment by Association Members holding a sufficient number of votes to comprise, along with such voting Association Members, a total of sixty-seven percent (67%) of all votes entitled to be cast by Association Members. Further provided, that any amendment or modification to this Declaration must be consented to by Declarant so long as Declarant is the Owner of any Lot or other portion of the Property, or any portion of the Additional Property, which consent Declarant may grant or withhold in its sole discretion. Any amendment or modification upon which the vote of Association Members is required pursuant to this Section 3 shall become effective when an instrument executed by the Association Members voting for such amendment or modification is filed of record in the Office of the Register of Deeds of Union County, North Carolina; provided, however, such an amendment or modification, in lieu of being executed by the Association Members voting for such amendment or modification, may contain a certification of the Secretary of the Association stating that the amendment or modification has been voted on and approved by the requisite number of votes of the Association Members, as provided in this Section 3.

Notwithstanding the terms of the immediately preceding paragraph of this Section 3, for a period of fifteen (15) years after the recordation of this Declaration, Declarant, without obtaining the approval of any Association Member or any Owner or Owners other than Declarant, shall have the unilateral right, in its sole and absolute discretion, to make any amendments or modifications hereto which Declarant deems necessary or desirable, including, without limitation, amendments or modifications to any procedural, administrative or substantive provision of this Declaration. Furthermore, at any time during the term of this Declaration, Declarant, without obtaining the approval of any Association Member or any Owner or Owners other than Declarant, shall have the unilateral right, in its sole and absolute discretion, to make any amendments or modifications hereto which do not involve a change which materially adversely affects the rights, duties or obligations specified herein.

Section 4.    Release of Property.  For a period of fifteen (15) years after the recordation of this Declaration, Declarant shall have the right, in its sole and absolute discretion, without the consent of the Association, any Association Member or any other Owner, to release any portion of the Property then owned by Declarant from the terms of this Declaration by recording a release in the Office of the Register of Deeds of Union County, North Carolina.  After the recordation of such release, the portion of the Property described therein shall not be subject to the terms of this Declaration.

Section 5.    Enforcement; Litigation.  The Association, Declarant or any Owner shall have the right, but not the obligation, on its own behalf or on behalf of others, to enforce the provisions of this Declaration.  Enforcement of the controls, covenants, conditions, restrictions, easements, development guidelines, charges and liens for which provision is made in this Declaration shall be by a proceeding at law or in equity (or otherwise, as provided in this Declaration) against any person or persons violating or attempting to violate any such control, covenant, condition, restriction, easement, development guideline, charge or lien, either to restrain such violation or to recover damages, and against the land to enforce any lien created by these covenants; and failure by the Association, Declarant or any Owner to enforce any such control, covenant, condition, restriction, easement, development guideline, charge or lien shall in no event be deemed a waiver of the right to do so thereafter or of any other or future violation of any thereof. Except as otherwise expressly provided in this Declaration, no judicial or administrative proceeding shall

36

be commenced or prosecuted by the Association unless approved by a vote of no less than two-thirds (2/3) of all votes entitled to be cast by the Association Members, which vote is taken at a duly held meeting of the Association Members at which a quorum is present, all in accordance with the Bylaws. The immediately preceding sentence shall not apply, however, to (a) actions brought by the Association to enforce the provisions of this Declaration, (b) the imposition and collection of assessments, charges or other fees hereunder, (c) proceedings involving challenges to ad valorem taxation, (d) counter-claims brought by the Association in proceedings instituted against it or (e) actions brought by the Association against any contractor, vendor, or supplier of goods or services to the Project. This Section shall not be amended unless such amendment is approved by the percentage of votes, and pursuant to the same procedures, necessary to institute proceedings as provided above.

Section 6.    Severability of Provisions.  If any paragraph, section, sentence, clause or phrase of this Declaration shall be or become illegal, null or void for any reason or shall be held by any court of competent jurisdiction to be illegal, null or void, the remaining paragraphs, sections, sentences, clauses or phrases of this Declaration shall continue in full force and effect and shall not be affected thereby. It is hereby declared that the remaining paragraphs, sections, sentences, clauses and phrases would have been and are imposed irrespective of the fact that any one or more other paragraphs, sections, sentences, clauses or phrases shall become or be illegal, null or void.

Section 7.    Notice.  Except as otherwise set forth herein expressly, whenever written notice to an Owner or Association Member (including Declarant) is required hereunder, such notice shall be given by the mailing of same, postage prepaid, to the address of such Owner or Association Member appearing on the records of Declarant or the Association. If notice is given in such manner, such notice shall be conclusively deemed to have been given by placing same in the United States mail properly addressed, with postage prepaid, whether received by the addressee or not. Declarant's address as of the date of recording of this Declaration is 6067 Hemby Road, Weddington, North Carolina 28104.

Section 8.    Titles.  The titles, headings and captions which have been used throughout this Declaration are for convenience only and are not to be used in construing this Declaration or any part thereof.

Section 9.    No Exemption.  No Owner or other party may exempt himself from the coverage hereof or obligations imposed hereby by non-use of such Owner's Lot(s) or other property located within the Project or the Common Area.

Section 10.    Changes to Plans for the Project.  Nothing contained herein shall be deemed to incorporate, by reference or otherwise, any plans or proposals promulgated by Declarant with respect to the development of the Project, and Declarant, subject to the covenants, conditions and restrictions contained in this Declaration, reserves the right to change any plans for the Project at any time and from time to time as Declarant may determine to be necessary based upon Declarant's continuing research and design program and/or market conditions, and any plans for the Project shall not bind Declarant or its successors and assigns to adhere to such plans in the development of the Property or any part thereof. In addition, Declarant reserves the right to change, from time to time, the uses and densities that exist on any portion(s) of the Property owned by Declarant, subject to the covenants, conditions and restrictions contained in this Declaration.

[remainder of page intentionally blank]

37

IN WITNESS WHEREOF, Declarant has caused this Declaration to be executed as of the day and year first above written.

TOLL NC I LLC,
a North Carolina limited liability company

By:_____
Name:_____
Title:_____

MECKLENBURG County, State of NORTH CAROLINA

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she voluntarily signed the foregoing document for the purpose stated therein and in the capacity indicated:

ANDREW J. SEMON
_____
Name of principal(s)

Date: APRIL 11, 2014

_____
Official Signature of Notary Public

CRISTY DYSON LUTZ, Notary Public
Notary printed or typed name

[OFFICIAL SEAL]

CRISTY DYSON LUTZ
NOTARY
◆ ◆ ◆
PUBLIC
MECKLENBURG COUNTY, NC

My commission expires: FEB. 12, 2017

CH-3170451 v7

<u>EXHIBIT "A"</u>

The "Property"

All of Lots 1 and 67-92, inclusive, and those areas designated as "COS - 1.402 ac" and "COS - 4.441 ac" on the plats recorded in Plat Cabinet M, pages 48 through 50, of The Preserve at Marvin Map 1, in the Office of the Register of Deeds for Union County, North Carolina.

AND

All of Lots 17-39, inclusive, and 53-59, inclusive, and the area designated as "COS - 15.923 acres" on the plats recorded in Plat Cabinet ____ at pages ____ through ____, of The Preserve at Marvin Map 2, in the Office of the Register of Deeds for Union County, North Carolina.

EXHIBIT "B"

**BYLAWS**

**OF**

**THE PRESERVE AT MARVIN COMMUNITY ASSOCIATION, INC.**

ARTICLE I

NAME AND LOCATION

Section 1. Name. The name of the corporation is The Preserve at Marvin Community Association, Inc. (the "Association").

Section 2. Location. The principal office of the Association shall be located in Union County, North Carolina. The registered office of the Association may be, but need not be, identical with the principal office.

ARTICLE II

DEFINITIONS

All capitalized terms when used in these By-Laws, or any amendment hereto (unless the context shall otherwise require or unless otherwise specified herein or therein) shall have the meanings set forth in that certain Declaration of Covenants, Conditions and Restrictions for The Preserve at Marvin executed by Toll NC I LLC, and duly recorded in the Office of the Register of Deeds for Union County, North Carolina (hereinafter referred to as the "Declaration").

ARTICLE III

MEETINGS OF ASSOCIATION MEMBERS

Section 1. Annual Meetings. The first annual meeting of the Association Members shall be held in the month of November first following the conveyance of first Lot to an Owner other than Declarant, and each subsequent regular annual meeting of the Association Members shall be held on the first Monday in November each year thereafter, at the hour of 7:00 o'clock, p.m., provided, however, the Board shall have the right, upon not less than ten (10) nor more than sixty (60) days' prior notice to the Association Members, to change the month, date and time of any annual meeting. If the day for the annual meeting of the Association Members is a legal holiday, the meeting will be held at the same hour on the first day following which is not a legal holiday.

Section 2. Special Meetings. Special meetings of the Association Members may be called at any time by (a) the President or by the Board or (b) by the holders of at least ten percent (10%) of all the votes entitled to be cast on any issue proposed to be considered at a proposed special meeting upon the delivery to the Association's Secretary of one or more signed and dated written demands describing the purpose or purposes for which it is to be held. Any such special meeting called by the Association Members in the manner described in (b) above shall be held within thirty (30) days after the delivery of such written demand by the holders of at least ten percent (10%) of the votes entitled to be cast at such meeting.

      Section 3.     Place of Meetings.  All meetings of the Association Members shall be held at such place, within Union County or Union County, North Carolina, as shall be determined by the Board.

      Section 4.     Notice of Meetings.  Written notice of each meeting of the Association Members shall be given by, or at the direction of, the Association's Secretary or other person authorized to call the meeting, by first class, registered or certified mail, not less than ten (10) days nor more than sixty (60) days before the date of such meeting to each Association Member entitled to vote thereat, addressed to the Association Member's address last appearing on the books of the Association, or supplied by such Association Member to the Association for the purpose of notice. Such notice shall specify the place, day and hour of the meeting, and, in the case of a special meeting, the purpose of the meeting.

      Section 5.     Membership in the Association.  Each and every Owner of a Lot shall automatically become and be an Association Member. In addition, for so long as Declarant owns any part of the Property, Declarant shall be an Association Member.

      Section 6.     Classes of Voting Right.  The Association shall have two (2) classes voting membership:

      Class I.  Class I Association Members shall be all Association Members with the exception of Declarant. Class I Association Members shall be entitled to one (1) vote for each Lot owned by such Association Member. When more than one Person owns an interest (other than a leasehold or security interest) in any Lot, all such Persons shall be Members and the voting rights appurtenant to said Lot shall be exercised as they, among themselves, determine, but in no event shall more than one (1) vote be cast with respect to any Lot. At any meeting of the Association Members, a representation by any one such owner that the owners of said Lot have agreed to a vote shall be conclusive unless another such owner contests such representation at such meeting prior to the casting of such vote.

      Class II.  The Class II Association Member shall be Declarant. The Class II Association Member shall be entitled to ten (10) votes for each Lot owned by Declarant.

      Section 7.     Quorum and Voting.  The presence at the meeting of Association Members entitled to cast, or of proxies entitled to cast, twenty percent (20%) of the votes entitled to be cast by all classes of the Association Members shall constitute a quorum for any action except as otherwise provided in the Articles, the Declaration, or these Bylaws; if, however, such quorum shall not be present or represented at any meeting, subsequent meetings may be called, subject to the same notice requirement, until the required quorum is present. No such subsequent meeting shall be held more than sixty (60) days following the preceding meeting.

      Section 8.     Proxies.  At all meetings of Association Members, each Association Member may vote in person or by proxy. All proxies shall be in writing and filed with the Association's Secretary. Every proxy shall be revocable.

      Section 9.     Action by Association Members.  During the Period of Declarant Control, the Board shall have the sole and exclusive authority to exercise all powers and rights of and to act in all instances on behalf of the Association, and the Members shall have no authority to exercise such powers or rights or to act by exercise of their votes, except as may be determined by the Board in its discretion, and except as provided with respect to the commencement of judicial or administrative proceedings as provided in Article XI, Section 5, of the Declaration, the levying of special assessments as provided in

2

Article V, Section 5 of the Declaration and those acts that the Act or other applicable laws provide may not be undertaken unilaterally by the Board, such as, to the extent required, ratification of the budget as provided in Article V, Sections 3 and 4 of the Declaration, amendment of this Declaration as provided in Article XI, Section 3 of the Declaration, borrowing of funds to pay operational costs of the Association as provided in Article VI, Section (e) of these Bylaws and conveyance by the Association of fee simple title to all or any part of the Common Elements as provided in Article VI, Section (u) of these Bylaws.

Except as may be otherwise specifically set forth in the Declaration, the Articles or these Bylaws, and after the Period of Declarant Control, the vote of a majority of all votes entitled to be cast by all classes of the Association Members, present or represented by legitimate proxy at a legally constituted meeting at which a quorum is present, shall be the act of the Association Members. Notwithstanding the above and except as otherwise expressly provided in the Declaration, no judicial or administrative proceeding (including without limitation any judicial or administrative proceeding against any Declarant) shall be commenced or prosecuted by the Association unless approved by a vote of no less than sixty-seven percent (67%) of all votes entitled to be cast by the Class I Association Members, which vote is taken at a duly held meeting of the Members at which a quorum is present, all in accordance with these Bylaws. The immediately preceding sentence shall not apply, however, to (a) actions brought by the Association to enforce the provisions of the Declaration, (b) the imposition and collection of assessments, charges or other fees hereunder, (c) proceedings involving challenges to ad valorem taxation, (d) counter-claims brought by the Association in proceedings instituted against it or (e) actions brought by the Association against any contractor, vendor, or supplier of goods or services to the Property.

Section 10.    Waiver of Notice.  Any Association Member may, at any time, waive notice of any meeting of the Association Members in writing and such waiver shall be deemed equivalent to the giving of such notice. Attendance by an Association Member at any meeting of the Association Members shall constitute a waiver of notice by him of the time and place thereof except where an Association Member attends a meeting for the express purpose of objecting to the transaction of any business because the meeting was not lawfully called. If all the Association Members are present at any meeting of the Association Members, no notice shall be required and any business may be transacted at such meeting.

Section 11.    Informal Action by Association Members.  Any action which may be taken at a meeting of the Association Members may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the Association Members who would be entitled to vote upon such action at a meeting and filed with the Secretary of the Association to be kept in the Association's minute book.

ARTICLE IV

BOARD OF DIRECTORS

Section 1.    Number and Appointment.  The business and affairs of the Association shall be managed by a Board of three (3) directors who are appointed by Declarant during the Period of Declarant Control, and by a Board of at least five (5) directors elected by the Members as provided by these Bylaws thereafter. The directors need not be Members. Notwithstanding anything contained herein to the contrary, the Declarant shall at all times be entitled to appoint and remove the members of the Board  and the officers of the Association during the Period of Declarant Control, which begins on the date that the Association is incorporated and ends at such time as Declarant no longer owns any portion of the Property or Additional Property, or at such earlier time as Declarant terminates such right by execution of a written instrument of termination; provided, however, if not sooner ending or terminated, the Period of Declarant

3

Control shall end on December 31, 2040. After the Period of Declarant Control, the Members shall, elect a Board of at least five (5) directors as provided by these Bylaws.

Section 2.    Initial Directors.    The initial directors shall be appointed by the Declarant. Such initial directors shall serve from the date upon which the Declaration is recorded in the Office of the Register of Deeds of Union County, North Carolina, until such time as their successors are duly appointed or elected and qualified.

Section 3.    Nomination.    Subject to Section 1 of this Article IV, nominations for the first election of directors on the Board shall be made from the floor at a meeting of the Association Members. After such first election of directors, nominations for election to the Board shall be made by a Nominating Committee. Subject to Section 1 of this Article IV, nominations may also be made from the floor at the annual meeting. Subject to Section 1 of this Article IV, the Nominating Committee shall consist of a Chairman, who shall be an Association Member or a member of the Board, and two (2) or more Association Members. The Nominating Committee shall be appointed by the Board prior to the annual meeting following the first election of directors and each annual meeting of the Association Members thereafter, to serve from the close of such annual meeting until the close of the next annual meeting and such appointment shall be announced at each such annual meeting. The Nominating Committee shall make as many nominations for election to the Board as it shall in its discretion determine, but not less than the number of vacancies that are to be filled.

Section 4.    Election.    Except as otherwise provided in this Article, including Section 1 hereof, directors shall be elected at the annual meeting of the Association Members and said election shall be by written ballot. At such election, the Association Members or their proxies may cast, in respect to each vacancy, as many votes as they are entitled to exercise under the provisions of the Articles, these Bylaws and the Declaration. Cumulative voting is not permitted.

Section 5.    Term of Office.    Each director shall hold office for the term for which he was appointed or elected, or until his death, resignation, retirement, removal, disqualification or until his successor is appointed or elected and qualified. Subject to Section 1 of this Article IV, at the first election of directors, the Association Members shall elect one (1) member of the Board for a term of three (3) years, who shall be the person receiving the largest number of votes, two (2) members of the Board for a term of two (2) years, who shall be the people receiving the second and third largest number of votes, and two (2) members of the Board for a term of one (1) year, who shall be the people receiving the fourth and fifth largest number of votes. At all annual elections thereafter but subject to Section 1 of this Article IV, director(s) shall be elected by the Association Members to succeed the director(s) whose term(s) then expire(s), and thereafter each director's term shall be three (3) years. Nothing herein contained shall be construed to prevent the election of a director to succeed himself. Votes shall be tallied at the meeting where they are so cast and, in the event of a tie vote, a run-off election shall be conducted at the same meeting.

Section 6.    Removal.    Subject to Section 1 of this Article IV, any newly elected director may be removed from the Board, with or without cause, by a majority vote of the Association Members. In the event of the death, resignation or removal of a director, his successor shall be selected by the remaining members of the Board and shall serve for the unexpired term of his predecessor. The Association Members may elect a director at any time to fill any vacancy not filled by the directors or, if applicable, not appointed by the Declarant.

4

Section 7.     Compensation.  No director shall receive compensation for any service he or she may render to the Association; however, any director may be reimbursed for his or her actual expenses incurred in the performance of his or her duties.

ARTICLE V

MEETINGS OF DIRECTORS

Section 1.     Regular Meetings.  Meetings of the Board shall be held on a regular basis as often as the Board sees fit on such days and at such place and hour as may be fixed from time to time by resolution of the Board.  Should said meeting fall upon a legal holiday, then that meeting shall be held at the same time on the next day which is not a legal holiday.

Section 2.     Special Meetings.  Special meetings of the Board shall be held when called by the President of the Association, or by any two directors, after not less than three (3) days notice to each director.

Section 3.     Quorum.  A majority of the number of directors shall constitute a quorum for the transaction of business.  Every act or decision done or made by a majority of the directors present at a duly held meeting at which a quorum is present shall be regarded as the act of the Board.

Section 4.     Informal Action by Directors.  Action taken by a majority of the directors without a meeting is nevertheless Board action if written consent to such action is signed by all of the directors and filed with the minutes of the proceedings of the Board, whether done before or after the action so taken.

Section 5.     Chairman.  A Chairman of the Board shall be elected by the directors and shall preside over all Board meetings until the President of the Association is elected.  Thereafter, the President shall serve as Chairman.  In the event there is a vacancy in the office of the Presidency, a Chairman shall be elected by the Board and serve until a new President is elected.

Section 6.     Participation by Conference Telephone.  Any one or more directors may participate in a meeting of the Board by means of a conference telephone or similar communications device that allows all directors participating in the meeting to simultaneously hear each other during the meeting, and such participation in a meeting shall be deemed presence in person at such meeting.

ARTICLE VI

POWERS OF THE BOARD

The Board, for the mutual benefit of the Association Members and the Owners, shall have the following specific powers and rights (without limitation of other powers and rights the Board may have):

(a)     To enter into or assume agreements with the appropriate governmental authorities to enable the Association to improve and maintain the Common Areas and Maintenance Areas or portions thereof;

(b)     To make reasonable rules and regulations for the use and operation of the Common Areas and Maintenance Areas, and to amend them from time to time;

5

(c)     To enter into or assume agreements or contracts with insurance companies with respect to insurance coverage relating to the Common Areas and Maintenance Areas and/or the Association;

(d)     To enter into or assume agreements or contracts with utility companies with respect to utility installation, consumption and service matters relating to the Common Areas, Maintenance Areas and/or the Association;

(e)     To enter into or assume contracts, maintain one or more bank accounts, and, generally, to have all the powers necessary or incidental to the operation and management of the Association;

(f)     To the extent permitted in the Declaration and these Bylaws, to sue or defend in any court of law in behalf of the Association;

(g)     To levy assessments in accordance with the provisions of the Declaration;

(h)     To borrow and repay funds in accordance with the provisions of the Act, including without limitation the Assessment Loan in favor of Declarant as described in Article V, Section 8, of the Declaration, which borrowings may be secured by assignment or pledge of rights against delinquent Owners or by liens on other Association assets, if the Board sees fit; provided; however, until such time as Declarant no longer owns any portion of the Property, the Board may not mortgage any portion of the Common Area without the prior written approval of Declarant, and provided further that any mortgaging of the Common Area shall comply with the Act;

(i)     To adjust the amount, collect and use any insurance proceeds to repair damage or replace lost property of the Association and if proceeds are insufficient to repair damage or replace lost property, to assess the Owners in proportionate amounts to cover the deficiency;

(j)     To exercise for the Association all powers, duties and authority vested in or delegated by the Declaration, these Bylaws, or the Articles to the Association and not reserved to the Association Members or Declarant by other provisions of the Declaration, these Bylaws or the Articles;

(k)     To declare the office of a member of the Board to be vacant in the event such member shall be absent, without the consent of the Board, from three (3) consecutive regular meetings of the Board;

(l)     To employ a manager or firm to manage the affairs and property of the Association, to employ independent contractors or such other employees as the Board may deem necessary, and to prescribe their duties and to set their compensation;

(m)     To enter into or assume agreements or contracts with builders regarding the construction of Improvements on Lots located in the Project,

(n)     To retain the services of legal and accounting firms;

(o)     To cause all officers or employees having fiscal responsibilities to be bonded, as the Board may deem appropriate;

(p)     To the extent permitted in the Declaration and these Bylaws, to enforce the provisions of the Declaration and any Supplementary Declaration and any rules made thereunder or hereunder and to enjoin and/or, at its discretion, seek damages or other relief for violation of such provisions or rules

6

and/or by Special Individual Assessments against any Owner for violation of such provisions or rules pursuant to the provisions of the Declaration;

(q)     To contract with any third party or any Association Member (including, without limitation, Declarant) for performance, on behalf of the Association, of services which the Association is otherwise required to perform pursuant to the terms of the Declaration and these Bylaws, or to assume any such contract entered into by Declarant, upon such terms and conditions and for such consideration as the Board may deem proper, advisable and in the best interests of the Association;

(r)     To employ or retain the services of professional architects or other Persons to serve on or advise the Architectural Control Committee;

(s)     To grant all necessary easements and rights-of-way over and across the Common Areas when in its sole discretion it deems such an action to be necessary and appropriate, including, but not limited to, easements for the installation and maintenance of electrical, telephone, cablevision, water, sewerage and other utilities and drainage facilities; provided, however, until such time as Declarant no longer owns any portion of the Property, the Board may not grant such an easement or right-of-way without the prior written approval of Declarant;

(t)     To convey fee simple title to all or any part of the Common Area when in its sole discretion it deems such an action to be necessary and appropriate; provided, however, until such time as Declarant no longer owns any portion of the Property, the Board may not convey any portion of the Common Area without the prior written approval of Declarant, and furthermore any conveyance of the Common Area must comply with the Act;

(u)     To contract with any third party, including any other property owners association, for the sharing of costs of maintaining Maintenance Areas, or to assume any such contract entered into by Declarant;

(v)     To take any and all other actions, and to enter into any and all other agreements as may be necessary or proper for the fulfillment of its obligations under the Declaration or these Bylaws or for the operational protection of the Association; and

(w)     To adopt reasonable rules from time to time governing conduct of Owners and other Persons occupying or otherwise located on the Property.

Notwithstanding anything contained herein to the contrary, none of the above-described rights and powers of the Board shall be obligatory on the part of the Board, and the failure or refusal by the Board to implement any such rights and powers shall not constitute a breach or default by the Board of any duties or obligations arising hereunder or otherwise owing to the Association Members.

## ARTICLE VII

## OFFICERS AND THEIR DUTIES

Section 1.      Officers. The officers of the Association shall be a President, a Vice-President, a Secretary and a Treasurer, and such other officers as the Board may from time to time by resolution create.

7

Section 2.     Election of Officers.  The election of officers shall take place at the first meeting of the Board following each annual meeting of the Association Members.

Section 3.     Term.  Each officer of the Association shall be elected annually by the Board and each shall hold office for one (1) year or until his death, resignation, retirement, removal, disqualification, or his successor is elected and qualifies.

Section 4.     Special Appointments.  The Board may elect such other officers as the affairs of the Association may require, each of whom shall hold office for such period, have such authority and perform such duties as the Board may, from time to time, determine.

Section 5.     Resignation and Removal.  Any officer may be removed from office with or without cause by the Board.  Any officer may resign at any time by giving written notice to the Board, the President or the Secretary.  Such resignation shall take effect on the date of receipt of such notice or at any later time specified therein, and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 6.     Vacancies.  A vacancy in any office may be filled by appointment by the Board. The officer appointed to such vacancy shall serve for the remainder of the term of the officer he or she replaces.

Section 7.     Multiple Offices.  The offices of Secretary and Treasurer may be held by the same person.  No person shall simultaneously hold more than one of any of the other offices except in the case of special offices created pursuant to Section 4 of this Article.

Section 8.     Compensation.  No officer shall receive any compensation from the Association for acting as such.

Section 9.     Duties.  The duties of the officers, unless otherwise stated by a resolution of the Board, are as follows:

(a)     President:  The President shall be the principal executive officer of the Association, and subject to the control of the Board, shall supervise and control the management of the Association.  The President shall preside at all meetings of the Board; shall see that orders and resolutions of the Board are carried out; shall sign all leases, mortgages, deeds, promissory notes and other written instruments and may co-sign all checks;

(b)     Vice-President:  The Vice-President shall act in the place and stead of the President in the event of his absence, inability or refusal to act, and shall exercise and discharge such other duties as may be required of him by the Board;

(c)     Secretary:  The Secretary shall record the votes and keep the minutes of all meetings and proceedings of the Board and of the Association Members, shall keep the corporate seal of the Association and affix it on all papers requiring said seal, shall serve notice of meetings of the Board and of the Association Members, shall keep appropriate current records showing the members of the Association together with their addresses, and shall perform such other duties as required by the Board; and

8

(d)    <u>Treasurer</u>: The Treasurer shall receive and deposit in appropriate bank accounts all monies of the Association and shall disburse such funds as directed by resolution of the Board, shall sign all checks and promissory notes of the Association, shall keep proper books of account, and shall prepare an annual report to be presented to the membership at its regular annual meeting, and deliver a copy of each to the Association Members.

## ARTICLE VIII

## COMMITTEES

Subject to <u>Section 1</u> of <u>Article IV</u> of these Bylaws, the Board shall appoint a Nominating Committee as provided in <u>Section 3</u> of <u>Article IV</u> of these Bylaws. In addition, the Board shall appoint other committees as deemed appropriate in carrying out its purpose.

## ARTICLE IX

## BOOKS AND RECORDS

The books, records and papers of the Association shall at all times, during reasonable business hours, be subject to inspection by any Association Member. The Declaration, the Articles and the Bylaws shall be available for inspection by any Association Member at the principal office of the Association, where copies may be purchased at reasonable cost.

## ARTICLE X

## ASSESSMENTS

As described more particularly in, and subject in all respects to, the Declaration, each Member is obligated to pay to the Association, among other assessments, charges and amounts, Annual Assessments, Special Assessments, and Special Individual Assessments, all of which are secured by a continuing lien upon each Lot in the Property. Any Assessments which are not paid when due shall be delinquent. If an Assessment is delinquent, as more particularly described in the Declaration, the Assessment shall bear interest from the due date until the date such Assessment and interest thereon is paid at the rate of eighteen percent (18%) per annum or the highest rate permitted by law, whichever is less. The Association may bring an action at law or in equity against the Owner personally obligated to pay the same or foreclose the lien against the portions of the Property and improvements thereon owned by the defaulting Owner as of the Assessment due date. Additionally, the late charges, costs of collection and reasonable attorneys' fees related to any such action or foreclosure shall be added to the amount of such Assessment, all as more particularly described in the Declaration. No Owner may exempt himself or herself from liability for Assessments or waive or otherwise escape liability from the Assessments by non-use of the Common Areas or abandonment of his or her property.

## ARTICLE XI

## CORPORATE SEAL

The Association may have a seal. If the Association elects to have a seal, it shall be circular in form having within its circumference the name of the Corporation, the state of its incorporation, the year of its incorporation, and the word "SEAL."

9

## ARTICLE XII

## AMENDMENTS

Subject to the limitations hereinafter contained, the Articles and these Bylaws may be amended or modified at any time by a vote of no less than fifty-one percent (51%) of all votes entitled to be cast by the Association Members, which vote is taken at a duly held meeting of the Association Members at which a quorum is present, all in accordance with these Bylaws. Provided, however, if fifty-one percent (51%) of all votes entitled to be cast by the Association Members cannot be obtained at such a meeting, then the Articles and these Bylaws may be amended by obtaining the vote of fifty-one percent (51%) of all votes present at a duly held meeting of the Association Members at which a quorum is present and by, within ninety (90) days of such vote, obtaining written consent to such amendment by Association Members holding a sufficient number of votes to comprise, along with such voting Association Members, a total of fifty-one percent (51%) of all votes entitled to be cast by Association Members. Further provided, that any amendment or modification to the Articles and these Bylaws must be consented to by Declarant so long as Declarant is the Owner of any Lot or other portion of the Property, which consent Declarant may grant or withhold in its sole discretion. In addition, Declarant, without obtaining the approval of any other Association Member or any other Owner or Owners other than Declarant, may make amendments or modifications to the Articles and these Bylaws which either (a) do not involve a change which materially adversely affects the rights, duties or obligations specified herein or therein or (b) apply only to the portions of the Property then owned by Declarant. Any amendment or modification effected pursuant to this Article XII shall become effective with respect to these Bylaws when an instrument is filed of record in the Office of the Register of Deeds for Union County, North Carolina; provided, however, such an amendment or modification, in lieu of being executed by the Association Members voting for such amendment or modification, may contain a certification of the Secretary of the Association stating that the amendment or modification has been voted on and approved by the requisite number of votes of the Association Members, as provided in this Article XII and when, with respect to the Articles, any amendment or modification is filed of record in the Office of the North Carolina Secretary of State. In addition to the foregoing rights, Declarant may, at Declarant's option, amend and modify the Articles and these Bylaws without obtaining the consent or approval of any other person or entity if such amendment or modification is necessary to cause the Articles and these Bylaws to comply with the requirements of FHA, VA, the Federal National Mortgage Association or any other governmental agency.

## ARTICLE XIII

## MISCELLANEOUS

Section 1.     The fiscal year of the Association shall begin on the first day of January and end on the 31st day of December of every year, except that the first fiscal year shall begin on the date of incorporation.

Section 2.     In the case of any conflict between the Articles and the Bylaws, the Articles shall control; and in the case of any conflict between the Declaration and the Bylaws or the Articles, the Declaration shall control.

10

## ARTICLE XIV

### LIABILITY LIMITS; INDEMNIFICATION OF
### DIRECTORS, OFFICERS AND OTHERS

Neither Declarant, nor any Association Member, nor the Board, nor the Association, nor any officers, directors, agents or employees of any of them shall be personally liable for debts contracted for or otherwise incurred by the Association or for a tort of another Association Member, whether or not such other Association Member was acting on behalf of the Association or otherwise. Neither Declarant, nor the Association, nor their directors, officers, agents or employees shall be liable for any incidental or consequential damages for failure to inspect any premises, improvements or portions thereof or for failure to repair or maintain the same. Declarant, the Association or any other person, firm or association making such repairs or maintenance shall not be liable for any personal injury or other incidental or consequential damages occasioned by any act or omission in the repair or maintenance of any premises, improvements or portions thereof.

The Association shall, to the extent permitted by applicable law, indemnify and defend all members of the Board from and against any and all loss, cost, expense, damage, liability, claim, action or cause of action arising from or relating to the performance by the Board of its duties and obligations, except for any such loss, cost, expense, damage, liability, claim, action or cause of action resulting from the gross negligence or willful misconduct of the person(s) to be indemnified.

The Association shall indemnify any director or officer or former director or officer of the Association or any person who may have served at the request of the Association as a director or officer of another corporation, whether for profit or not for profit, against expenses (including attorneys' fees) or liabilities actually and reasonably incurred by him or her in connection with the defense of or as a consequence of any threatened, pending or completed action, suit or proceeding (whether civil or criminal) in which he or she is made a party or was (or is threatened to be made) a party by reason of being or having been such director or officer, except in relation to matters as to which he or she shall be adjudged in such action, suit or proceeding to be liable for gross negligence or willful misconduct in the performance of a duty.

The indemnification provided herein shall not be deemed exclusive of any other rights to which those indemnified may be entitled under any statute, these Bylaws, agreement, vote of Association Members or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

The Association may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Association, or is or was serving at the request of the Association as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him or her and incurred by him or her in such capacity, or arising out of his or her status as such, whether or not the Association would have the power to indemnify him or her against such liability.

The Association's indemnity of any person who is or was a director, officer, employee or agent of the Association, or is or was serving at the request of the Association, as a director, officer, employee or agent of the Association, or is or was serving at the request of the Association, as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall be

11

reduced by any amounts such person may collect as indemnification (i) under any policy of insurance purchased and maintained on his or her behalf by the Association or (ii) from such other corporation, partnership, joint venture, trust or other enterprise.

Nothing contained in this Article XIV, or elsewhere in these Bylaws, shall operate to indemnify any director or officer if such indemnification is for any reason contrary to any applicable state or federal law.

12

# EXHIBIT C



7:44

**Marvin Messenger**
11h · 

To all Village of Marvin taxpayers: We would like to inform you about an individual attempting to use litigation to extort money from the town or to pressure the local government into meeting personal demands. This individual's actions would misuse taxpayer dollars on baseless claims, setting an unfortunate precedent. The Village of Marvin does not have $3 million to meet this demand—this would have to come from residents, amounting to approximately $500 per person in our community of 6,000. Do you want your tax dollars supporting this kind of conduct? This person seeks to influence Marvin's decisions for personal gain, from targeting elected officials to pushing personal neighborhood concerns, without credible evidence of harm or wrongdoing.



Like      Comment      Send

Write a comment...